LOCKRIDGE GRINDAL NAUEN P.L.L.P.
REBECCA A. PETERSON (241858)
rapeterson@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

[Additional Counsel on Signature Page]

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| **JENNIFER REITMAN, ERIN GRANT,** and **CAROL SHOAFF,** individually and on behalf of a class of similarly situated individuals,<br><br>   **PLAINTIFFS,**<br><br>V.<br><br>**CHAMPION PETFOODS USA, INC.** and **CHAMPION PETFOODS LP**,<br><br>   **DEFENDANTS.**<br>_____ | Case No.  2:18-cv-01736-DOC-JPR<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge: Hon. David O. Carter<br>Ctrm: 9th Floor, 9D<br>Hearing Date:  November 4, 2019<br>Hearing Time: 8:30 a.m. |

PLEASE TAKE NOTICE that on November 4, 2019 at 8:30 a.m. or as soon thereafter as the matter may be heard by the Honorable David O. Carter in Courtroom 9D of the above-entitled Court, located at 411 West Fourth Street, Santa Ana, California 92701, Plaintiffs Jennifer Reitman, Carol Shoaff, and Erin Grant, by their undersigned attorneys, on behalf of themselves and all others similarly situated, will and hereby move the Court to enter an order certifying the following Class pursuant to Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3)::

> *Class:* All persons residing in of the State of California who purchased the Dog Food from July 1, 2014 to the present.

Plaintiffs also request that the following subclass be certified pursuant to Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3):

> *Pentobarbital Subclass:* All persons residing in the State of California who purchased JBS Dog Foods between January 2016 and December 2018.

In the alternative, Plaintiffs request that the Class be certified with respect to the following issues, pursuant to Rule 23(c)(4):

a) Are the "Biologically Appropriate," "Fresh Regional Ingredients," and "Never Outsourced." ("BAFRINO") and/or Natural representations misleading?

b) Are the BAFRINO and/or Natural representations material?

c) Did Champion Petfoods USA, Inc. and Champion Petfoods LP. ("CPF") know the BAFRINO and/or Natural representations were false?

d) Did CPF conceal that the Dog Food contained heavy metals and/or BPA, were at risk of containing pentobarbital, and/or that any of the BAFRINO or Natural representations were false?

e)  Would a buyer be expected to rely on the following information in deciding whether to purchase the Dog Food:

    i.  The existence of heavy metals and/or the risk of inclusion of BPA and/or pentobarbital;

    ii.  CPF's use of expired, frozen, and reground ingredients;

    iii.  CPF's sourcing of ingredients both internationally and outside the geographic region of its kitchens; and

    iv.  CPF's failure to adequately audit and/or inspect its suppliers.

f)  Are the BAFRINO and Natural misrepresentations, and/or CPF's concealment of the risk of heavy metals, BPA, and/or pentobarbital, likely to deceive a reasonable consumer?

g)  Were CPF's misrepresentations regarding, and its, concealment of the use of expired, frozen, and reground ingredients likely to deceive a reasonable consumer?

h)  Were CPF's misrepresentations regarding, and its concealment of, the sourcing of ingredients both internationally and outside the geographic region of its kitchens likely to deceive a reasonable consumer?

i)  Were CPF's misrepresentations regarding the known risk of pentobarbital from using JBS to manufacture tallow and meal likely to deceive a reasonable consumer?

j)  Did CPF's misrepresentations have the capacity to deceive?

k)  Did CPF have a duty to disclose that the Dog Food has a risk of containing heavy metals, BPA, and pentobarbital and/or that the foods did not meet the BAFRINO or Natural promises?

l)  Did CPF breach the express warranties created by the BAFRINO or Natural promises?

m)  Does the Dog Food conform to the promises and affirmations of fact CPF made on the label?

n)   Is CPF liable for punitive damages based on its active concealment of the risk of heavy metals and/or inclusion or risk of pentobarbital in the Dog Food?

Plaintiffs further request that this Court appoint them as Class Representatives. Finally, Plaintiffs request that this Court appoint Lockridge Grindal Nauen P.L.L.P.; Gustafson Gluek, PLLC; Cuneo Gilbert & LaDuca LLP; Robbins Arroyo LLP; and Lite DePalma Greenberg, LLC as Co-Lead Class Counsel.

In support of this motion, Plaintiffs refer to the Memorandum of Points and Authorities and Declaration of Rebecca A. Peterson in support of this Motion, the exhibits, and the record in this matter, which demonstrate that the proposed classes meet the requirements of Rule 23.

# **TABLE OF CONTENTS**

I.      SUMMARY OF CASE ...................................................................1

II.     SUMMARY OF THE FACTS AND CLASS DEFINITIONS ......................2

    A.      CPF Knew the Labels Were False and Misleading.............................2

        1.      Fresh Regional Ingredients .........................................2

            a.      CPF Allowed Various Kinds of Non-Fresh Ingredients ..3

            b.      The Ingredients Are Not Regional with a Focus on Local3

            c.      Heavy Metals and Bisphenol A ("BPA") Are Not in Fresh Regional Ingredients.................................5

            d.      Fresh Ingredients Would Not Have a Risk of Pentobarbital ...................................6

        2.      Biologically Appropriate .........................................7

        3.      Never Outsourced ...................................................8

    B.      CPF's Knowledge and Duty of Disclosure to the Class ......................8

    C.      Common Evidence Will Be Used to Prove the Class Claims...............9

    D.      Plaintiffs Are Representative of the Class ...........................................10

    E.      Class Definitions .................................................................................11

III.    ARGUMENT...............................................................................11

    A.      Rule 23(a) Requirements......................................................................12

        1.      The Class Is Sufficiently Numerous That Joinder Is Impracticable.............................................................12

        2.      There Are Numerous Issues Common to the Class .................12

        3.      Plaintiffs' Claims Are Typical .................................14

        4.      Plaintiffs and Their Counsel Are Adequate.............................15

B.   Rule 23(b) Requirements ....................................................16

    1.   Common Issues Predominate Over Plaintiffs' Claims ............16

        a.   UCL, FAL, and CLRA Claims......................................17

        b.   Breach of Express Warranty Claim...............................20

        c.   Breach of Implied Warranty Claim ...............................22

        d.   Fraudulent and Negligent Misrepresentation Claims.....22

        e.   Fraud by Omission Claim...............................................24

    2.   A Class Action Is the Superior Method of Adjudication..........24

C.   Damages ................................................................................25

D.   Alternative Rule 23(c)(4) Limited Issues Class ..........................28

E.   Plaintiffs Meet the Rule 23(b)(2) Requirements ...........................29

IV.   CONCLUSION...........................................................................30

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*Allen v. Conagra Foods, Inc.*,
    3:13-CV-01279-WHO, 2019 WL 3302821 (N.D. Cal. July 22, 2019)...................18

*Allen v. Hyland's Inc.*,
    300 F.R.D. 643 (C.D. Cal. 2014)...........................................................................20

*Amador v. Baca*,
    No. 10-CV-1649-SVW, 2016 WL 8904537 (C.D. Cal. Nov. 18, 2016)...........28, 29

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
    568 U.S. 455 (2013)..............................................................................11, 12, 16, 20

*Arnott v. U.S. Citizenship & Immigration Servs.*,
    290 F.R.D. 579 (C.D. Cal. 2012)..........................................................................29

*Avilez v. Pinkerton Gov't Servs., Inc.*,
    596 F. App'x 579 (9th Cir. 2015) (unpublished) ..................................................28

*Basile v. Valeant Pharm. Int'l, Inc.*,
    CV-14-2004-DOC, 2017 WL 3641591 (C.D. Cal. Mar. 15, 2017) .......................17

*Beck-Ellman v. Kaz USA, Inc.*,
    283 F.R.D. 558 (S.D. Cal. 2012) ..........................................................................22

*Brickman v. Fitbit, Inc.*,
    No. 3:15-CV-02077-JD, 2017 WL 5569827 (N.D. Cal. Nov. 20, 2017)...............23

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ..............................................................................25

*Broomfield v. Craft Brew All., Inc.*,
    No. 17-CV-01027-BLF, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018).........*passim*

*Brown v. Hain Celestial Grp., Inc.*,
    C 11-03082 LB, 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014)................15, 17, 21

*Bruno v. Quten Research Inst., LLC*,
    280 F.R.D. 524 (C.D. Cal. 2011).........................................................12, 14, 17, 20

*Champion Petfoods USA, Inc. v. JBS USA Food Co.*,
    No. 18-CI-00371 (Ky. Commw. Ct.–Logan Cir. Ct.) ................................ 9

*Cole v. Asurion Corp.*,
    267 F.R.D. 322 (C.D. Cal. 2010) .............................................................. 24

*Collins v. eMachines, Inc.*,
    202 Cal. App. 4th 249, 134 Cal. Rptr. 3d 588 (2011), *as modified*
    (Dec. 28, 2011) ......................................................................................... 19

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .................................................................................... 25

*Daugherty v. Am. Honda Motor Co.*,
    144 Cal. App. 4th 824, 51 Cal. Rptr. 3d 118 (2006), *as modified* (Nov.
    8, 2006) ..................................................................................................... 19

*Diaz v. Albertson's LLC*,
    CV-1600257 DSF (JEMx), 2016 WL 8904415 (C.D. Cal. Dec. 20,
    2016) ......................................................................................................... 28

*Edwards v. Ford Motor Co.*,
    603 F. App'x 538 (9th Cir. 2015) (unpublished) ..................................... 19

*Engalla v. Permanente Med. Grp., Inc.*,
    15 Cal. 4th 951, 938 P.2d 903 (1997) ...................................................... 23

*Forcellati v. Hyland's, Inc.*,
    CV 12-1983-GHK, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ........... 17

*Frlekin v. Apple Inc.*,
    C13-03451 WHA, 2015 WL 6851424 (N.D. Cal. Nov. 7, 2015) ........... 28

*Guido v. L'Oreal, USA, Inc.*,
    284 F.R.D. 468 (C.D. Cal. 2012), *on reconsideration*, CV 11-1067
    CAS (JCx), 2012 WL 2458118 (C.D. Cal. June 25, 2012) ..................... 18

*Guido v. L'Oreal, USA, Inc.*,
    No. 2:11-cv-01067-CAS, 2014 WL 6603730 (C.D. Cal. July 24,
    2014) ......................................................................................................... 27

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...................................................... 14, 15, 16

*In re Activision Sec. Litig.*,
   621 F. Supp. 415 (N.D. Cal. 1985) ........................................................ 28

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ............................................... 20, 27

*In re HiEnergy Techs., Inc. Sec. Litig.*,
   No. 8:04-CV-01226 DOC, 2006 WL 2780058 (C.D. Cal. Sept. 26,
   2006) ..................................................................................................... 12

*In re Tobacco II Cases*,
   46 Cal. 4th 298, 207 P.3d 20 (2009) ........................................... 18, 19, 29

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods.*
   *Liab. Litig.*,
   No. MDL 10-2172-CJC, 2012 WL 4904412 (C.D. Cal. Sep. 20, 2012) ................ 27

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ...................................................... 15, 26

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ............................................................. 18

*Keegan v. Am. Honda Motor Co.*,
   284 F.R.D. 504 (C.D. Cal. 2012) .......................................................... 22

*Kwikset Corp. v. Superior Court*,
   51 Cal. 4th 310, 246 P.3d 877 (2011) .................................................. 20

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510, 513 (9th Cir. 2013) ....................................................... 27

*Lilly v. Jamba Juice Co.*,
   308 F.R.D. 231 (N.D. Cal. 2014) ............................................... 19, 21, 28

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) .............................................................. 15

*Martin v. Monsanto Co.*,
   No. 16-2168-JFW, 2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) ............ 15, 19, 21

*Mui Ho v. Toyota Motor Corp.*,
   931 F. Supp. 2d 987 (N.D. Cal. 2013) ................................................... 24

*Neal v. Naturalcare, Inc.*,
  CV-12-00531 DOC (OPx), 2012 WL 12548490 (C.D. Cal. Dec. 20,
  2012) ................................................................................................ 17

*Nguyen v. Nissan N. Am., Inc.*,
  ---F.3d---, No. 18-16344, 2019 WL 3368918 (9th Cir. July 26, 2019)................. 26

*Petersen v. Costco Wholesale Co.*,
  312 F.R.D. 565 (C.D. Cal. 2016)........................................................*passim*

*Philips v. Ford Motor Co.*,
  No. 14-CV-02989-LHK, 2016 WL 7428810 (N.D. Cal. Dec. 22,
  2016), *aff'd*, 726 F. App'x 608 (9th Cir.) ............................................... 27

*Ragland v. U.S. Bank Nat'l Ass'n*,
  209 Cal. App. 4th 182, 147 Cal. Rptr. 3d 41 (2012) ............................... 23

*Reitman v. Champion Petfoods USA, Inc.*,
  CV181736 DOC (JPRx), 2019 WL 1670718
  (C.D. Cal. Feb. 6, 2019) .................................................... 12, 19, 21, 22

*Schmitt v. Younique LLC*,
  No. 17-1397 JVS, 2019 WL 1431906 (C.D. Cal. Jan. 10, 2019)........................... 25

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012)........................................................*passim*

*TV Interactive Data Corp. v. Sony Corp.*,
  929 F. Supp. 2d 1006 (N.D. Cal. 2013).................................................... 27

*Valentino v. Carter–Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) ................................................................ 28

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)............................................................................. 12

*Weinstat v. Dentsply Int'l, Inc.*,
  180 Cal. App. 4th 1213, 103 Cal. Rptr. 3d 614 (2010) .......................... 20

*Wolin v. Jaguar Land Rover N.Am.*,
  617 F.3d 1168 (9th Cir. 2010) .............................................................. 24

- vi -

*Zakaria v. Gerber Prods. Co.*,
    CV 15-00200 JAK (Ex), 2016 WL 6662723 (C.D. Cal. Mar. 23, 2016) ............... 23

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) .................................................................. 24

**STATUTES, RULES & OTHER AUTHORITIES**

Cal. Bus. & Prof. Code
    §17200 ....................................................................................................... 18
    §17500 ....................................................................................................... 18

Cal. Civ. Code
    §1770(a) ..................................................................................................... 19
    §1791.1(a) .................................................................................................. 22

Cal. Com. Code
    §2313(1)(a) & (b) ...................................................................................... 20

Federal Rules of Civil Procedure
    Rule 23(a)(4) .............................................................................................. 15
    Rule 23(b)(3)(A) ........................................................................................ 24
    Rule 23(b)(3)(B) ........................................................................................ 25
    Rule 23(b)(3)(C) ........................................................................................ 25
    Rule 23(b)(3)(D) ........................................................................................ 25

7A Wright & Miller, *Federal Practice and Procedure: Civil* §1790 (3d ed) ................... 28

## I.    SUMMARY OF CASE

This case is about how a company, CPF, intentionally changed the packaging and labels on its Dog Food to attract consumers looking to purchase high quality pet food and willing to pay top market price for that food.[1] CPF's generic representations of quality evolved to robust marketing touting specific factual attributes through statements and pictures promising high quality food that provided top nutritional value and contained natural, fresh, and local ingredients:



CPF, however, was more concerned with growing its presence in the premium pet food market than ensuring that the labels were actually true. This focus on growth left CPF unable to meet the Dog Food's labels' representations and promises on quality and content. As discussed below, CPF was aware of its shortcomings, but never told the consumers and instead continued to charge ultra-premium prices while misleading

---

[1] "CPF" refers to Champion Petfoods USA, Inc. and Champion Petfoods LP. "Dog Food" is identified in Paragraphs 6 and 62 of the Third Amended Complaint ("TAC"). Unless otherwise noted, "¶" references are to the TAC and references to "Ex. __" are exhibits to the Declaration of Rebecca A. Peterson in support of this motion.

consumers into thinking they purchased dog food that was high quality, natural, fresh, provided top nutritional value, and made with regional (local) ingredients.

## II.     SUMMARY OF THE FACTS AND CLASS DEFINITIONS

The Dog Food is deceptively marketed to purchasers CPF calls "Pet Lovers," with the same mission and universal tag lines—"Biologically Appropriate," "Fresh Regional Ingredients," and "Never Outsourced" (collectively "BAFRINO"). *See, e.g.*, ¶62. Every bag markets the natural qualities of the Dog Food and states it is made using "trusted" suppliers. August 13, 2019 Report of Dr. Jon A. Krosnick at 39-42 (Ex. 1) ("Krosnick Report"). CPF intentionally targeted consumers who prioritized feeding their dogs food that offered the best nutritional value without risk of contaminants, toxins, or other low-quality ingredients. CPF explains that these consumers "[are] dedicated to their pet[s], love[] their pet[s] and would do just about anything to ensure the health and well-being of their pet[s]." CPF1165408 at p. 8 (Ex. 2). CPF chose the BAFRINO phrases to specifically target these consumers and distinguish the Dog Food from other brands. Further, CPF chose to evade providing detailed information about the quality and content of the Dog Food. CPF1291251 (Vice President of Sales and Marketing instructing to give a generic response so not to "document[] a deviation from [the] package.") (Ex. 3); CPF1273130 (CPF purposefully skewed heavy metal results to have a lower average) (Ex. 4); Wagner Dep. 98:6-20 (CPF never told consumers that dog food made with pentobarbital contaminated tallow was shipped to the retailers) (Ex. 5). In the end, CPF's misrepresentations and deception allowed them to sell the Dog Food at premium prices, much higher than other pet foods, and increase its sales. CPF1973651 at -69 (Ex. 6).

### A.     CPF Knew the Labels Were False and Misleading

#### 1.     Fresh Regional Ingredients

CPF knew that the Class (as defined herein) cared about and considered the promise of "Fresh Regional Ingredients" when purchasing the Dog Food. CPF1803444 (internal CPF e-mail noting "[m]ore pet lovers are looking beyond the ingredient panel to see where

their ingredients come from.") (Ex. 7); CPF0060142 (CPF developed a "standard response" to address the numerous heavy metal inquiries) (Ex. 8); CPF0190864 at pp. 36-37, 40, 42 (Ex. 9); CPF0221173 (Ex. 10). Plaintiffs Jennifer Reitman ("Plaintiff Reitman"), Erin Grant ("Plaintiff Grant"), and Carol Shoaff ("Plaintiff Shoaff") (collectively, "Plaintiffs") testified that the freshness of the Dog Food was important to their purchasing decisions. Reitman Dep. 144:14-145:14 (Ex. 11); Shoaff Dep. 81:1-4, 169:7-16 (Ex. 12); Grant Dep. 126:21-127:10 (Ex. 13).

### a.   CPF Allowed Various Kinds of Non-Fresh Ingredients

CPF chose to use ingredients that were not always fresh, but were instead stored ingredients that were frozen, expired, and reground dry dog food known as "regrinds." *See*, *e.g.*, CPF1770001 (approving use of expired fresh turkey meat) (Ex. 14); CPF2062755 (Ex. 15); CPF1762571 (CPF policy allowing nonconforming kibble to be reground for future use) (Ex. 16); CPF1826327 (CPF's use of frozen rabbit that it stored for 3-4 years) (Ex. 17); Milam Dep. 261:8-10 (confirming use of frozen rabbit) (Ex. 18); CPF1306725 (CPF is told that "fresh" can be used only if ingredients "are always fresh") (Ex. 19). The inclusion of these non-fresh ingredients was so common place that CPF had a "Regrind mountain" of old and rejected kibble, and had a common practice of using expired ingredients after a sensory test. CPF1739610 (Ex. 20) (describing "698 tonne" mountain of product "condemned to regrinds"); CPF1180627 (showing employees allowed use of expired ingredients after sensory evaluation) (Ex. 21). The use of expired or years-old ingredients, along with regrinds, directly contradicts CPF's labels and stated policy that "our fresh ingredients are ***never more than three weeks old from their date of production***." CPF2004325 (Ex. 22) (emphasis in original).

### b.   The Ingredients Are Not Regional with a Focus on Local

CPF sought to capitalize on consumers' desire for regional, local food:

- 3 -

> "...Based on feedback in the field and from our expert panels fresh regional ingredients (FRI) are our biggest opportunity....The ability to feature and tell this story is a great asset. More pet lovers are looking beyond the ingredient panel to see where their ingredients come from. Our ability to source transparently (named sourcing, 100 mile diet) and leverage our local smaller suppliers gives us the greatest advantage..."
>
> -Chris Milam, Champion Petfoods Director of Ingredient Innovation and Supplier Partnerships

(CPF 1803444 (Ex. 7).[2] However, CPF knew its "regional" labeling was false and contradicted the label claims that CPF "focus[es] on local ingredients":



Instead, CPF freely used ingredients sourced from outside the geographic region of its kitchens and internationally. *See*, *e.g.*, CPF0050936 at -44 to -45 (vitamins from China) (Ex. 23); CPF0244035 (turmeric from India) (Ex. 24); CPF1710466 (Spray Dried Mackerel from Morocco) (Ex. 25). CPF has recognized that it had to alter its own *internal* definition of Regional based on its true focus of market growth. CPF1973924 at -24 ("Originally, this term meant that we had a strong focus on sourcing ingredients from our

---

[2]Plaintiffs testified that sourcing of local, regional ingredients was important to their purchasing decisions concerning the Dog Food. Reitman Dep. 96:13-23, 99:18-100:8 (Ex. 11); Shoaff Dep. 81:1-4, 169:7-16 (Ex. 12); Grant Dep. 92:3-17, 126:21-127:10 (Ex. 13).

local region and our fresh regional ingredients were required to be from the local region due to the 'fresh' definition …. As we have grown, we have expanded our 'regional' definition to mean that we source our ingredients from a named region ….") (Ex. 26). Yet, CPF made no changes to the labels. Indeed, CPF's own recent admission that it "ha[s] recently considered changing [the 'regional'] definition … as we have outgrown our ability to source from our local region" shows CPF understands the term is false and misleading. *Id.*

### c.    Heavy Metals and Bisphenol A ("BPA") Are Not in Fresh Regional Ingredients

CPF also knew its products were not "Fresh" or "Regional" because they contained heavy metals and/or had the risk of containing BPA. CPF's own documents indicate that the "key" to "Fresh Regional Ingredients" would be to have "no … heavy metals" and to "eliminate … synthetics." CPF2088727 ("Fresh Regional Ingredients" is a "key differentiator" and means "[n]o … heavy metals" and "natural" ingredients) (Ex. 27); CPF0220192 (food should not contain synthetics or heavy metals) (Ex. 28). Thus, CPF knew or believed that "no … heavy metals" (or synthetics) was possible for its ultra-premium priced products. *Id.* Yet CPF failed to follow any regular testing schedule to ensure the Dog Food did not contain heavy metals and conform to the "Fresh Regional" claim. *See* CPF1295272 (2013 e-mail stating, "[T]here are a number of risks that we are completely blind to …. These include …heavy metals ….") (Ex. 29); CPF0172530 ("It looks like the testing schedule hasn't been followed too well, all of the fish diets are supposed to get heavy metals analysis as part of their extra testing.") (Ex. 30). And when CPF did test for heavy metals, it was clear that the Dog Food contained heavy metals. *See* CPF0191844 (CPF's White Paper) (Ex. 31). Likewise, CPF did not conduct **any** BPA testing to ensure conformance with its labels, simply relying on its packaging suppliers' representations that the packaging was BPA-free. Minnaar Dep. 35:14-16 (BPA test

- 5 -

results are not part of CPF's supplier audit) (Ex. 32); CPF2093092 (suppliers only confirmed that BPA was not intentionally added to the packaging) (Ex. 33).

### d.     Fresh Ingredients Would Not Have a Risk of Pentobarbital

Pentobarbital (a controlled barbiturate that is commonly used in euthanizing animals) is not allowed in pet food. ¶¶30-35. The FDA has said it is pet food manufacturers' responsibility to address the known risk of pentobarbital inclusion in pet food, including that it is safe and properly labeled. *Id.* CPF chose to ignore this duty when it engaged a Category 2 Rendering Facility (JBS USA Holdings, Inc. ("JBS")) as the supplier for its beef tallow and meal. ¶11; CPF1297218 (explaining a Category 2 facility accepts animals that died from means other than slaughter and also condemned carcasses) (Ex. 34). Specifically, CPF failed to: (1) have a written agreement with JBS; (2) test any product for pentobarbital delivered by JBS (3) require JBS to do any testing itself; and (4) properly audit JBS, a supplier of an ingredient CPF considered "high risk." ¶38 (CPF admits lack of written agreement was an oversight); Wagner Depo. 14:4-23:6 (CPF did not test for pentobarbital and lacked auditing and inspection of the slaughterhouse supplying the raw materials) (Ex. 5). CPF admits it only audits suppliers of "high risk" ingredients "that carry a risk of contaminating our finished product," and "[t]allow would be high risk." *Id.* at 18:11-19:5 (Ex. 5). But even when CPF audited JBS, it turned a blind eye by failing to pursue a corrective action in response to discovering that materials remained on the equipment from earlier production runs (creating a possibility of cross contamination). ¶¶11, 117; CPF2117191 (buildup of other products discovered on equipment) (Ex. 35); CPF2119942 (Director of Certification and Compliance admits he never received a corrective action response from JBS and "following up on [corrective action] after audits" is "a weak point" for him) (Ex. 36).

Had CPF properly audited or monitored JBS, it would have learned that JBS's business practices, such as allegedly picking up dead animal parts from Cornell Veterinary

School and accepting condemned animals and deadstock, created an on-going risk since 2016 for pentobarbital contamination. JBS0000791 (Ex. 37); JBS0000793 (Ex. 38); JBS0008378 (Ex. 39). The FDA's recent finding that JBS lacked proper manufacturing oversight and practices to ensure no euthanized animals or pentobarbital-contaminated materials entered JBS's plant further confirms the risk was always there. April 23, 2019 FDA Warning Letter (Ex. 40). Thus, CPF's use of a high-risk rendering facility and tallow and meal that contains or has a high risk of containing pentobarbital shows the Dog Food is not made with Fresh Regional Ingredients.[3]

### 2.    Biologically Appropriate

"Biologically Appropriate" is a nutritional statement made by CPF on all of the Dog Food's packaging speaking directly to its quality, *see* ¶62, touting that it is tied to freshness and a natural diet. CPF0001957 (package defining "biologically appropriate" as "NOURISH AS NATURE INTENDED—ORIJEN mirrors the richness, freshness and variety of WholePrey™ meats that dogs are evolved to eat.") (Ex. 41); CPF0001874 (package stating the same) (Ex. 42). Yet the Dog Food contained non-fresh ingredients (*e.g.* regrinds, frozen, and expired ingredients) and contaminants (heavy metals, BPA, and pentobarbital) that are not the fresh Biologically Appropriate diet promised by CPF. Likewise, the risk of contaminants in the Dog Food, such as BPA and pentobarbital, is unnatural and is not Biologically Appropriate. Brown-Tarry Dep. 82:7-11 (manager of Technical Product Design and Development testifying pentobarbital is not Biologically Appropriate) (Ex. 43).[4] And CPF does not disclose the risk of these contaminants on the labels. Muhlenfeld Dep. 191:17-192:9 (testifying consumers could not know that pentobarbital might be present based on packaging) (Ex. 44); Grant Dep. 150:1-6 (Ex. 13).

---

[3] Likewise, meal and tallow made at a rendering facility are not fresh ingredients.

[4] For the same reasons, the Dog Food is not natural and the statements of "Nourish as Nature Intended" and "Delivering Nutrients Naturally" is misleading. ¶¶67-68.

### 3.   Never Outsourced

CPF regularly outsources the manufacture of tallow and meal to rendering facilities such as JBS, which is known for using animals that do not satisfy CPF's specifications, including the use of animals that died from means other than slaughter. ¶¶11, 30-41; *see* Section II.A.1.D. CPF's outsourcing of its tallow and meal clearly contravenes the "Never Outsourced" promise, which it makes on all its labels.

### B.   CPF's Knowledge and Duty of Disclosure to the Class

The common evidence will show that CPF did not disclose the true quality of its Dog Food to Class members, even when they specifically asked. For instance, CPF never disclosed the results of its sporadic heavy metal testing. *See* CPF0066047 (instructing CPF employees not to share heavy metal test results with consumers) (Ex. 45); CPF0210007 (CPF decides to omit "details of sampling frequency, lot numbers, specific diets etc." in its White Paper) (Ex. 46); CPF0211931 (June 2017 e-mail chain stating CPF did not want to disclose its actual heavy metal testing schedule because it performs "less than 1 test per year per diet for one kitchen only so I don't think that would come across in a positive light.") (Ex. 47). CPF also intentionally misled Class members by including pictures of farmers in conjunction with terms like "local farms" run "by people we know and trust" to support the "Fresh Regional Ingredients" claim on its labels. ¶¶12, 62CPF never included a picture of large rendering facilities, like JBS, nor did CPF disclose that at least one of the "local" farmers pictured on its labels was actually part of Tyson Foods Inc. ("Tyson"), one of the world's largest food companies and meat processors. CPF1817671 (Ex. 48). In fact, CPF ***purposefully*** omitted any mention of Tyson because while CPF "typically mention[s] the name [of the farm]" it is "problematic" with respect to the Tyson-owned farms "since Tyson is a huge multinational conglomerate." *Id*. This pattern continued when it came to the risk of pentobarbital. ¶¶36-40, 96-97. CPF chose not to

- 8 -

recall any of its JBS Dog Food[5] or even warn Class members when it learned that JBS sold it pentobarbital-contaminated tallow that ultimately made its way into CPF's products and onto retail shelves. Wagner Dep. 98:6-20 (Ex. 5). Instead, CPF initiated a lawsuit seeking damages for the pentobarbital-contaminated tallow it purchased from JBS, sold to the public, and never recalled. Complaint, *Champion Petfoods USA, Inc. v. JBS USA Food Co.*, No. 18-CI-00371 (Ky. Commw. Ct.–Logan Cir. Ct.), filed Nov. 14, 2018 (Ex. 49). CPF's actions are consistently profit-driven.

Every picture and word on CPF's packaging was designed to induce the Class members to believe CPF's BAFRINO story. *See* ¶¶94-98. CPF made sure its image was protected by omitting "problematic" supplier names and lack of testing, concealing the risk of heavy metals and BPA, and avoiding "panic in the marketplace" by concealing that CPF in fact made and distributed kibble with pentobarbital-contaminated tallow. CPF1817671 (Ex. 48); CPF0060142 (Ex. 8); CPF0066047 (Ex. 45); Wagner Dep. 47:10-20, 98:6-20 (Ex. 5). These facts were exclusively within CPF's knowledge, and CPF knew it was material to consumers. CPF1803444 ("More pet lovers are looking beyond the ingredient panel to see where their ingredients come from.") (Ex. 7); CPF1826606 ("Champion's supply chain is an integral part of its brand promise") (Ex. 50.)

## C. Common Evidence Will Be Used to Prove the Class Claims

Common evidence will prove Plaintiffs' and the Class members' damages on a class-wide basis. Plaintiffs' expert, Dr. Krosnick, conducted a survey to determine whether CPF's misrepresentations are material to consumers and whether correcting those misrepresentations decreased the market value of the food. *See* April 8, 2019 Krosnick Report at 5, 29 (Ex. 1); Krosnick Dep. 12:6-24 (Ex. 51). This scientifically designed and

---

[5] "JBS Dog Food" refers to Acana Regionals Appalachian Ranch, Acana Heritage Red Meat, and Orijen Regional Red manufactured and sold between January 2016 and December 2018.

conducted survey of 6,728 U.S. adult consumers showed the respondents photos and text from the Dog Food. Krosnick Report at 41 (Ex. 1). The respondents were then randomly selected to view anywhere from zero to eight "corrective statements" regarding the misrepresentations CPF made about its Dog Food—i.e. the risk of heavy metals, the risk of BPA, that the ingredients may not be fresh, that the ingredients may not be regionally sourced, and that CPF uses third party manufacturers. *Id.* at 41-42. The results of this survey showed that the value of the Dog Food decreased with each additional piece of corrective information shown, demonstrating both that CPF's misrepresentations were material and showing a percentage decrease in value attributable to each common misrepresentation about the Dog Food. *Id.* at 29-31. This survey data can be used to determine class-wide damages. *See* Declaration of Colin B. Weir, ¶¶12, 38-39 ("Weir Report") (Ex. 52). Dr. Krosnick also conducted a separate survey of 859 adult consumers to determine whether the risk of the presence of pentobarbital in CPF's food was material to consumers. *See* August 13, 2019 Krosnick Report at 38-39 (Ex. 1). The results show the risk of the presence of pentobarbital is material to class members who purchased the JBS Dog Food (the Pentobarbital Subclass, defined below). *Id.*

### D.    Plaintiffs Are Representative of the Class

Plaintiff Reitman purchased the Dog Food from approximately January 2012 until July 2016. ¶55; Reitman Dep. 45:14-17, 54:12-16 (Ex. 11). Plaintiff Shoaff purchased the Dog Food from approximately 2013 until April 2018.  ¶56; Shoaff Dep. 37:19-24, 44:19-45:4 (Ex. 12). Plaintiff Grant purchased the Dog Food from approximately February 2011 until January 2019.  ¶57; Grant Dep. 14:7-11, 34:23-35:2 (Ex. 13). Like the putative Class, Plaintiffs relied on CPF's packaging, which bore the BAFRINO promises, when making their purchasing decisions. Reitman Dep. 144:3-146:10 (Ex. 11); Shoaff Dep. 162:23-165:16, 169:7-21 (Ex. 12); Grant Dep. 121:25-123:5, 127:2-10 (Ex. 13). Plaintiffs were unaware that the Dog Food had a risk of containing heavy metals, BPA, pentobarbital, and

non-regional and non-fresh ingredients and would not have purchased the Dog Food or JBS Dog Food had this information been disclosed. ¶¶55-58; Reitman Dep. 146:19-22 (Ex. 11); Shoaff Dep. 149:22-150:7 (Ex. 12); Grant Dep. 144:20-145:8 (Ex. 13). Plaintiffs have satisfied their duties as class representatives and understand their responsibilities as representatives of the Class they seek to represent. Reitman Dep. 134:6-25 (Ex. 11); Shoaff Dep. 158:19-159:1 (Ex. 12); Grant Dep. 78:24-79:8 (Ex. 13).

### E.   Class Definitions

Plaintiffs propose the following Class and Subclass (collectively the "Class"):

*Class:* All persons residing in the State of California who purchased the Dog Food from July 1, 2014 to the present.

*Pentobarbital Subclass:* All persons residing in the State of California who purchased JBS Dog Food between January 2016 and December 2018.

Excluded from the Class and Subclass are persons or entities who purchased the Contaminated Foods for business use or resale; governmental entities; CPF and its affiliates, subsidiaries, employees, current and former officers, directors, agents, and representatives; and members of this Court and its staff.

### III.   ARGUMENT

A class certification motion tests whether claims are amenable to class treatment. Plaintiffs are not required to prove they will win at trial but must instead show they have met each of the requirements of Rule 23(a) and at least one subsection of Rule 23(b).[6] The Court's class certification analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 465-66 (2013).[7] However, "Rule 23 grants courts no license to

---

[6] Unless otherwise noted, all references to "Rule __" are to the Federal Rules of Civil Procedure.

[7] Here, as throughout, all emphasis is deemed added and citations and footnotes are omitted unless otherwise noted.

engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*; *Petersen v. Costco Wholesale Co.*, 312 F.R.D. 565, 573-74 (C.D. Cal. 2016).

As this Court and others have found, consumer protection claims are well-suited for class certification, especially where they are premised on uniform misrepresentations. Accordingly, the Court should certify the Class per Rule 23(b)(2) and (b)(3).

### A.    Rule 23(a) Requirements

#### 1.    The Class Is Sufficiently Numerous That Joinder Is Impracticable

"A proposed class of at least forty members presumptively satisfies the numerosity requirement [of Rule 23(a)(1)]." *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 533 (C.D. Cal. 2011). Given CPF's total sales in California during the class period (approximately $350 million), numerosity cannot seriously be contested. Weir Report at 12, Table 2 (Ex. 52). Further, where "'general knowledge and common sense indicate [a class size] is large,'" numerosity is met. *In re HiEnergy Techs., Inc. Sec. Litig.*, No. 8:04-CV-01226 DOC (JTLx), 2006 WL 2780058, at *3 (C.D. Cal. Sept. 26, 2006).

#### 2.    There Are Numerous Issues Common to the Class

"Commonality requires that class members share a common injury and this injury is 'capable of classwide resolution,' meaning that determination of the claims' 'truth or falsity will resolve an issue that is central to [the claims'] validity.'" *Bruno*, 280 F.R.D. at 535 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("*Dukes*")). As this Court has recognized, the commonality requirement is "relatively lenient." *Bruno*, 280 F.R.D. at 535-36. Indeed, commonality is met where "even a single common question" exists. *Dukes*, 564 U.S. at 349-50; *see also Petersen*, 312 F.R.D. at 575. This Court has also recognized that, by CPF's own admission, this case presents core common issues. *See Reitman v. Champion Petfoods USA, Inc.*, CV181736 DOC (JPRx), 2019 WL 1670718, at *2 (C.D. Cal. Feb. 6, 2019) ("According to Defendants, the 'tie that bonds'

all of Plaintiffs' causes of action together is the allegation that Champion's pet foods contain levels of heavy metals making them unsafe for consumption, such that various Champion advertising statements are misleading or that Champion had a duty to disclose the presence of heavy metals and BPA in its food.").

While that sufficiently satisfies commonality, this case presents numerous other common questions of law or fact, including:

o)      Are the BAFRINO and/or Natural representations misleading?

p)      Are the BAFRINO and/or Natural representations material?

q)      Did CPF know the BAFRINO and/or Natural representations were false?

r)      Did CPF conceal that the Dog Food contained heavy metals and/or BPA, were at risk of containing pentobarbital, and/or that any of the BAFRINO or Natural representations were false?

s)      Whether a buyer be expected to rely on the following information in deciding whether to purchase the Dog Food:

         i.      The existence of heavy metals and/or the risk of inclusion of BPA and/or pentobarbital;

         ii.     CPF's use of expired, frozen, and reground ingredients;

         iii.    CPF's sourcing of ingredients, both internationally and outside the geographic region of its kitchens; and

         iv.     CPF's failure to adequately audit and/or inspect its suppliers.

t)      Are the BAFRINO and Natural misrepresentations, and/or CPF's concealment of the risk of heavy metals, BPA, and/or pentobarbital, likely to deceive a reasonable consumer?

u)      Were CPF's misrepresentations regarding, and its concealment of, the use of expired, frozen, and reground ingredients likely to deceive a reasonable consumer?

v)   Were CPF's misrepresentations regarding, and its concealment of, the sourcing of ingredients both internationally and outside the geographic region of its kitchens likely to deceive a reasonable consumer?

w)   Were CPF's misrepresentations regarding the known risk of pentobarbital from using JBS to manufacture tallow and meal likely to deceive a reasonable consumer?

x)   Did CPF's misrepresentations have the capacity to deceive?

y)   Did CPF have a duty to disclose that the Dog Food has a risk of containing heavy metals, BPA, and pentobarbital and/or that the foods did not meet the BAFRINO or Natural promises?

z)   Did CPF breach the express warranties created by the BAFRINO or Natural promises?

aa)   Does the Dog Food conform to the promises and affirmations of fact CPF made on the label?

bb)   Is CPF liable for punitive damages based on its active concealment of the risk of heavy metals and/or inclusion or risk of pentobarbital in the Dog Food?

As these common issues demonstrate, Plaintiffs' claims rise and fall on the "'truth or falsity'" of CPF's promises—"namely, whether Defendants' products were marketed using misrepresentations and whether these misrepresentations were material," and the resolution of this, and other, issues, "'is central to the claims' validity." *Bruno*, 280 F.R.D. at 535 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). Accordingly, commonality is satisfied.

### 3.   Plaintiffs' Claims Are Typical

"'The purpose of the typicality requirement is to assure that the interests of the named representative aligns with the interests of the class.'" *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 475 (C.D. Cal. 2012). Here, the Court examines "'whether the class representatives and the rest of the putative class have similar injuries and conduct,'" *Peterson*, 312 F.R.D. at 577, but in false labeling cases the focus is on the defendant's

- 14 -

conduct and plaintiff's legal theory, *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 734 (9th Cir. 2007). "[I]t is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ("*Buono*"). Typicality is met when "Plaintiffs have [] alleged their injuries derive from the 'same course of conduct—namely, Defendants' manufacturing and sale of the [Dog Food]." *Peterson*, 312 F.R.D. at 577.

Here, Plaintiffs' claims and resulting injuries stem from CPF's identical BAFRINO and Natural representations and CPF's material omissions. Thus, their "individual experience[s] with the product[s] [are] irrelevant. *Martin v. Monsanto Co.*, No. 16-2168-JFW (SPx), 2017 WL 1115167, at *4 (C.D. Cal. Mar. 24, 2017). Plaintiffs and the Class members were all exposed to the same statements on CPF's packaging, and "they were all injured in the same manner." *Id*. Further, that "[d]ifferent plaintiffs may have found different label statements material, and, in deciding to buy a product, may have relied on something other than [the challenged statements]"…"does not make the named plaintiffs' claims atypical." *Brown v. Hain Celestial Grp., Inc.*, C 11-03082 LB, 2014 WL 6483216, at *12 (N.D. Cal. Nov. 18, 2014). Typicality is satisfied because Plaintiffs' claims and those of the proposed Classes arise from the same course of conduct by CPF. Additionally, Plaintiffs and the Class members can prove damages by a common methodology as a result of this conduct, and there is no need to prove damages on an individual basis. *See supra* Section III.C.

### 4.    Plaintiffs and Their Counsel Are Adequate

Rule 23(a)(4) requires Plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Representatives are adequate when: (1) there is no conflict of interest between the representatives, their counsel, and absent class members; and (2) the representatives and their counsel will "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020. Here, Plaintiffs' interests are aligned with those of the Class members because they have all

been harmed by the same common misconduct and seek the same relief. *See supra* Section IV.A.3.

Plaintiffs have all actively participated in this litigation, communicating regularly with counsel, producing documents, and sitting for day-long depositions. Peterson Decl., ¶55. Plaintiffs are aware of their duties as class representatives and are knowledgeable and informed about their claims and the relief they are requesting. *Id.* They have adequately represented the Class and will continue to do so. *Tait*, 289 F.R.D. at 477-78.

"[P]laintiffs' counsel must be qualified, experienced, and generally able to conduct the proposed litigation." *Id.* at 477. Putative class counsel are qualified lawyers experienced in the successful prosecution of class actions, and submit their firm resumes setting forth their experience and expertise in the management and leadership of class action litigation. *See* Firm Resumes (Ex. 53-57). These firms have already undertaken substantial work in this litigation and will continue to devote the resources necessary to see this case through to a successful outcome.

## B.     Rule 23(b) Requirements

### 1.     Common Issues Predominate Over Plaintiffs' Claims

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation … [and] focuses on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022. Although "the focus of Rule 23(b)(3) is on the predominance of common **questions**," it does not demand that Plaintiffs prove the common questions will be answered "in favor of the class." *Amgen*, 568 U.S. 459, 460, 466 (emphasis in original). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

"In determining whether common questions predominate, the Court identifies the substantive issues related to plaintiff's claims (both the causes of action and affirmative

defenses), and then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried." *Petersen*, 312 F.R.D. at 579; *see also Basile v. Valeant Pharm. Int'l, Inc.*, CV-14-2004-DOC (KES), 2017 WL 3641591, at *12 (C.D. Cal. Mar. 15, 2017). Here, each of Plaintiffs' claims centers on common issues that predominate over any individual issues.

### a. UCL, FAL, and CLRA Claims[8]

Courts generally consider the UCL, FAL, and CLRA together for the purposes of evaluating predominance. *See Bruno*, 280 F.R.D. at 534; *Forcellati v. Hyland's, Inc.*, CV 12-1983-GHK (MRWx), 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014) ("[f]or purposes of class certification, the UCL, FAL, and CLRA are materially indistinguishable"). That is because the core issues of materiality, reliance, and causation "make up the bulk and engine" of these claims, and "California's approach to proving" those issues "in consumer-deception cases makes [them] amenable to common proof." *Brown*, 2014 WL 6483216, at *15; *see also Tait*, 289 F.R.D. at 480 ("[C]laims under the UCL, FAL, and CLRA [are] ideal for class certification ...."); *Forcellati*, 2014 WL 1410264, at *9 (holding that "[e]ach statute allows Plaintiffs to establish the required elements of reliance, causation, and damages by proving that Defendants made what a reasonable person would consider a material misrepresentation"); *Neal v. Naturalcare, Inc.*, CV-12-00531 DOC (OPx), 2012 WL 12548490, at *8 (C.D. Cal. Dec. 20, 2012) (granting class treatment of UCL, FAL, and CLRA claims).

Plaintiffs' UCL, FAL, and CLRA claims "rely on the same objective test, that is, whether 'members of the public are likely to be deceived'" by the BAFRINO and Natural

---

[8] "UCL" refers to the California Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq.*; "FAL" refers to the California False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq.*, and "CLRA" refers to the California Consumer Legal Remedies Act, Cal. Civ. Code §§1750, *et seq.*

representations, and they are "ideal for class certification because they do not require the court to investigate 'class members individual interaction with the product.'" *Tait*, 289 F.R.D. at 480; *see also Allen v. Conagra Foods, Inc.*, 3:13-CV-01279-WHO, 2019 WL 3302821, at *16, *20 (N.D. Cal. July 22, 2019) (granting class treatment of UCL, CLRA, and FAL claims because they are premised on the reasonable consumer standard and recognizing they are routinely certified).

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 481 (C.D. Cal. 2012), *on reconsideration*, CV 11-1067 CAS (JCx), 2012 WL 2458118 (C.D. Cal. June 25, 2012) (citing Cal. Bus. & Prof. Code §17200). Each prong of the UCL is "a separate and distinct theory of liability." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).[9] Notably, the UCL purposefully "focus[es] on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312, 207 P.3d 20, 30 (2009). Accordingly, the class-action device has been recognized as an important mechanism of "achieving the remedial goals" of the UCL. *Id.* at 313, 207 P.3d at 30.

Similarly, the FAL prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500. UCL and FAL claims are routinely found to be amenable to class treatment because "[u]nder both the UCL and FAL, relief is available without individualized proof of deception, reliance, and injury."

---

[9] "A business practice is 'unfair' if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Guido*, 284 F.R.D. at 481. An "unlawful" practice is any practice forbidden by law, and false advertising, as alleged here, "can never be a lawful business practice." *Id.* "To succeed under the 'fraudulent' prong, plaintiffs 'need only show that members of the public are likely to be deceived' by the advertising or marketing campaign, which can be demonstrated by the effect the advertisement has on 'the reasonable consumer.'" *Id.*

- 18 -

*Martin*, 2017 WL 1115167, at *6 (citing *In re Tobacco II Cases*, 46 Cal. 4th at 320, 207 P.3d at 35). The CLRA is largely indistinguishable because it prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code §1770(a). Reliance is an element, but "an inference of common reliance arises if representations are material, and materiality is judged by an objective standard rather than any understandings specific to the individual consumer." *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 242 (N.D. Cal. 2014); *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 541 (9th Cir. 2015) (unpublished) ("[A] finding that the defendant has failed to disclose information that would have been material to a reasonable person who purchased the [] product gives rise to a rebuttable inference of reliance as to the class.").

CLRA, FAL, and UCL "fraudulent" claims premised upon omissions require a showing that "the omission [is] contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 835, 51 Cal. Rptr. 3d 118, 126 (2006), *as modified* (Nov. 8, 2006). A duty to disclose arises when a defendant (1) "has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff," (2) "actively conceals a material fact from the plaintiff," or (3) "makes partial representations that are misleading because some other material fact has not been disclosed." *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255, 134 Cal. Rptr. 3d 588, 593 (2011), *as modified* (Dec. 28, 2011).

At the heart of Plaintiffs' statutory claims is whether CPF made uniform misrepresentations on, and omissions from, its packaging. As the Court found, these representations "are disputable facts that may or may not be true." *Reitman*, 2019 WL 1670718, at *5. That determination, along with whether the misrepresentations and omissions are material or likely to deceive a reasonable consumer, permeate the statutory

claims and can be determined classwide.[10] "The central predominating question is whether [CPF's] marketing statements [are] 'materially misleading," and "this inquiry focuses on [CPF's] representations [and omissions] about the [Dog Food] and applies a single, objective 'reasonable consumer' standard—not … a subjective test that inquires into each class members' experience with the product." *Bruno*, 280 F.R.D. at 537. Once Plaintiffs prove these core common issues, they can prove the resultant injury across the class. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 329, 246 P.3d 877, 890 (2011) ("For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she ***paid more for*** than he or she otherwise might have been willing to pay if the product had been labeled accurately.") (emphasis in original). Predominance is therefore satisfied.

### b.   Breach of Express Warranty Claim

"To prevail on a breach of express warranty claim, the plaintiff must prove (1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227, 103 Cal. Rptr. 3d 614, 626 (2010) (citing Cal. Com. Code §2313(1)(a) & (b)). "[E]ach of the[se] elements is subject to common proof." *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 669 (C.D. Cal. 2014) (certifying class with respect to CLRA, UCL, FAL, and express warranty claims). "Proof of reliance on specific promises or representations is not required," but, as with the UCL, FAL, and CLRA, Plaintiffs must "demonstrate that the alleged misrepresentation would have been material to a reasonable consumer." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d

---

[10] Materiality is a common question to be "addressed at trial or in a ruling on a summary-judgment motion. The allegation should not be resolved in deciding whether to certify a proposed class." *Amgen*, 568 U.S. at 470.

919, 984-85 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and *aff'd*, 674 F. App'x 654 (9th Cir. 2017). Since all elements are subject to common proof, "[c]ourts have found that breach of express warranty claims are appropriate for class treatment where whether defendant misrepresented its product and whether such misrepresentation breached warranties are issues common to members of the putative class" and "plaintiffs can demonstrate that the alleged misrepresentation would have been material to a reasonable consumer." *Id.* at 985.

Those are precisely the circumstances here. The BAFRINO and Natural representations created express warranties common to the Class[11] and are material, and CPF breached these warranties. These issues predominate and will be proven through common evidence such as expert surveys and opinion, and documents and testimony proving the Dog Food (1) is at risk of containing pentobarbital because CPF outsourced the manufacture of its tallow and meal to JBS, a repeated supplier of pentobarbital-contaminated tallow, and (2) contains heavy metals, unnatural toxins like BPA, and ingredients that are stored, frozen, imported, expired, and reground. Predominance is met because no individual issues remain. *See Lilly*, 308 F.R.D. at 242 (predominance met because UCL and breach of express warranty claims "do not depend upon any issues specific to individual consumers"); *Brown*, 2014 WL 6483216, at *1 (certifying two Rule 23(b)(3) classes pursuing UCL, CLRA and breach of express warranties claims); *Martin*, 2017 WL 1115167, at *7-8 (predominance met for breach of express warranty (and CLRA, FAL, and UCL claims because "[w]hether … a statement constitutes an express warranty, whether that warranty was breached, and whether that statement was likely to deceive a reasonable consumer are issues subject to common and generalized proof").

---

[11] The Court has already determined that "Biologically Appropriate" and "Fresh Regional Ingredients" "are assertions of fact of which the seller has special knowledge and as alleged were relied on by customers" and while "[w]hether or not the statements are true is to be determined … they are not subjective." *Reitman*, 2019 WL 1670718, at *5.

- 21 -

### c.      Breach of Implied Warranty Claim

An implied warranty of merchantability guarantees that goods "(1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; [and] (4) Conform to the promises or affirmations of fact made on the container or label.'" Cal. Civ. Code §1791.1(a). Whether a product is fit for its ordinary purpose "focuses on the expectations for the performance of the product when used in the customary, usual[,] and reasonably foreseeable manners." *Tait*, 289 F.R.D. at 485. None of these elements raise any individual issues (and the Court has dispensed with the privity inquiry, *Reitman*, 2019 WL 1670718, at *6). CPF made uniform BAFRINO and Natural promises on its packaging. Whether the Dog Food is fit for its ordinary purpose relies on an objective standard and "the breach of implied warranty is therefore susceptible of common proof" and appropriate for class treatment. *Tait*, 289 F.R.D. at 485. Further, whether the Dog Food is adequately labeled and conforms to the labels' promises and affirmations of fact are quintessential common issues of fact that will be proven using the same common evidence. The breach of implied warranty claim is therefore well-suited for class treatment. *See Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 537 (C.D. Cal. 2012) (breach of implied warranty claim "susceptible to common proof"); *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 568 (S.D. Cal. 2012).

### d.      Fraudulent and Negligent Misrepresentation Claims

Fraudulent and negligent misrepresentation claims are also well-suited for class treatment because they focus on the falsity of CPF's statements, its knowledge of falsity as well as several elements required to prove the UCL, CLRA, and FAL claims (which are routinely certified). Fraudulent misrepresentation requires "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) the speaker's knowledge of falsity (scienter); (3) the intent to defraud or to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Broomfield v. Craft Brew All., Inc.*, No. 17-CV-01027-BLF,

- 22 -

2018 WL 4952519, at *12 (N.D. Cal. Sept. 25, 2018). Reasonable reliance requires, in part, a showing of materiality. *Id.* But "'a presumption, or at least an inference, of [actual] reliance arises wherever there is a showing that a misrepresentation was material.'" *Id.* (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977, 938 P.2d 903, 919 (1997) (alteration in original)). "The elements of negligent misrepresentation are '(1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.'" *Id.* at *13 (quoting *Ragland v. U.S. Bank Nat'l Ass'n*, 209 Cal. App. 4th 182, 196, 147 Cal. Rptr. 3d 41, 53 (2012)). With respect to reliance, where "material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class." *Zakaria v. Gerber Prods. Co.*, CV 15-00200 JAK (Ex), 2016 WL 6662723, at *13 (C.D. Cal. Mar. 23, 2016).

Both fraudulent and negligent representation have elements in common with UCL, FAL, and CLRA claims and both require an intent to induce or defraud. Demonstrating CPF's knowledge, Plaintiffs will prove CPF intended to deceive the Class with its false labels. Courts have found that, "[a]s with Plaintiffs' consumer law claims, resolution of each of these elements is common to the class." *Broomfield*, 2018 WL 4952519, at *13 (certifying class of purchasers of Kona beer pursuing UCL, FAL, CLRA, common law fraud, fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment claims); *see also Zakaria*, 2016 WL 6662723, at *14 (finding predominance met because "both [intentional and negligent] misrepresentation claims are subject to the same analysis that applied to the CLRA claim[:] whether Plaintiff can show that the alleged … [m]isrepresentation was 'material' is subject to common questions of proof, to which Defendant may respond with appropriate fact-based arguments"); *Brickman v. Fitbit, Inc.*, No. 3:15-CV-02077-JD, 2017 WL 5569827, at *6 (N.D. Cal. Nov. 20, 2017) (finding

materiality and reliance standards applied equally to consumer, common law fraud, and negligent misrepresentation claims); *Cole v. Asurion Corp.*, 267 F.R.D. 322, 330-31 (C.D. Cal. 2010) (finding common issues predominated UCL, FAL, common law fraud, and negligent misrepresentation claims).

For these reasons, and those stated above for the UCL, FAL, and CLRA claims, common issues predominate the fraudulent and negligent misrepresentation claims.

### e.    Fraud by Omission Claim

Similar to the fraudulent and negligent misrepresentation claims and Plaintiffs' omissions-based statutory claims, in order to prove fraud by omission under California law, "a plaintiff must show (1) the concealment or suppression of material fact, (2) a duty to disclose the fact to the plaintiff, (3) intentional concealment with intent to defraud, (4) justifiable reliance, and (5) resulting damages." *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013). While actual reliance is required, the issue alone is not sufficient to defeat predominance. *Broomfield*, 2018 WL 4952519, at *13. Accordingly, for the same reasons expressed above, predominance is met.

### 2.    A Class Action Is the Superior Method of Adjudication

"In determining superiority, courts must consider the four factors of Rule 23(b)(3)." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). The first factor requires the Court to analyze "the class members' interests in individually controlling the prosecution or defense of separate actions[.]" Fed. R. Civ. P. 23(b)(3)(A). "Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190. Given the small amount of individual damages and the cost of obtaining the type of evidence (including expert evidence) necessary to prove class members' claims, individual actions would result in negative value propositions, meaning that no reasonable consumer would bring such an action. Accordingly, this factor weighs in favor of class certification. *See Wolin v. Jaguar*

*Land Rover N.Am.*, 617 F.3d 1168, 1175 (9th Cir. 2010). The second factor requires a court to determine "the extent and nature of any litigation concerning the controversy already begun by or against class members[.]" Fed. R. Civ. P. 23(b)(3)(B). While there are other similar class actions currently pending against CPF, this is the first-filed case, none of the other cases involve California law, and with the exception of *Weaver v. Champion Petfoods USA, Inc.*, 2:18-CV-01996 (E.D. Wis. Dec. 18, 2018), all of the other cases are stayed or in initial stages.

The third factor examines "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). This factor also weighs in favor of class certification because Plaintiffs are citizens of this District and this is the only forum in which California claims are pending. Finally, the Court must consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D)). This case does not present any manageability concerns because it involves only California law and is premised upon uniform misrepresentations and omissions. However, should the Court find otherwise, it should not refuse to certify a class on the basis of manageability alone "given the variety of procedural tools courts can use to manage the administrative burdens of class litigation." *Briseno*, 844 F.3d at 1128. This factor weighs in favor of class certification.

## C.     Damages

Plaintiffs will present evidence supporting a price premium theory for the Class and a full-refund theory for the Pentobarbital Subclass. These damages models are consistent with Plaintiffs' liability theories and provide the common method this Circuit and *Comcast* require. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). At the class certification stage, "'Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability.'" *Schmitt v.*

*Younique LLC*, No. 17-1397 JVS (JDEx), 2019 WL 1431906, at *9 (C.D. Cal. Jan. 10, 2019) (quoting *Buono*, 847 F.3d at 1121)).

Plaintiffs' price-premium damages model measures "only those damages attributable" to Plaintiffs' theory of liability—CPF's failure to disclose the risk of heavy metals and BPA in its Dog Food and CPF's misrepresentations regarding the quality and sourcing of its ingredients—resulting in Plaintiffs and Class members paying a premium. *See id.* at *8; *Nguyen v. Nissan N. Am., Inc.*, ---F.3d---, No. 18-16344, 2019 WL 3368918, at *4 (9th Cir. July 26, 2019) ("Plaintiff's proposed benefit-of-the-bargain measure of damages is both cognizable under the CLRA and a reasonable basis of computation."). As set forth in the Krosnick Report, a common class-wide decrease in value of the Dog Food was determined using the scientifically conducted survey methodology. *See supra* Section II.C. This decrease in value can be used, and was used, by Plaintiffs' expert, to calculate the economic loss the Class suffered due to CPF's deceptive labeling. *See* Weir Report at 14, Table 3 (Ex. 52).

This model directly ties Plaintiffs' theory of liability to the damages sought. Each misrepresentation and omission (regarding heavy metals, BPA, and fresh, regional, and never outsourced ingredients) decreases the value of the Dog Food by 10.7%. *See* April 8, 2019 Krosnick Report at 30 (Ex. 1). Where multiple misrepresentations apply, the decrease in value depends on how many of the misrepresentations are applicable. *Id.* For example, where all eight misrepresentations apply (as is the case with nearly all Dog Food), the decrease in value is 59.6%. *Id.* That is, Dr. Krosnick's survey determined the decrease in value of the Dog Food attributable to each of the misrepresentations alleged by Plaintiff—including the presence of each heavy metal and BPA, whether the ingredients are fresh, whether the ingredients are regional, and CPF's use of third-party manufacturers. *See id.* at 29-30. Thus, the theory of liability (that the labels were deceptive) is directly tied to the theory of damages (that Class members paid a significant

premium for the Dog Food). And this decrease in value is common to each Class member and can be used to determine damages. *See* Weir Report, ¶¶21-23, 35-37 (Ex. 52). "Individual interpretation of the [m]isrepresentations is irrelevant to the determination of class-wide diminution in value damages." *Id.* at ¶45; *see also Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2016 WL 7428810, at *11 (N.D. Cal. Dec. 22, 2016) (whether damages may differ among class members is irrelevant because "the *calculation* of damages applying such a model 'is invariably an individual question and does not defeat class action treatment'" (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013))), *aff'd*, 726 F. App'x 608 (9th Cir.). Thus, "[i]f the market price for the Champion Pet Foods was higher as a result of the Misrepresentations, then ALL consumers will have paid a higher price than if the truth had been disclosed, regardless of their personal interpretations." Weir Report, ¶47 (Ex. 52).

Courts in this District, as well as across the country, have accepted class-wide damages models based on surveys. *See*, *e.g.*, *ConAgra*, 90 F. Supp. 3d at 1022-32 (holding that the proposed survey analysis was "sufficiently reliable to be used in calculating class-wide damages," and, therefore, satisfied *Comcast* as part of a hybrid damages methodology); *Guido v. L'Oreal, USA, Inc.*, No. 2:11-cv-01067-CAS, 2014 WL 6603730, at *5, *14 (C.D. Cal. July 24, 2014) (finding a survey methodology to be an admissible way to calculate class-wide damages); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1019-20 (N.D. Cal. 2013); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, No. MDL 10-2172-CJC (RNBx), 2012 WL 4904412, at *3-4 (C.D. Cal. Sep. 20, 2012).

The full-refund model is also well-supported and simple. CPF sold adulterated and misbranded Dog Food in violation of state and federal regulations. The Dog Food sold to the Pentobarbital Subclass should never have been placed on shelves or into the marketplace in the first place, and the Subclass is entitled to a full refund as a result. This

damages model is therefore also tied to Plaintiffs' theory of liability in accordance with *Comcast*. Both of Plaintiffs' damages models can be proven with common evidence and are consistent with their theories of liability, thus satisfying Rule 23(b)(3).

### D.    Alternative Rule 23(c)(4) Limited Issues Class

Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1229 n.3 (9th Cir. 1996). In fact, Rule 23(c)(4) has been recognized as a "management device" that "'imposes a duty on the court and gives it ample power to 'treat common things in common and to distinguish the distinguishable.'" *In re Activision Sec. Litig.*, 621 F. Supp. 415, 438 (N.D. Cal. 1985). In order to obtain Rule 23(c)(4) issue certification, Plaintiffs must meet the Rule 23(a) and (b) requirements, with the exception of predominance. *See Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579, 579–80 (9th Cir. 2015) (unpublished). "Courts have applied subdivision (c)(4)(A) to allow a partial class action to go forward, leaving questions of reliance, damages, and other issues to be adjudicated on an individual basis." 7A Wright & Miller, *Federal Practice and Procedure: Civil* §1790 (3d ed). Issue certification can be employed "even if only one common issue can be identified as appropriate for class treatment, that is enough to justify the application of the provision as long as the other Rule 23 requirements are met." *Id.*; *see also Diaz v. Albertson's LLC*, CV-1600257 DSF (JEMx), 2016 WL 8904415, at *6 (C.D. Cal. Dec. 20, 2016); *Frlekin v. Apple Inc.*, C13-03451 WHA, 2015 WL 6851424, at *2 (N.D. Cal. Nov. 7, 2015).

Accordingly, if the Court rejects Rule 23(b)(3) certification, it should grant issue certification as to liability for any or all claims. *See Amador v. Baca*, No. 10-CV-1649-SVW, 2016 WL 8904537, at *3 (C.D. Cal. Nov. 18, 2016) ("[T]he Ninth Circuit endorses 23(c)(4) liability classes."); *Petersen*, 312 F.R.D. at 584 (certifying liability-only class per Rule 23(c)(4)); *Lilly*, 308 F.R.D. at 244 (certifying Rule 23(c)(4) class "for purposes of

determining liability" because "the fact that a class may not be satisfied for purposes of seeking damages does not mean that it cannot be certified at all").

Alternatively, the Court should certify certain or all issues identified in Section III.A.2 because determining core issues on an individual basis—like whether CPF (1) made material misrepresentations and omissions, (2) was aware of the falsity of its representations and that it was making material omissions, (3) had a duty to disclose, and (4) omissions had the likelihood or capacity to deceive a reasonable consumer—"would burden the judiciary, which is contrary to the goals of efficiency and judicial economy advanced by Rule 23." *Tait*, 289 F.R.D. at 487. On the other hand, "the efficiency of a single liability determination" of these core common issues would further these goals. *Amador*, 2016 WL 8904537, at *6. The Court should certify pursuant to Rule 23(c)(4) all or any of the common questions in Section III.A.2, and/or liability-only classes.

### E. Plaintiffs Meet the Rule 23(b)(2) Requirements

Plaintiffs seek Rule 23(b)(2) certification to prohibit the future sale of adulterated and misbranded dog food. "Rule 23(b)(2) allows for the certification of a class when a single injunction or declaratory judgment would provide relief to each member of the class" and when "class members complain of a pattern or practice that is generally applicable to the class as a whole." *Arnott v. U.S. Citizenship & Immigration Servs.*, 290 F.R.D. 579, 588 (C.D. Cal. 2012). Rule 23(b)(2) certification is warranted because "Plaintiffs claim that [CPF] has a uniform policy and practice of misrepresenting on its packaging…" and "[e]njoining those alleged misrepresentations would provide relief to the class as a whole." *Broomfield*, 2018 WL 4952519, at *8. Further, "injunctive relief is the 'primary form of relief' available under the consumer protection laws." *Id.* (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 319, 207 P.3d at 34). "And in any event, 'whether the damages claims are incidental to the injunctive relief the plaintiffs seek is irrelevant,

- 29 -

because the plaintiffs are not seeking to recover damages for the proposed Rule 23(b)(2) class.'" *Id*. Accordingly, a Class should be certified pursuant to Rule 23(b)(2).

## IV.  CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for class certification pursuant to Rule 23(b) or 23(c)(4).

Dated: August 29, 2019

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

*/s/ Rebecca Peterson*
REBECCA A. PETERSON

ROBERT K. SHELQUIST
REBECCA A. PETERSON (241858)
KRISTA FREIER (*pro hac vice*)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
            rapeterson@locklaw.com
            kkfreier@locklaw.com

ROBBINS ARROYO LLP
KEVIN A. SEELY (199982)
STEVEN M. MCKANY (271405)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: kseely@robbinsarroyo.com
            smckany@robbinsarroyo.com

GUSTAFSON GLUEK, PLLC
DANIEL E. GUSTAFSON (*pro hac vice*)
KARLA M. GLUEK
RAINA C. BORRELLI (*pro hac vice*)
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
            kgluek@gustafsongluek.com
            rborrelli@gustafsongluek.com

CUNEO GILBERT & LADUCA, LLP
CHARLES LADUCA (*pro hac vice*)
KATHERINE VAN DYCK (*pro hac vice*)
BRENDAN S. THOMPSON (*pro hac vice*)
4725 Wisconsin Ave NW, Suite 200
Washington, DC 20016
Telephone: 202-789-3960
Facsimile: 202-789-1813
E-mail: kvandyck@cuneolaw.com
          charles@cuneolaw.com
          brendant@cuneolaw.com

LITE DEPALMA GREENBERG, LLC
JOSEPH DEPALMA (*pro hac vice*)
SUSANA CRUZ HODGE (*pro hac vice*)
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone:  (973) 623-3000
E-mail:   jdepalma@litedepalma.com
           scruzhodge@litedepalma.com

LITE DEPALMA GREENBERG, LLC
STEVEN J. GREENFOGEL (*pro hac vice*)
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Telephone: (267) 519-8306
Facsimile: (973) 623-0858
E-mail: sgreenfogel@litedeplama.com

ANDREWS DEVALERIO LLP
Daryl D. Andrews (*pro hac vice*)
265 Franklin Street, Suite 1702
Boston, MA 02110
Telephone: (617) 936-2796
E-mail: daryl@andrewsdevalerio.com

POMERANTZ LLP
Gustavo F. Bruckner (*pro hac vice*)
Samuel J. Adams (*pro hac vice*)
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
E-mail:  sjadams@pomlaw.com
             gfbruckner@pomlaw.com

STEPHENS & STEPHENS LLP
CONRAD B. STEPHENS
505 South McClelland Street
Santa Maria, CA 93454
Telephone:  (805) 922-1951
E-mail:  conrad@stephensfirm.com

**Attorneys for Plaintiffs**

1366955; 794505