Lorin M. Hitt, Ph.D. - 5/30/2019

Case 2:18-cv-01736-DOC-JPR Document 104-1 Filed 10/09/19 Page 1 of 53 Page ID
#:7442

Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                       -   -   -

 4    JENNIFER REITMAN and CAROL      :

 5    SHOAFF individually and on      :

 6    behalf of a class of            :

 7    similarly situated              :

 8    individuals,                    :

 9        Plaintiffs,                 : Civil Action No.

10            vs.                     : 2:18-CV-01736DOC(JPRX)

11    CHAMPION PETFOODS USA, INC.     :

12    and CHAMPION PETFOODS LP,       :

13        Defendants.                 :

14                       -   -   -

15        Videotaped deposition of LORIN M. HITT, PH.D.

16        Philadelphia, Pennsylvania

17        Thursday, May 30, 2019

18        8:57 a.m.

19
      BEFORE:
20

21    Gail L. Inghram Verbano:

22        Registered Diplomate Reporter,

23        Certified Realtime Reporter,

24        Certified Shorthand Reporter-CA (No. 8635)

25
```

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01786-RGC-JPR Document 104-1 Filed 10/09/19 Page 2 of 53 Page ID
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.
#:7443

1

2

3

4

5

6            Videotaped deposition of LORIN M. HITT

7     PH.D., held at the offices of GREENBERG TRAURIG,

8     LLP, 1717 Arch Street, Suite 400, Philadelphia,

9     Pennsylvania, on Thursday, May 30, 2019,

10    beginning at approximately 8:57 a.m., the

11    proceedings being recorded stenographically by

12    Gail Inghram Verbano, Registered Diplomate

13    Reporter, Certified Realtime Reporter,

14    Certified Shorthand Reporter-CA (No. 8635), and

15    transcribed under her direction.

16

17

18

19

20

21

22

23

24

25

Lorin M. Hitt, Ph.D. - 5/30/2019
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.
Case 2:18-cv-01736-ROC-JPR Document 104-1 Filed 10/09/19 Page 3 of 53 Page ID #:7444

```
 1        A P P E A R A N C E S

 2

 3   On behalf of Plaintiffs:

 4        RAINA C. BORRELLI, ESQ.

 5        rborrelli@gustafsonglueck.com

 6        GUSTAFSON GLUEK, PLLC

 7        120 South Sixth Street, No. 2600

 8        Minneapolis, Minnesota 55402

 9        612.333.8844

10

11   On behalf of Defendants:

12        JARED R. KESSLER, ESQ.

13        kesslerj@gtlaw.com

14        GREENBERG TRAURIG, LLP

15        333 Avenue of the Americas

16        Miami, Florida 33131-3238

17        305.579.0754

18

19   ALSO PRESENT:

20        SABRINA FRANZ, Legal Videographer

21

22

23

24

25
```

```
 1                    C O N T E N T S

 2    EXAMINATION OF:                           PAGE

 3    LORIN M. HITT, PH.D.

 4          By Ms. Borrelli                        6

 5

 6

 7                    E X H I B I T S

 8    EXHIBIT                              IDENTIFIED

 9    Exhibit 1    Rebuttal expert report of L. Hitt   21

10    Exhibit 2    Backup data to Footnote 161       187

11    Exhibit 3    Backup data to Footnote 166       191

12    Exhibit 4    Backup data to Footnote 167       193

13    Exhibit 5    Backup data to Footnote 170       195

14

15

16

17

18

19

20

21

22

23

24

25
```

Lorin M. Hitt, Ph.D.   -   5/30/2019
Case 2:18-cv-01736-RGC-JPR   Document 104-1   Filed 10/09/19   Page 5 of 53   Page ID
#:7446
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Philadelphia, Pennsylvania

Thursday, May 30, 2019; 8:57 a.m.

- - -

THE VIDEOGRAPHER:  This is the videographer speaking.  This is Sabrina Franz here on behalf of Depo International.

Today is May 30th of 2019, and the time is 8:57 a.m.  We're at Greenberg Traurig, PA, at 1717 Arch Street, Suite 400, Philadelphia, Pennsylvania, 19103, to take the video deposition of Lorin Hitt in the matter of Jennifer Reitman and Carol Shoaff, et al., versus Champion Petfoods USA, Incorporated, and Champion Petfoods, LP, et al.

Will counsel please introduce themselves for the video record.

MS. BORRELLI:  Raina Borrelli for Gustafson Gluek on behalf of the plaintiffs.

MR. KESSLER:  And Jared Kessler from Greenberg Traurig on behalf of the defendants.

THE VIDEOGRAPHER:  Will the court reporter please administer the oath.

- - -

LORIN M. HITT, PH.D.,

Page 5

after having been first duly sworn or affirmed to testify to the truth, was examined and testified as follows:

- - -

EXAMINATION

BY MS. BORRELLI:

Q.   Good morning.  Do you prefer I call you Dr. Hitt?  Professor Hitt?  Mr. Hitt?

A.   Professor or Dr. is customary.  It doesn't matter.

Q.   All right.  Okay.  So I understand you've had your deposition taken a number of times before; correct?

A.   That's correct.

Q.   Okay.  So I'm not going to go through all the basic rules.  I think you probably know them, but I will just remind you.  Let's try not to talk over each other.  Okay?

A.   Okay.

Q.   We have a court reporter here taking down everything that we say.  And if you need a break at any time today, please just let me know.  Happy to stop whenever.  Otherwise, I customarily stop every hour, hour and a half or so, if that works.

Page 6

A.   That's fine.

Q.   Dr. Hitt, do you consider yourself an expert in survey design?

A.   I use surveys in my own work.  And so to the extent I'm using them for my own work, I consider myself an expert in that methodology.  I wasn't brought in here specifically to critique a survey.  That was Dr. Hanssens' role in this particular case.

Q.   And you say you use surveys in your own work.  What is your own work?

A.   My own work is research on the economics of information and economics of information technology.

Q.   Can you describe a little more in layman's terms what that means.

A.   It's the study of the impact of information on consumers, organizations and markets and the role of technology in influencing that.

Q.   And in what way do you use surveys in that work?

A.   So I principally use surveys for factual data collection.  So do you or do you not do the following things in your

Page 7

organization?  That's a -- that's a pretty typical question.

Q.   So is it fair to say that you don't typically use surveys in your own work to determine the value of a particular attribute of a consumer product?

A.   In my own work, I have a preference for using archival data, actual prices, actual transactions.  So typically, no, I don't use surveys for those methods -- for those questions.

Q.   Do you consider yourself an expert in survey data analysis?

A.   Certainly I've done a fair amount of data analysis of survey data.  And I am an expert in econometrics, applied economics, of which data analysis is a portion of that.  I also teach data analytics.

Q.   So you say you've done data analysis of survey data.  I assume by that you mean in your own work?

A.   In my own academic work as well as in other litigation cases as well.

Q.   Has any of that been data analysis of survey data related to valuation of attributes

Page 8

Lorin M. Hitt, Ph.D.  -  5/30/2019

Case 2:18-cv-01736-ROC-JPR   Document 104-1   Filed 10/09/19   Page 6 of 53   Page ID
#:7447

Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

of consumer products?

A. Yes.

Q. What sort of methodologies have you used for that data analysis?

A. So those methodologies included, you know, analysis of just general survey tabulations, statistics on general survey data. It's involved evaluation of hedonic price methods. It's involved evaluation of conjoint surveys.

(Clarification by reporter.)

That word will probably come up again, conjoint surveys.

I think that's the ones I recall immediately. There may be others.

Q. What is the Lewbel-Watanabe method?

A. So as far as I can tell, it's a -- whether that's a conventional term for a method is unclear. But what it is describing -- I think this a -- Professor Krosnick is describing it as a method of using basically binary response data to certain kinds of surveys in order to make inferences about willingness to pay.

Q. I think you noted in your expert

Page 9

report in this case that you did find other -- you did find articles in the academic world where the so-called Lewbel-Watanabe method was used; correct?

A. I don't believe it was in my report. Professor Hanssens, I think, identified two papers that referenced it as the Lewbel-Watanabe method.

Q. Okay. Did you take a look at those papers that Dr. Hanssens cited?

A. Yes.

Q. Did you read them?

A. Yes. It's been a few weeks, but yes.

Q. Were both of those papers from reputable peer-reviewed academic journals?

A. I'd have to go back and look. They're not the top five, which is the ones I typically focus on. But I'd have to look.

I don't -- I don't really -- I don't recall which ones they're in, but I recall there were -- it wasn't in American Economic Review or Quarterly Journal of Economics or any of those sort of top-tier ones that I focus on.

Q. Could you perform the calculations under the Lewbel-Watanabe method?

Page 10

A. It's not something I would typically do, but yes. It's formulaic. You follow the econometric model and you can do the calculations.

Q. Can you perform the data analysis under the Lewbel-Watanabe method?

A. Yes. There's no -- I mean, it's -- it's pretty clearly laid out in the papers as to what you're supposed to do.

Q. How many surveys have you designed throughout your career?

A. I'd have to go back and count. Maybe somewhere between five and ten.

Q. Of those five to ten surveys that you've designed, how many have you implemented and, you know, collected data from?

A. All of them. I wouldn't be designing them. I mean, my doctoral dissertation involved survey work -- well, also, in terms of that number, there's multiple iterations of the same survey. So it might actually be a total number larger than five to ten, but five to ten research problems that had surveys associated with them.

Q. What types of surveys were those?

Page 11

A. So corporate surveys, so administered to informed respondents at large corporations to investigate -- yeah, typically to investigate business practices.

Q. That's all five to ten of them were that type of survey?

A. They're all of that form, one way or another.

Q. Were any of them related to the valuation of an attribute of a consumer product?

A. Not of consumer product.

Q. What is a treatment and control survey?

A. Well, that particular phrase is also an unusual construction, and I think it's -- I think Mr. Weir constructed that phrase.

What I understand it to mean is that you have two samples. You have a treatment group and a control group. That's pretty common. It's standard research design.

You have a treatment group, a control group. You make inferences by comparing results, statistics of the treatment group relative to the control group.

Page 12

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 104-1 Filed 10/09/19 Page 7 of 53 Page ID #:7448
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Mr. Weir's use of it, though -- I wouldn't, yeah, endorse Mr. Weir's use of that because it seems somewhat unusual. But the idea of treatments and controls in survey design or other kinds of methods are pretty common.

Q. Have you ever designed a treatment-and-control-type survey?

A. Again, I wouldn't characterize surveys generally that way. I do do analysis that relies on treatment and control methods, which, for example, a difference-in-difference analysis is viewed as a treatment and control -- could be viewed as a treatment and control style method.

Q. Is that a survey?

A. It can use survey data, but I -- I've done that using survey data, yes.

Q. When you say you've done that using survey data, did you design the survey that collected that survey data?

A. Yes.

Q. What sort of survey was that?

A. So the one that comes immediately to mind was a survey we did of New York -- I think

it's all New York nursing homes where we looked at their adoption of technology.

And some did and some didn't. And as a result of that, we could use that data to -- as an input to what's called the difference-in-difference model, which then enables you to tease out the marginal effect of adopting a particular technology on performance, which is what this study was about.

Q. But that wasn't a survey related to an attribute of a consumer product; correct?

A. That's correct.

Q. And it wasn't a survey where some of the survey respondents were shown different information than other survey respondents; correct?

A. That's correct.

Q. Do you consider yourself an expert in treatment and control survey design?

A. Again, I find that construction unusual. I'm an expert in applied economics and data analysis, and I've used survey methods in my own work. I don't know how to respond more than that.

Q. What is contingent valuation?

A. So there's a more formal definition. But contingent valuation is a family of methods where you essentially ask people what their valuation is for a particular -- for a particular -- usually it's used in sort of a public goods setting. So would you -- how much would you be willing to pay to clean this beach up, for example.

Q. You said it has a more formal definition. What is that definition?

A. I'd have to pull the -- I'd have to pull the definition up to get the formal one. But the informal definition is essentially asking people what their value is of a particular usually public good.

Q. And how do you know that it's most commonly used for public goods?

A. I've looked at this literature. The vast majority of it is focused on nonmarket goods. There are better methods available for dealing with market-based goods, which is why it's not used in -- generally, economists don't favor those methods when there's alternatives available, for all sorts of reasons.

Q. Have you ever designed a contingent valuation study?

A. I wouldn't use those methods because I don't believe they're reliable.

Q. And do you consider yourself an expert in contingent valuation?

A. I wouldn't consider myself an expert in contingent valuation because I don't believe those methods are -- are appropriate so I haven't implemented them. I am familiar with those methods, and I am familiar with the literature of the critiques and uses of those methods.

Q. Have you ever used contingent valuation?

A. I wouldn't use it in my own work, again, because I don't believe it's reliable.

Q. Have you ever studied contingent valuation?

A. Yes, I've looked at contingent valuation in the past.

Q. When you say you've "looked at," what does that mean?

A. I've reviewed the relevant literature, some of the relevant literature on contingent

Lorin M. Hitt, Ph.D.   -   5/30/2019

Case 2:18-cv-01786-RGC-JPR   Document 104-1   Filed 10/09/19   Page 8 of 53   Page ID
#:7449

Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

valuation; and I've addressed previous studies
that proposed contingent valuation methods in
litigation context, which involved doing
literature review and analysis of what's the
current state of the art.

Q.   In that past work, have you ever found
any authoritative articles or books that say
contingent valuation is inappropriate to use
with a consumer market good?

A.   So let me separate that into two
things. I've read studies that say contingent
valuation does not yield reliable estimates of
willingness to pay, which would include all
sorts of goods.

And then the second observation is the
vast majority of contingent valuation studies
I've seen are typically nonmarket goods. And
it's my own belief that there are many better
methods available for market goods.

Q.   What is a choice-based conjoint study?

A.   Choice-based conjoint is a methodology
where you present a sequence of choices to
consumers where you -- there -- maybe there's
perhaps four or five attributes that are
presented to consumers. There's some

Page 17

guidelines of how many you're supposed to do.
You present a sequence of choices
where those attributes are varied and typically
present -- a consumer would be presented with
10, 20 scenarios with 3 products, perhaps an
option not to choose any product. And you make
a series of choices through those surveys. And
then that's the -- that's the general method.
That's the way it's typically implemented.

Q.   Have you ever designed a choice-based
conjoint study?

A.   No. Conjoint is not a method I would
regularly use. Again, my preferences are
strongly for market data.

Q.   Do you consider yourself an expert in
choice-based conjoint studies?

A.   I've been asked to evaluate these
studies, and I'm familiar with them, and I
teach them in my -- I teach the use of these
studies in my courses. So I'm very familiar
with them.

I've analyzed data generated from
choice-based conjoint in the past, but it's not
a method would normally use.

Q.   So is that a no? You do not consider

Page 18

yourself an expert in choice-based conjoint?

A.   I think within the scope of what I
described, it's not something I would normally
use in my own work. But I'm familiar with the
techniques, and I've worked with the data
generated from these surveys.

So I would consider myself an expert
to that extent; but, again, it's not a method I
prefer to use.

Q.   And, again, you've never designed a
choice-based conjoint study; correct?

A.   That's correct.

Q.   In your opinion, are there methods
that can be used to determine class-wide
damages for a consumer product sold at retail,
as in this case, where there's alleged
misrepresentations or omissions?

A.   In the abstract, there are a number of
methods that could potentially be used.
Whether they can be applied in any particular
setting depends on the details of the setting.
I articulate a few methods that I've commonly
seen used in those contexts. But without
considering the specifics of the setting, it's
hard to say what abstract method is

Page 19

appropriate.

Q.   What potential methods are those that
could be used?

A.   I mean, the methods I've described
that I've seen commonly used for evaluation of
consumers goods are hedonic price methods,
conjoint methods, discrete-choiced, structural
demand modeling approaches.

I've seen those used in the past.
Those are the typical ones used for -- that
have been used for evaluation of product
features. But whether or not any of those
would be appropriate here has to be evaluated
in the setting.

Q.   In this case, did you determine
whether any of those methods would be
appropriately used here?

A.   That wasn't within the scope of my
work. But it's my understanding that a lot of
the data you would typically use for those
kinds of things are not available here, which
would severely limit the use. But that's not
something I was -- I evaluated.

Q.   So is it your opinion that there's no
possible method in this case to determine

Page 20

Lorin M. Hitt, Ph.D.   -   5/30/2019
Case 2:18-cv-01736-ROC-JPR   Document 164-1   Filed 10/09/19   Page 9 of 53   Page ID
#:7450
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, inc., et al.

**Page 21**

1 classwide damages for the Champion Petfood
2 products at issue?
3     A.  I haven't really considered that
4 question.  What I do believe is the methods
5 proposed I don't think are reliable.  Whether
6 there could be another method that -- I don't
7 know.
8         (Exhibit 1, Rebuttal expert
9         report of L. Hitt, was marked for
10        identification.)
11 BY MS. BORRELLI:
12    Q.  Hand you what's been marked as
13 Exhibit No. 1.  This is titled the "Rebuttal
14 Expert Report of Lorin M. Hitt."
15        Do you recognize this document?
16    A.  Yes.
17    Q.  Can you turn to Page 41, please.
18        Is that your signature appearing there
19 dated May 13th, 2019?
20    A.  Yes.
21    Q.  Could I have you turn to your CV,
22 which is Appendix No. 1 in your report.
23        Looking at your CV, it looks like your
24 education background prior to MIT was in
25 electrical engineering?

**Page 23**

1 management, which includes management science
2 and operations research; mathematical models of
3 operations, service operations; things like
4 that.  It's got the information group, of which
5 I'm one of the senior folks.
6         That does two sets of things.  It does
7 more technology-oriented things, and it does
8 information economics kinds of things.  That's
9 what I do.
10        The decisions component is -- trying
11 to be broad and encompassing, but the group,
12 they focus on human decision-making and things
13 like negotiations as well as decision biases
14 and things like that.
15        And so one of -- we're an
16 agglomeration of those three general areas.
17 It's about 28, '9 faculty.
18    Q.  But your area is specifically in
19 information economics?
20    A.  That's me, yeah.  I'm in a group
21 called -- information strategy and economics is
22 the way we describe ourselves.  And I'm within
23 that group.
24    Q.  Do you teach in any areas outside of
25 that particular area of the department?

**Page 22**

1    A.  That's correct.
2    Q.  This is more my own curiosity.  How
3 did you turn from electrical engineering to
4 economics?
5    A.  So when I got done with my master's
6 degree, I got sick of working in the laboratory
7 and started looking for other jobs.  And
8 consultants are -- were at the time gobbling up
9 engineers for analytics capabilities.
10        And I joined a financial service
11 consulting firm and worked for them for three
12 years.  And that -- that was the transition.
13 And from there, I switched over to economics
14 entirely.
15    Q.  You're currently employed at the
16 University of Pennsylvania; correct?
17    A.  That's correct.
18    Q.  And it says that the department you're
19 in is operations, information and decisions
20 department.  Can you describe what that is or
21 how that fits into the school.
22    A.  So it's -- I think it's the second or
23 third -- probably third-largest department at
24 Wharton.  It's an agglomeration of a number of
25 different things.  It's got operations

**Page 24**

1    A.  So it's -- it's -- it's
2 interdisciplinary, so it's hard to say what
3 areas I teach in.  I teach data analytics.  I
4 teach graduate-level information economics
5 course.  I've also taught undergraduate-level
6 information economics.
7         So my teaching is focused on that.
8 I've also taught the introductory operations
9 management class, but it's either -- most of my
10 work is either in analytics or information
11 economics.
12    Q.  So in your CV, you have a list of
13 articles that were published in refereed
14 journals.
15        Does "refereed" mean "peer-reviewed"?
16 Is that the same thing?
17    A.  Yes.
18    Q.  How many peer-reviewed articles on
19 survey design have you written?
20    A.  On survey design?
21    Q.  Yes.
22    A.  So I wouldn't be focused specifically
23 on that.  A number of these articles use
24 surveys, but the abstract methodology is not --
25 is not something I do on the -- applied

Lorin M. Hitt, Ph.D.  -  5/30/2019
Case 2:18-cv-01736-DOC-JPR  Document 194-1  Filed 10/09/19  Page 10 of 53  Page ID #:7451
Jennifer Keitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Page 25

1  economists typically used methods.
2      Q.  When you say "a number of these
3  articles use surveys," what does that -- what
4  do mean by that?
5      A.  That the primary data input was
6  derived from a survey.
7      Q.  When you wrote the article, the survey
8  was already done.  You just had the data; is
9  that right?
10      A.  No.  Most of the ones -- I think there
11  have been some -- I probably have done papers
12  where the surveys were already done, but almost
13  all of it I was responsible for the design and
14  implementation of the survey.
15      Q.  Okay.  So which of these articles
16  involved the design and implementation of a
17  survey?
18      A.  Let's go to the back.  Let's work from
19  the back, because more of them are there.
20          So working from the back, 41 relies on
21  a survey.
22      Q.  So can we talk about each of these as
23  we go through, please?  So No. 41, what sort of
24  survey did you design and implement?
25      A.  So this was a survey of information

Page 26

1  technology professionals.  And it was asked --
2  it was asked regarding business practices in
3  place in their organization.
4      Q.  So that was not a survey related to
5  valuation of an attribute of a consumer good;
6  correct?
7      A.  That's correct.  It actually is
8  related to the valuation of technology, but
9  it's not related to the valuation of a consumer
10  good.
11      Q.  Okay.  All right.
12      A.  So -- oh, there's probably -- let's
13  see.  Actually, I probably skipped -- didn't go
14  too far back.  Some of this -- so for a number
15  of years, Erik Brynjolfsson and I wrote the
16  surveys that were used for the
17  InformationWeek 500.  I can't remember how many
18  different surveys we wrote for that.  But
19  that's 60, 61 and 62.  But that's trade
20  publication work.  Just for completeness,
21  mentioning that.
22          In terms of published work, 38 is a
23  survey, but it uses results of some of the
24  other papers we did with the -- with the IT
25  work practices survey.

Page 27

1      Q.  So, again, that didn't involve survey
2  related to valuation of a consumer good;
3  correct?
4      A.  That's correct.
5      Q.  Okay.
6      A.  36 and all -- in all of its forms
7  involved -- yeah, that was -- that was an
8  extended version of the previous one.  We
9  actually reimplemented the same general method
10  and collected more data.  So that 36 was based
11  on that.
12          31 -- actually, let me see.
13          Yes, 31.
14      Q.  What sort of survey was involved in
15  that article?
16      A.  Same -- same general thing:  Business
17  practices.
18          19.
19      Q.  What sort of survey did that article
20  involve?
21      A.  That was employee survey.  I'm trying
22  to recall.  It's been a while.  I believe it
23  was an employee survey that had questions both
24  about individuals as well as about
25  corporations.  It was regarding the use of

Page 28

1  information systems outsourcing and
2  off-shoring.
3      Q.  So, again, that didn't involve
4  valuation of a consumer good; correct?
5      A.  That's correct.
6          So 10 was an experiment, but there was
7  an ex post survey of the respondents.  So
8  that's somewhere in between -- there was an
9  experiment implemented there where we did
10  collect additional information about the
11  participants in survey form.  So that's sort of
12  a survey.
13      Q.  Okay.  Again, not related to valuation
14  of a consumer product; correct?
15      A.  That's correct.  Because, again, I
16  think I mentioned before, I believe that there
17  are better methods for doing that.
18          Number 7.
19      Q.  What sort of survey did that involve?
20      A.  That was several different ones which
21  I contributed to -- one I wrote entirely; one I
22  contributed to.  So it involves a large-scale
23  survey of nursing home employees and their work
24  practices and work life.
25          And it is the companion study --

Lorin M. Hitt, Ph.D.   -   5/30/2019
Case 2:18-cv-01736-DOC-JPR   Document 194-1   Filed 10/09/19   Page 11 of 53   Page ID
#:7452
Jennifer Keltman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

¹ companion survey of organizations and the
² practices that they implement.  And I think one
³ of -- I think both of those were used in 7.
⁴ I'd have to go back and make sure.  But both of
⁵ them were used in that research stream, which
⁶ produced 7.
⁷     Q.   Again, that did not involve valuation
⁸ of a consumer product; correct?
⁹     A.   That's correct -- well, it's a
¹⁰ commercial product.  So it was thinking about
¹¹ the economic impact of an electronic medical
¹² records system, which was -- we were -- one of
¹³ our research partners was the vendor.  So we're
¹⁴ thinking about the value their product was
¹⁵ contributing.
¹⁶     Q.   As part of that research, did you
¹⁷ determine a dollar value that that product was
¹⁸ worth?
¹⁹     A.   We -- so that was the -- as part of
²⁰ the survey, we did look at how that quantity
²¹ varies.  But the data that generated the
²² valuation was based on external, like, market
²³ data, financial reporting.
²⁴     Q.   So you didn't use the survey data to
²⁵ determine the value of the product?

Page 29

¹     A.   Not in this way.
²     Q.   Okay.
³     A.   So it was part of the -- it was part
⁴ of the research design.  But, again, it's --
⁵ the primary sources for, for example, the
⁶ economic impact which we then turned into a
⁷ dollar value was archival financial data.
⁸     Q.   Any others?
⁹     A.   I think that's it.  I think I may have
¹⁰ skipped over one that might have used the same
¹¹ data as the other one, but we already talked
¹² about the same survey.
¹³     Q.   How many classes on survey design have
¹⁴ you taught?
¹⁵     A.   Again, that's not something I normally
¹⁶ do as my regular job, although I've been
¹⁷ invited to -- I've been invited a couple of
¹⁸ times to talk about survey-based methods in
¹⁹ doctoral classes.  And I do cover it in my own
²⁰ doctoral class, but the focus was not entirely
²¹ on survey methods.
²²     Q.   What sort of survey methods have you
²³ covered in your doctoral class?
²⁴     A.   So wide range.  So if it was in one of
²⁵ these papers, I would have covered it.  The

Page 30

¹ ones I was asked specifically to speak on were
² the use of corporate surveys.
³     Q.   So you weren't asked to speak on
⁴ conjoint surveys?
⁵     A.   Me personally in these cases, no.
⁶ Although one of the things we do cover in my
⁷ Ph.D. class is conjoint, because it's used
⁸ in -- used in some papers and a couple of
⁹ domains that are relevant to my students.
¹⁰     Q.   You haven't been asked to speak on
¹¹ contingent valuation studies?
¹²     A.   So not in class.
¹³     Q.   Have you been asked to speak about
¹⁴ them elsewhere?
¹⁵     A.   I've given talks about economic
¹⁶ methods for valuation of product features, of
¹⁷ which that comes up as a method.
¹⁸     Q.   Where have you given such talks?
¹⁹     A.   There are public talks through --
²⁰ we've done -- we did a number of them with
²¹ Cornerstone Research.
²²     Q.   Okay.  When you say "public talks,"
²³ who was the audience?
²⁴     A.   Principally, lawyers and some of the
²⁵ in-house counsel and other people involved

Page 31

¹ working with in-house counsel and large
² organizations.
³     Q.   Have you conducted any research in
⁴ survey design?
⁵     A.   I don't think I'd characterize it that
⁶ way, so I think the answer is no.
⁷     Q.   Can you return to Appendix 2 of your
⁸ report, which is your prior testimony.
⁹        Sorry.  Before we turn away from your
¹⁰ CV, I should ask, is there anything that needs
¹¹ to be added or changed to your CV since you
¹² issued your report?
¹³     A.   I don't think so.
¹⁴     Q.   If you think of anything, let me know.
¹⁵     A.   Okay.
¹⁶     Q.   All right.  So in your list of prior
¹⁷ testimony, let me ask before I forget:
¹⁸ Anything that needs to be added or changed
¹⁹ since the date that this was issued?
²⁰     A.   I don't think so.
²¹     Q.   So in this list, I see three items
²² noted as class actions.  If a case is a class
²³ action, have you specifically noted that in
²⁴ this list?
²⁵     A.   Let me just go through and make sure.

Page 32

Lorin M. Hitt, Ph.D. - 5/30/2019

Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 12 of 53 Page ID #:7453

Jennifer Keilman and Carol Sloan vs. Champion Petfoods USA, Inc.; et al.

Page 33

¹ Probably, but that's not something
² I've looked at.
³ Q. Okay. The ones I see are the Shop-Vac
⁴ case, the Buckeye Tree Lodge case, and the
⁵ Polaris case.
⁶ A. Oh, let me add a couple more, then.
⁷ So Shamrell is a class action.
⁸ Q. Okay. The one, Shamrell versus Apple.
⁹ A. Yes.
¹⁰ Calloway was a class action.
¹¹ Q. Sorry. Let me find that on this.
¹² A. That's the one right below.
¹³ Q. Oh, yeah.
¹⁴ A. Okay. ProSys was an antitrust class
¹⁵ action in Canada, so that's a little bit
¹⁶ different.
¹⁷ Opperman versus Path, that was a class
¹⁸ action.
¹⁹ Buckeye Tree Lodge is labeled as such.
²⁰ Ashley Furniture, which is the top of
²¹ page -- I guess labeled 2, was a class action.
²² The case below is part of the same
²³ case, just a different venue.
²⁴ These California opt-outs were
²⁵ opt-outs from the class.

Page 34

¹ So there's a big list of this -- as
² was Felix, but that's not a class action. It
³ was an opt-out from a class.
⁴ Johannessohn is labeled as such.
⁵ And, yes, the rest is --
⁶ Q. Okay. In any of the cases listed in
⁷ Appendix 2, not just the class cases, did you
⁸ design a survey?
⁹ A. No.
¹⁰ Q. In any of the cases that you just
¹¹ identified as being class cases, which side
¹² were you on, plaintiffs' or defendants'?
¹³ A. I would characterize them all as -- I
¹⁴ think all as defense. There are sometimes
¹⁵ counterclaims, but not typically in class
¹⁶ actions, so those would be defense side.
¹⁷ Q. In the class cases you've been
¹⁸ involved in, have you been then opposing a
¹⁹ plaintiff's expert that calculates class-wide
²⁰ damages?
²¹ MR. KESSLER: Objection to the
²² form.
²³ THE WITNESS: So -- so I'm -- my
²⁴ typical role is to respond to either economic
²⁵ analysis related to class action, so I'd be

Page 35

¹ typically responding to some other expert
² report.
³ BY MS. BORRELLI:
⁴ Q. Were they -- were you typically
⁵ responding to some other expert report related
⁶ to class damages?
⁷ A. Yes. Typically, I think in almost all
⁸ these cases, the focus of my work was
⁹ damages-related.
¹⁰ Q. In any of these class cases, did you
¹¹ opine that the opposing expert had set forth a
¹² sufficient methodology to support finding class
¹³ damages?
¹⁴ A. I don't believe so.
¹⁵ Q. What is a relevant product market?
¹⁶ A. So let me just ask you, is that being
¹⁷ drawn from my report or shall I answer
¹⁸ casually?
¹⁹ Q. It's probably something you said in
²⁰ your report.
²¹ A. Okay.
²² Q. But I want to talk about that in
²³ relation to some of your prior expert work.
²⁴ A. So there are some technical economic
²⁵ definitions of "product market." So what I'm

Page 36

¹ referring to is relevant product market in the
² casual sense that I may have used that phrasing
³ in my report is the market boundaries of the
⁴ market at issue.
⁵ Q. In which of these cases in Appendix 2
⁶ of your report did you analyze or identify the
⁷ relevant product market?
⁸ A. I have to go back and look at the
⁹ specific cases. It is an issue that comes up
¹⁰ fairly frequently as to whatever market
¹¹ simulation or other method is proposed. The
¹² boundaries of the market have been properly
¹³ defined, and I know in some cases they have not
¹⁴ done so or they've -- it's been done either too
¹⁵ narrowly or too broadly. I'd have to go back
¹⁶ and look at the specific cases to see which
¹⁷ ones.
¹⁸ Q. In any of these cases, did you
¹⁹ actually yourself analyze and determine what
²⁰ the relevant product market was?
²¹ A. No. That was not typically my role,
²² to put forth a formal market definition.
²³ That's actually a fairly involved exercise, and
²⁴ so I was typically asked to comment on whether
²⁵ or not such an exercise had been performed.

Lorin M. Hitt, Ph.D. - 5/30/2019

Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 13 of 53 Page ID
#:7454

Jennifer Reitman and Carol Sloan, vs. Champion Petfoods USA, Inc., et al.

Q. In which of these cases in Appendix 2 did you calculate or analyze a new supply and demand curve based on external market events, like misrepresentations or omissions?

A. In terms of calculating a new supply and demand curve, so in terms of doing a structural model where there would be a supply and demand and a market equilibrium, I've been asked to respond to several of those.

I have not put forth one affirmatively because I believe these are very difficult to do properly. I have put forth analysis of, for example, difference-in-difference analysis. That's another way of getting at some of the same constructs. But I don't believe I've put forth my own affirmative equilibrium valuation model.

Q. In which of these cases in Appendix 2 did you analyze or calculate a new market equilibrium price based on external market events, like misrepresentations or omissions?

A. So that's -- I can't recall anywhere I've actually affirmatively put forth a new figure. I'm generally asked to critique the existing ones. I don't think it's been my role

Page 37

in any of these cases to actually do the explicit market price, the equilibrium market price calculation in these class actions.

Q. In the Shop-Vac case, did you -- can you recall what that case was about? Let's start there.

A. So that case was related to mislabeling of wet-dry vacuum cleaners on two technical attributes. I believe one was something referred to as P-course power, and the other was capacity.

Q. Do you recall what your general opinion was in that case?

A. So -- so in that case, I think the plaintiffs had an engineer that put forth what resembled but was not a hedonic price analysis. I don't think the person putting forward was even familiar with the methodology. But they were interpreting it as such, and I was asked to critique that.

And my conclusion was, is that it wasn't even close to being reliable. I think they didn't even understand what they had done.

Q. Did you conduct your own hedonic regression in that case?

Page 38

A. I had explored variations of that method, including doing reanalysis of the data to demonstrate that it wasn't stable, that you didn't get a consistent result, depending on very small changes in the assumptions. I didn't put forth one I would consider to be correct.

Q. And in that case, did you calculate the change in market value due to the marketing misrepresentations that were alleged?

A. So by itself, hedonics can't calculate market values, so that wouldn't even be possible.

I did critique what -- their estimates of what's referred to as an implicit price varied tremendously depending on assumptions. So I did look at those.

It's a whole additional level of analysis to be able to say anything about market prices, especially for hedonics. It's pretty well understood that you -- without a lot of work, you can't get anything like that out of a hedonic price analysis.

Q. In any of the class cases listed in Appendix 2, did you provide opinions rebutting

Page 39

an expert that had conducted a consumer survey?

A. So it depends on what your boundary of "consumer survey" would be. Some of these were conjoints. Some of those conjoints were implemented. Some of them were proposed -- I don't know if they fully implemented -- surveys as well.

Q. So the answer is that you did critique some conjoint surveys?

A. Yes. I've done some reanalysis of conjoint data.

Q. Do you recall which cases involved conjoint?

A. So Calloway is definitely one.

Path, I believe it was proposed but not implemented.

Buckeye Tree Lodge, I believe it was proposed. I can't recall whether they implemented it or not. I don't think I did the reanalysis, but I don't remember whether they actually implemented the survey.

I think in Johannessohn, they might have proposed something; but, again, I didn't do the reanalysis of that. I did something different.

Page 40

Lorin M. Hitt, Ph.D. - 5/30/2019

Case 2:18-cv-01736-RGK-JPR Document 194-1 Filed 10/09/19 Page 14 of 53 Page ID #:7455

Jennifer Keilman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Q. In the cases where you said that they may not have implemented the conjoint, did you provide any criticisms or rebuttal to the conjoint survey design in your opinions?

A. Yes.

Q. Okay. And what sort of criticisms were those?

A. Similar to the ones that I described here, in a sense that -- and particularly, the Opperman versus Path, one of the critiques was that the decision environment is very -- the decision environment they are hypothesizing in the survey was so far removed from the actual decision environment that it couldn't possibly give you reliable results.

There are some special issues related to privacy which were addressed in that one. Privacy is particularly bad because there's a known behavior referred to as "the privacy paradox" that expressed preferences have no resemblance to revealed preferences in privacy-related studies; and to the extent that the conjoint was an expressed preference method, it couldn't possibly be reliable in that context.

*Page 41*

I think those are two of the major opinions I had. There were a number of others, but that's the ones I recall.

Q. But, again, you wouldn't consider yourself an expert in conjoint survey design; correct?

MR. KESSLER: Object form.

THE WITNESS: So I think I characterize my expertise in conjoint is, I'm an apply economist familiar with the methods generally in this domain. And reanalysis of conjoint data is something I'm familiar with. And I'm familiar with the technique and I've taught it, but it's not something I would typically affirmatively do on my own.

BY MS. BORRELLI:

Q. Have you ever designed a conjoint survey?

A. No, consistent with the previous answer.

Q. In the Volkswagen opt-out cases, what sort of opinion were you providing?

A. In the opt-outs, these are issues -- they're all damages cases. So I was asked to provide an opinion about whether there was

*Page 42*

economic injury in these cases.

Q. What was your opinion?

A. There's a lot of different cases and a lot of different circumstances. But in general, at least marketplace data does not suggest that there was economic injury in here because of some fairly interesting, unique characteristics of the setting, including the fact that they included a very generous extended warranty on any car that had been repaired, which has considerable value.

So, in general, my comment was that in many of these, that the injury was minimal, if any.

Q. In those Volkswagen cases, did you calculate the change in market value to the vehicles due to the failure to disclose the emissions issue?

A. I did do some market price calculations. I wouldn't characterize it -- again, there would have been -- it depends exactly what you mean about "value." So I did do some investigation of change in market prices.

And in some of those cases -- to be

*Page 43*

precise -- I did do a calculation of what would be called user cost, which is a sense for how much -- how much did you pay in total for the ownership of a vehicle, which is an input to a value calculation, but I wouldn't consider it market value by itself.

Q. Just to be clear what I meant by "market value," my understanding is in that case, consumers alleged that their vehicles were of lower value because of Volkswagen's misrepresentations about basically cheating on the emissions standards.

Did you do anything to calculate that change in market value as alleged by the plaintiffs in those cases?

MR. KESSLER: Objection to the form.

THE WITNESS: So I did respond to assertions related to market value, and I did do analysis of marketplace data to examine whether or not there was any evidence that the -- there was an impact on market price.

BY MS. BORRELLI:

Q. When you say "marketplace data," what do you mean by that?

*Page 44*

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 15 of 53 Page ID #:7456
Jennifer Keithman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Page 45

1    A.  So in the auto industry, there's a
2  number of widely available -- well, you have to
3  pay for it, but it's available.  There's both
4  auction data, and there's retail sales data.
5      And I did reanalysis of both of those
6  sources.  One is something called AuctionNet.
7  The other is called J.D. Power PIN, which
8  stands for Power Information Network.  And
9  those -- it's possible to do analysis of market
10  prices using those data.  It's actual
11  transactions.
12    Q.  What was the Polaris case about, if
13  you recall?
14    A.  Polaris case was about all-terrain
15  vehicles.  I don't know how much I can say
16  about this because it's not in public domain,
17  as far as I know.  But it's -- Polaris is a
18  manufacturer of all-terrain vehicles.
19    Q.  Sure, yeah.  I don't want you to
20  disclose anything that is covered by a
21  protective order.
22      Are your opinions in that case covered
23  by a protective order?  Can you talk about what
24  your opinions were?
25    A.  I can say it's broadly in the same

Page 46

1  spirit as my other class-action work.  I don't
2  think I can say anything more than that because
3  that case is still pending.
4    Q.  Okay.  Have you ever served as an
5  expert for either of the Champion defendants in
6  this case before?
7    A.  No.
8    Q.  All right.  What did you do to prepare
9  for your deposition today?
10    A.  So I read through my report.  I read
11  through the various backup documents that were
12  produced that support the analyses.  Reread
13  some of the literature.  I spoke with my
14  research team, spoke with counsel.
15    Q.  Did you review Mr. Hanssens'
16  deposition transcript?
17    A.  No, I hadn't seen Mr. Hanssens'
18  deposition.
19    Q.  Did you review Mr. Hanssens' final
20  expert report in this case?
21    A.  Yes, I did; and I cite it in my
22  report.
23    Q.  All right.  So looking at your report,
24  Exhibit 1, is there anything, sitting here
25  today, that you need to change in your report?

Page 47

1    A.  Oh, the main report?
2    Q.  Yeah.  Looking at now just on Pages 1
3  through 41, your main report --
4    A.  Nothing of which I'm aware.  Things
5  can always come up, but nothing -- sitting here
6  right now, nothing of which I'm aware.
7    Q.  So this report, Exhibit 1, contains
8  all of your opinions in this case; correct?
9    A.  It contains all the opinions I've
10  reached at the time I wrote the report.  Things
11  may come up.  I may be asked to opine on other
12  things.  We may have things that come up today.
13  So it covers up until the time of the report.
14    Q.  Have you reached any opinions in this
15  case since the date of this report, which I
16  believe was May 13th, until today that are
17  not in this report?
18    A.  I don't think anything I would
19  consider an opinion separate from what's here.
20    Q.  And this report, Exhibit 1, contains
21  all of the reasoning and bases for your
22  opinions that you hold thus far in this case;
23  correct?
24    A.  Yes, as I articulated there.  There
25  may be things I know and things in my head that

Page 48

1  we may discuss today, but this is -- this is
2  the way I present the reasoning for what my
3  opinions are.
4    Q.  And the information that you relied on
5  to reach your opinions, that's all identified
6  in this report or in Appendix 3 to this report;
7  correct?  Appendix 3 is your list of documents
8  or materials relied upon.
9    A.  To the best of my knowledge, yes.
10    Q.  Can you look at Appendix 3 just for a
11  second before we get to your main report.  As
12  far as pleadings that you reviewed, you
13  identified the second amended class action
14  complaint.
15      Are you aware that a third amended
16  complaint has now been filed?
17    A.  I don't know if I've seen that, so I
18  don't know.
19    Q.  Since you don't know if you've seen
20  it, I assume that complaint doesn't change any
21  of your opinions in any way as you sit here
22  today?
23    A.  Since I haven't read it, I don't know.
24    Q.  Okay.
25    A.  So it might in the future, but not at

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 16 of 53 Page ID
#:7457
Jennifer Keilman and Carol Shioan vs. Champion Petfoods USA, Inc., et al.

1  the moment.
2      Q.  Sure.  Sure.
3          Did you review the deposition
4  transcripts of any plaintiffs in this case?
5      A.  I did after the filing of the report.
6  So I read through both -- I read through both
7  the named plaintiffs' depositions.
8      Q.  Did anything in those depositions
9  change anything about your opinions in this
10 case?
11     A.  No.  It helped me better understand
12 some of the comments in Dr. Hanssens' report,
13 but it didn't change any of the opinions.
14     Q.  Did you review the deposition
15 transcripts of any Champion employees taken in
16 this case?
17     A.  I don't believe so.
18     Q.  Did you interview any Champion
19 employees as part of your work in this case?
20     A.  No.
21     Q.  All right.  When were you retained as
22 an expert in this matter?
23     A.  I think the formal retainer letter was
24 signed somewhere mid-April.  We had had
25 discussions probably a couple weeks before.

Page 49

1      Q.  And what were you told about what you
2  were being asked to do in this case?
3      A.  I think it's similar to what's laid
4  out in the report, which is to broadly examine
5  whether or not you could reliably determine
6  injury in this case, and to respond to -- I
7  believe at that time both the Weir and the
8  Krosnick reports were available, so to respond
9  to those particular reports, mostly Mr. Weir's
10 but also Professor Krosnick's to the extent it
11 touched on issues I was addressing.
12     Q.  Did anyone limit how long you could
13 spend working on this report or this case?
14     A.  No.
15     Q.  Were there any monetary restrictions
16 put on the work you could do in this case?
17     A.  I tried to be efficient, but nobody
18 put any constraints on.
19     Q.  Did you request any materials or
20 documents from Champion in this case that you
21 weren't given?
22     A.  So there were things I would like to
23 see that I don't think exist.  So, for example,
24 it would have been nice to have retail price
25 data but, as I understand, that doesn't exist.

Page 50

1      Q.  That would have been nice to have,
2  huh?
3      A.  It would have.
4      Q.  I agree.
5      A.  And not unusual.  That happens.  But,
6  yes, there were things like that that came up
7  where it's like, Does this exist?, and the
8  answer was no.
9          But there wasn't anything I
10 specifically requested that I wasn't provided
11 that I know exists.
12     Q.  So no one prevented you from doing
13 what you thought was the best thing to do in
14 your expert opinion to analyze Mr. Weir and
15 Dr. Krosnick's reports; correct?
16     A.  I think that's correct.
17     Q.  Okay.  Did you work with Dr. Hanssens
18 in the process of drafting your report?
19     A.  No.  I didn't speak with him at all.
20     Q.  Did you ever see any drafts of his
21 report?
22     A.  I believe I got the final, signed
23 version, so that's the only version I saw.
24     Q.  Do you agree with Dr. Hanssens'
25 opinions in this case?

Page 51

1      A.  There was -- so I focus specifically
2  on portions of his report, and I believe it's
3  consistent with mine and my own understanding.
4  I didn't read his report as extensively to
5  fully evaluate, but I didn't see anything I
6  disagree with, sitting here now.
7      Q.  Did you speak with any other experts
8  hired by Champion in this case?
9      A.  I spoke with my research team but not
10 with who I would consider other experts.
11     Q.  Did you look at the reports of any
12 other experts hired by Champion in this case?
13     A.  No.
14     Q.  So I think you said you worked with
15 Cornerstone Research.  Is that what you
16 referred to as your research team?
17     A.  That's correct.
18     Q.  My understanding is they also worked
19 with Dr. Hanssens.  Is that correct?
20     A.  I believe that's correct, yes.
21     Q.  Did the same research team work with
22 both you and Dr. Hanssens?
23     A.  I don't believe so.  But, again, their
24 internal workings, I usually don't see.
25     Q.  If you look at Page 4, Paragraph 14,

Page 52

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 17 of 53 Page ID
Jennifer Keilman and Carol Sloan, vs. Champion Petfoods USA, Inc., et al.
#:7458

Page 53

1 of your report.
2   A.  Paragraph 14.  Okay.
3   Q.  So this paragraph identifies what you
4 were asked to do in this case.
5      Were you asked to do anything beyond
6 these two items, which were evaluating whether
7 putative class members are similarly situated
8 such that a common method can be used to assess
9 economic injury, and to review and respond to
10 the Weir and Krosnick reports on issues
11 relating to the calculation of economic injury
12 to the proposed class?
13   A.  I think this covers it, what I was
14 asked to do.
15   Q.  Did you speak with any putative class
16 members in this case?
17   A.  No.
18   Q.  Did you interview any purchasers of
19 Champion products?
20   A.  No.
21   Q.  Did you yourself conduct any tests or
22 studies to determine whether putative class
23 members are similarly situated?
24   A.  So the -- the work I did is outlined
25 in the report regarding product

Page 54

1 differentiation, survey data, prices and so
2 forth.  So I would consider that supporting of
3 those issues.
4      I didn't do anything separately than
5 what's articulated in the report on looking at
6 prices, looking at product design, looking at
7 some public information about those things.
8   Q.  Had you heard of Dr. Krosnick before
9 you were retained in this case?
10   A.  I'd run across the name, but I can't
11 say I knew him.
12   Q.  Would you agree he's an expert in
13 survey design and methodology?
14   A.  I agree --
15      MR. KESSLER:  Objection to form.
16      THE WITNESS:  I agree he works in
17 that domain.  I don't typically evaluate
18 people; I evaluate work product.  So I don't
19 know how to answer that.
20 BY MS. BORRELLI:
21   Q.  Had you heard of Mr. Weir before you
22 were retained in this case?
23   A.  Yes.
24   Q.  Had you come across him in other
25 litigation matters?

Page 55

1   A.  Yes.
2   Q.  Have you critiqued his work in prior
3 cases?
4   A.  I actually don't know, because I know
5 he was involved in cases that may have settled
6 before I filed any reports.  So I don't think
7 I've ever filed a report.  I have looked at
8 some of his work in the past, though.
9   Q.  Were you hired in this case to design
10 a survey to determine classwide damages?
11   A.  No.
12   Q.  Were you hired in this case to conduct
13 a survey to determine classwide damages?
14   A.  No.
15   Q.  Were you asked in this case to
16 calculate classwide damages at the initial
17 point of purchase?
18   A.  I was not asked to do any affirmative
19 class damages calculations.  So that was --
20 that was not in the scope of what I was asked
21 to do thus far.
22   Q.  This report, Exhibit 1, did you draft
23 this report?
24   A.  I wrote the -- I wrote the initial
25 draft beginning to end.  Then my research team

Page 56

1 contributed things, and I incorporated that
2 into the report.
3   Q.  But you adopt all of the text in this
4 report as your own and all of the opinions in
5 this report as your own; correct?
6   A.  It's either things I directly wrote or
7 things that my research team recommended that I
8 went through and edited and adopted.
9   Q.  What assumptions did you make to
10 underlie your expert opinions, if any?
11   A.  I think we'd have to do those in
12 context.  There's no sort of overarching
13 assumptions that were made.  There was some
14 analysis done, and some analysis may require
15 assumptions.  But I'd have to -- I don't
16 typically think of it that way, in the
17 abstract.
18      The only -- well, there's the general
19 assumption that pervades these things, and I'm
20 not making a judgment of the merits.  And I'm
21 presuming that the -- the allegations are --
22 regarding the products are true.  That's a
23 presumption that typically pervades these kinds
24 of reports.
25   Q.  Right.  You're not a lawyer; right?

Lorin M. Hitt, Ph.D. - 5/30/2019

Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 18 of 53 Page ID #:7459

Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

A. I'm not a lawyer, and I'm not a --
a -- you know, a technical expert as you would
characterize them in this case.

Q. Sure. So you're not putting forward
any legal opinion about the viability of
plaintiff's claims; correct?

A. Only to the extent it relates to
damages and the types of economic issues I
discuss in the report.

Q. And you don't have any legal opinion
about plaintiffs' theory of liability; correct?

A. No legal opinion. I was asked to do
economic analysis that might inform that.

Q. Sure.

Can you turn back for a moment to
Paragraph 6 of your report, which is on Page 2.
That paragraph is about prior experience in
litigation matters, which we covered a little
bit through your Appendix 2. But here you say
you evaluated the value of a product or product
features, including -- and then you list
various products.

I think you had said earlier that you
never performed your own analysis to determine
the market value of a product in one of the

Page 57

cases you were involved in.

A. So my role is typically not to put
forth affirmative value estimates. It's to do
the evaluations of models for thinking about
value of the product features. And in some
cases, there are conclusions you can draw where
the incremental value is likely small.

So I typically play the -- I -- I
generally don't put forth affirmative opinions
in most of these cases, typically responding to
others. In some -- in some of the patent
contexts, I've done things where I try to get
some bounds as to what it might be.

Q. So in this paragraph, when you say
you've evaluated the value of a product, by
that you don't mean you've calculated the value
of a product; right?

A. So I characterized it as I've
evaluated; in some cases, I've provided
estimates of bounds of what it could be.
That -- that's typically in patent litigation,
not in class action.

But I haven't -- outside of that, I
don't think I put forward an affirmative
estimate to say, Yes, the number should be X.

Page 58

Q. Can you look at Page 5. There's a
heading called "Summary of Opinions."

A. Actually, let me limit that to class
action. I'd have to think a lot more about in
patent --

Q. Sure.

A. -- because that sometimes comes up.
But in consumer class action, I think that's
strictly true.

Q. Okay. So looking at Page 5, there's a
heading called "Summary of Opinions," starting
at Paragraph 18. So this section goes from
Paragraph 18 to Paragraph 25.

Does this list summarize all of the
opinions that you currently hold in this case?

A. Yes. Based on -- as I sit here today,
I think this is a reasonable summary of the
material in my report, which is all the
opinions I have, yeah, at the moment.

Q. You don't have any opinions about
whether the Champion dog food at issue in this
case contains any heavy metal, do you?

A. I don't have an independent opinion on
that. There are -- there's documents that are
floating around with that kind of information

Page 59

in it, but that's not -- that's outside the
scope of my analysis.

Q. You don't have any opinions about
whether the Champion dog food at issue in this
case contains BPA or other plasticizers;
correct?

A. I think same answer as before: I
don't have an independent opinion about that.
There are documents that have information
related to that, but that's generally outside
the scope of my report.

Q. You don't have any opinions in this
case about whether the Champion dog food at
issue contains pentobarbital; correct?

A. That's correct.

Q. You don't have any opinions about
whether there's a risk that the Champion dog
food at issue in this case contains any heavy
metals; correct?

A. That's correct; subject to, there are
documents that I cite that mention those kinds
of things, but that's not within the scope of
my opinions.

Q. You don't have any opinions in this
case about whether there's a risk that the

Page 60

Lorin M. Hitt, Ph.D. - 5/30/2019

Case 2:18-cv-01736-RGC-JPR Document 194-1 Filed 10/09/19 Page 19 of 53 Page ID
#:7460

Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

**Page 61**

1  Champion dog food products at issue contain BPA
2  or other plasticizers; correct?
3     A.  I believe same answer, which is, yeah,
4  there are documents that I cite that have that
5  information in it, but that's not within the
6  scope of my opinion.
7     Q.  You don't have any opinions about
8  whether there's a risk that the Champion dog
9  foods at issue contain pentobarbital; correct?
10    A.  That's correct.
11    Q.  You don't have any opinions in this
12 case about whether Champion's marketing of the
13 products as fresh or containing fresh
14 ingredients is accurate; correct?
15    A.  I don't have any independent opinion
16 other than the information that I've reviewed.
17    Q.  You don't have any opinions in this
18 case about whether Champion's marketing of the
19 products as containing regional ingredients is
20 accurate; correct?
21    A.  That's correct.  Same answer.  Yeah.
22 There's materials that discuss that, but that's
23 not the focus of my opinion.
24    Q.  You don't have any opinions in this
25 case about whether Champion's marketing of the

**Page 62**

1  products at issue as containing ingredients
2  that are never outsourced is accurate; correct?
3     A.  Yes, same answer as before.  There are
4  documents that mention that, but that's not the
5  scope of my work.
6     Q.  And you aren't offering any opinions
7  in this case about Dr. Krosnick's survey design
8  beyond what's specifically identified in your
9  report, Exhibit 1; correct?
10    A.  I think that's largely correct.  I do
11 rely on Dr. Hanssens for additional critiques
12 of the survey, and so I've incorporated some of
13 those.  There may be other things that come up
14 in discussion today, but the opinions I have
15 about his survey are articulated here.
16    Q.  If you think of a new opinion you have
17 about Dr. Krosnick's survey today, please let
18 me know, okay?
19    A.  Will do.
20    Q.  All right.  You don't have any
21 opinions about the corrective statements used
22 by Dr. Krosnick in his survey; correct?
23    A.  I don't have any opinion about the
24 text of the corrective statements, other than
25 the observations I made, is the -- they were --

**Page 63**

1  I think he more or less took them as well.
2     Q.  You don't have any opinions about
3  Dr. Krosnick's survey population; correct?
4     A.  I believe that to the extent there --
5  I have opinions about that, they're reliant on
6  Dr. Hanssens for -- he did that analysis of
7  whether the population is representative or
8  not.
9        That may come up when we -- if we get
10 into questions about consumer preferences.  But
11 I don't have any independent opinion about his
12 sampling methodology beyond the extent to which
13 it could reflect consumer preferences that I
14 talk about in here.
15    Q.  In this case, you did not design any
16 survey to support your opinions; correct?
17    A.  That's correct.
18    Q.  And you did not conduct any survey to
19 support your opinions in this case; correct?
20    A.  I did not design or implement a survey
21 as part of my work.  It was beyond the scope.
22    Q.  Could you have done that work?
23    A.  I don't -- I don't know.  I haven't
24 thought carefully about that.  It wouldn't be
25 something I would typically do as a preferred

**Page 64**

1  method because, again, I have a strong
2  preference for dealing with archival data as
3  opposed to survey data when dealing with
4  consumer -- consumer analysis.
5     Q.  Could you have collected the archival
6  data that you prefer to use in order to support
7  your opinions in this case?
8        MR. KESSLER:  Objection to form.
9        THE WITNESS:  I don't believe the
10 most common sources of data were available that
11 I would use, but I didn't do a full evaluation
12 for what else might be possible there.
13 BY MS. BORRELLI:
14    Q.  To support your opinions in this case,
15 did you independently analyze -- can't speak
16 anymore -- analyze all of Champion's sales
17 data -- all of Champion's available sales data?
18    A.  So I did -- so as part of my analysis,
19 I did do some reanalysis of the sales data that
20 Mr. Weir used to come up with his damages
21 estimates.  That's the data I was using, and
22 it's not really sales data.  It's production
23 data.
24       But so I -- I did look at the pricing
25 information that Professor Krosnick produced as

Lorin M. Hitt, Ph.D.   -   5/30/2019
Case 2:18-cv-01736-ROC-JPR   Document 194-1   Filed 10/09/19   Page 20 of 53   Page ID
#:7461
Jennifer Keithman and Carol Sloan vs. Champion Petfoods USA, Inc., et al.

¹ well as the production data that Mr. Weir
² relied on to estimate sales, but I didn't go
³ beyond the scope of that.
⁴     Q.  Did you ask Champion for any data
⁵ beyond what Mr. Weir and Mr. Krosnick relied
⁶ on?
⁷     A.  I did ask whether or not retail sales
⁸ and retail price data was available, and the
⁹ answer was no.
¹⁰     Q.  Did you seek any Champion retail sales
¹¹ data from any third parties outside of
¹² Champion?
¹³     A.  I believe that was a question I put to
¹⁴ my research team, and they were not -- they
¹⁵ didn't know of anything that was available.
¹⁶ That's one of the things that I did -- I
¹⁷ typically do and I believe I did in this case
¹⁸ upfront.  And it didn't seem to be available
¹⁹ data there either.
²⁰         MS. BORRELLI:  Okay.  Let's go
²¹ off the record.
²²         THE VIDEOGRAPHER:  This marks the
²³ end of Tape No. 1 of the deposition of
²⁴ Dr. Lorin Hitt.  We are going off the record at
²⁵ 10:06 a.m.

Page 65

¹         (Recess.)
²         THE VIDEOGRAPHER:  This marks the
³ beginning of Tape No. 2 of the deposition of
⁴ Dr. Lorin Hitt.  We are going back on the
⁵ record at 10:16 a.m.
⁶ BY MS. BORRELLI:
⁷     Q.  Okay.  Dr. Hitt, I want to start
⁸ talking about your specific opinions in this
⁹ case.
¹⁰     So if you look at Page 9 of your
¹¹ report, Exhibit 1, looks like your first
¹² opinion that I see -- it's also the first one
¹³ in the list of your summary of opinions -- is
¹⁴ that Dr. Krosnick's --
¹⁵     A.  I'm sorry.  Page 9?
¹⁶     Q.  Yep.
¹⁷     A.  Wrong place.
¹⁸         Okay.
¹⁹     Q.  So it looks like your first opinion is
²⁰ that Dr. Krosnick's estimated change in value
²¹ is an estimated change in willingness to pay,
²² which is not the same as a change in price.  Is
²³ that correct?
²⁴     A.  That's what it says, yes.
²⁵     Q.  You aren't offering a legal opinion

Page 66

¹ about the harm that plaintiffs allege they
² suffered in this case; correct?
³     A.  I'm not offering a legal opinion.  I'm
⁴ providing economic analysis that might inform
⁵ that.
⁶     Q.  How do you define "value"?
⁷     A.  So "value" means a lot of different
⁸ things in a lot of different contexts.  The
⁹ way -- so I think I -- I can't answer it in the
¹⁰ abstract.  But if you want to talk about
¹¹ specific context, we can do that.
¹²     Q.  In the context of this case, in your
¹³ view, what is the proper definition of "value"?
¹⁴     A.  So the way that Mr. Weir in particular
¹⁵ has set up his analysis is he is measuring the
¹⁶ value as a change in the market price.  There
¹⁷ are circumstances where that can be
¹⁸ appropriate.  But the -- but that's what his --
¹⁹ that's what he's using as his assessment of
²⁰ value, is the price paid in the actual world
²¹ versus the price that would be paid in the
²² but-for world.
²³     Q.  But that doesn't quite answer my
²⁴ question.
²⁵     In your view, what is the definition

Page 67

¹ of "value" that should be used in this case?
²     A.  That's one possible one that can be
³ used.  And that's the way they set up their
⁴ analysis.  And that's the -- that's the analysis
⁵ that I've responded to.
⁶     Q.  So you don't have an issue with
⁷ Mr. Weir's definition of how he defines "value"
⁸ in this case?
⁹     A.  So there are other ways of defining
¹⁰ "value," and it doesn't encompass all those.
¹¹ So I think it should have been more precise and
¹² focused specifically on market price.  But
¹³ that's -- but I'm taking that that's his
¹⁴ analysis, and that's the one I'm responding to.
¹⁵     Q.  Do you have a different definition of
¹⁶ "value" that you would have used in this case?
¹⁷     A.  There are other possible theories one
¹⁸ could construct, but I didn't -- I didn't do
¹⁹ any evaluation as to what other ways you could
²⁰ conceive it.  So I focused specifically on the
²¹ change in price -- change in market prices.
²²     Q.  So you're okay with using that
²³ definition as the definition of "value" in this
²⁴ case?
²⁵         MR. KESSLER:  Object to form.

Page 68

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 21 of 53 Page ID #:7462
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

THE WITNESS: Again, I -- I object to the idea of tying it back to value, but for the -- in all its meanings. But for the perspective of doing this analysis, I focused specifically on the change in price as the analysis. And I'm fine doing that analysis.

BY MS. BORRELLI:

Q. How do you define "willingness to pay"?

A. I don't think my definition is any different from the general definition. The report has the textbook definition, which is essentially the amount you'd be willing to pay for a product or service.

Q. So you agree with Dr. Krosnick's definition of "willingness to pay"?

A. He stated it a little bit differently, but it's -- as I read it, it's consistent with the standard definition. I don't think -- except I don't think he called it "willingness to pay." I'd have to go back and look at his deposition.

They're throwing around the word "value," which I don't agree with. But the

*Page 69*

definition he seemed to give of "value" was what I consider to be willingness to pay.

Q. How is value different from willingness to pay?

A. So willingness to pay -- sorry.

Again, "value" can have many, many different meanings. And it's not the -- the difference here is, is that it's not market price, which is what Mr. Weir is using it for.

You could casually refer to willingness to pay as a value of a product. But they're not analyzing it that way in the subsequent portions of it.

Again, "value" has many, many definitions, and it's being switched between -- in various uses. So I prefer to use the willingness to pay, market price, which is precise.

Q. So how do you define market price?

A. Market price is the equilibrium market price that would either be paid -- the market price that is actually there is the price actually paid by consumers. That market price might vary across transaction and across consumer.

*Page 70*

Q. So we theoretically should know the market price in the actual world in this case; right?

MR. KESSLER: Objection to the form.

BY MS. BORRELLI:

Q. We can find that out?

A. So two issues with that. One is we actually don't in this case, which is one of the points of contention.

And then the market prices with respect to a market. And in differentiated product markets where those boundaries are a little diffusive -- for example, consumers pay multiple prices for the same product. So what a market price means in that context needs to be carefully defined.

Q. So in your view, is there a market price of the Champion pet foods at issue in this case in the actual world? Can we determine that?

MR. KESSLER: Objection to form.

THE WITNESS: I think there are multiple market prices in the actual world that do exist. I don't think we have specific data

*Page 71*

on those. But there are -- with proper market definitions, you should be able to read off the prices paid, and that would be the market price within that boundary. But there are -- there's not a single market price for all products and all times for all consumers.

BY MS. BORRELLI:

Q. Can the market price be determined through survey methods?

A. So objecting to "the market price," if there was a -- well, there are multiple prices, and that's part of the problem. Survey methods could potentially be an input. But by itself, I don't believe you can get a market price from simply survey methods. And I explain why, at least for the survey that was presented here, that that's not sufficient.

Q. So it's your opinion that the Champion pet foods at issue in this case are not in one particular relevant product market?

A. So I haven't done a full market boundaries exercise, but I will note that there is not a single market price for these products at any given time and that there hasn't been a market boundary definition done.

*Page 72*

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 22 of 53 Page ID #:7463
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

1 So how many markets there are and how
2 many different market prices there are, I don't
3 know. But it's -- there's no reason to believe
4 there's just one, especially given all the
5 different products.
6 Q. You said you have not done a full
7 market boundary analysis, so you don't actually
8 know how many markets there are, in your view;
9 correct?
10 A. That's correct. That's a very
11 extensive analysis, and hundreds of pages of
12 antitrust reports written solely on that
13 issue.
14 Q. Did you analyze or calculate the
15 cross-elasticity of demand as to other pet
16 foods in the market?
17 A. No.
18 Q. Did you analyze whether any
19 products -- other products in the pet food
20 market are close substitutes for the Champion
21 pet foods at issue in this case?
22 A. So I cite a number of things,
23 identifying that there are a large number of
24 other products out there. Any of those could
25 be a potential substitute, but I didn't do any

Page 73

1 quantitative analysis as to the degree of
2 substitutability, nor did my experts.
3 Q. Can average willingness to pay and
4 value ever be the same?
5 A. Only if you define the two as being
6 equal. So, in general, if you -- that's the
7 problem with using phrases like "value," which
8 can mean many different things in many
9 different contexts.
10 If -- if you're using it as use of
11 market price, only by accident.
12 Q. What do you mean by that? Why "only
13 by accident"?
14 A. Two numbers can be equal by accident,
15 but there's no general economic principle that
16 says there's a relationship between average
17 willingness to pay and prices.
18 (Incidental comments off the
19 stenographic record.)
20 BY MS. BORRELLI:
21 Q. In Paragraph 32 of your report, you
22 say, "The literature cited by Dr. Krosnick
23 further confirms that his analysis is intended
24 to measure the change in average willingness to
25 pay from consumer choice data." You have a

Page 74

1 footnote there, Footnote 34, citing articles by
2 Watanabe and Lewbel.
3 Did you read those articles?
4 A. Yes.
5 Q. Do you agree with the conclusions of
6 those articles?
7 A. There wasn't anything I saw that
8 looked incorrect technically. Whether those
9 articles applied to this setting or to any
10 particular setting, that's not something I -- I
11 did an evaluation for all possible settings. I
12 don't believe that the way they're being used
13 is correct. But I didn't see anything
14 technically wrong with any of the articles, as
15 I reviewed them.
16 Q. And what's the issue you have with
17 using average willingness to pay in this case?
18 A. It's not an appropriate construct for
19 measuring market price. There are approaches
20 that you could use to figure out what actual
21 and but-for market prices are. Average
22 willingness to pay is typically not an input to
23 that, and it certainly can't be the only input.
24 Q. What are those other methods that can
25 be used to determine the but-for market prices?

Page 75

1 A. You need to -- you need both a supply
2 and a demand curve. And average willingness to
3 pay is a -- is an average of the demand.
4 So you need both a way to characterize
5 supply, which is made complex by this being a
6 differentiated product market, and then --
7 sorry -- demand -- and you need a way to
8 characterize supply.
9 Q. You said there are methods you can use
10 to do that. What methods can you use to arrive
11 at that result?
12 A. So in the abstract, there are methods
13 that do demand curve estimation and then
14 incorporate supply-side approaches, and then
15 make some -- define the markets, identify the
16 competitors, do some calculations as to what
17 the equilibrium prices are.
18 That hasn't been done here, but that's
19 one method that has been used in economics. I
20 don't know whether it could be applied fully
21 here, but it hasn't been done here.
22 Q. So you did not apply that methodology
23 here; correct?
24 A. No, I didn't -- I did not implement
25 that methodology.

Page 76

Lorin M. Hitt, Ph.D.   -   5/30/2019
Case 2:18-cv-01736-DOC-JPR   Document 194-1   Filed 10/09/19   Page 23 of 53   Page ID
#:7464
Jennifer Keilman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Q. So you don't know whether the results of using that methodology would be any different than what Dr. Krosnick found in his survey?

A. **No, but that's kind of an odd question, because any two numbers by accident can be equal. I think it's extremely unlikely.**

Q. But you haven't done the work so you don't know for sure?

A. **So if I -- I could -- I wouldn't even characterize it that way. I'd say that there's no reason to believe that that's the number at all.**

**Could it be by accident? I can't even speculate. But there's no reason to believe that that's the correct number, because he hasn't done all the things that are necessary in order to figure out what the actual and but-for prices would be.**

Q. And you also did not do that work; correct?

A. **That's correct.**

Q. You talk a little bit in Paragraph 35 on Page 12 about the supply conditions which affect actual prices paid. And you talk about

this again later in your report, but we can start with it here.

What are supply-side factors?

A. **I articulate at least some of them here. But they are -- typically, you identify in order to characterize supply, you identify the set of relevant competitors. At a minimum, it includes estimates of average -- sorry -- fixed and marginal costs.**

**There's usually, alongside the supply, there's -- some blends it in to supply and demand but some characterization of competitive interaction.**

**It also includes other types of responses. It includes a set of possible responses that competitors can take in addition to prices and any other actions that they might take.**

**So it's the -- it's the cost structure definition of "competitors" and the set of strategic choices that they can make.**

Q. Did you do any analysis or work to determine which supply-side factors would be applicable in this case?

A. **I think, in general, those are**

applicable in every setting. And whether or not you can fully characterize them and get an adequate characterization, you have to actually do the whole thing. But those characteristics I described are applicable here.

Q. Would those supply-side factors that you identified be the same in the but-for world? Would the same factors exist?

A. **So the same considerations exist. They may take on different values -- almost certainly take on different values because you're going to be operating in a different world.**

**But those same considerations would apply in both the actual and the but-for world, and they're not going to -- the considerations are the same; but the actions and the -- what's actually done is going to likely differ.**

Q. Would you agree that in the actual world, the value of the supply-side factors that you have identified are fixed because they actually have occurred?

A. **So setting aside the word "value" --**

Q. I was using your word.

A. **Okay. So -- so the -- the figure**

that -- the actual world does exist and you can observe the outcomes of that. You don't necessarily observe the primitives that generated the outcome, which is one of the problems of -- you have to figure those out to figure out what happens in the but-for world.

Q. What are the primitives? I haven't heard that term before.

A. **So what you observe in the real world is an equilibrium outcome. You don't observe all possible outcomes; it's the intersection of supply and demand. You don't observe all the things that led that to be the actual result. So you, for example, don't know the shape of the supply curve in the actual world either because you only observe one point.**

**And so you have figures, for example, potentially prices and quantities sold. There's some question as to whether you even have those here. But that's what you observe. You don't observe all of the characteristics that drive what supply and demand are.**

Q. You have to do some studies, some analysis to come up with that?

A. **Typically, yes.**

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 24 of 53 Page ID #:7465
Jennifer Keilman and Carol Sloan vs. Champion Petfoods USA, Inc., et al.

1  Q.  Did you do analysis of any of the
2  supply-side factors in this case?
3  **A.  I examined the ones I thought could**
4  **potentially be relevant, but I haven't done**
5  **more than that.**
6  Q.  You say you examined the ones you
7  thought could potentially be relevant.  What do
8  you mean by "examined"?
9  **A.  Examined is looked at the setting,**
10 **looked at the existing literature and what**
11 **people have done, and given some consideration**
12 **to what are the factors that would be needed to**
13 **be analyzed to characterize supply.**
14 Q.  But you didn't collect any data from
15 Champion or elsewhere to actually do any
16 analysis of those particular factors here, did
17 you?
18 **A.  No, I didn't undertake any data**
19 **collection to build a supply model.**
20 Q.  Could you have done that?
21 MR. KESSLER:  Objection to form.
22 THE WITNESS:  I don't know.
23 BY MR. KESSLER:
24 Q.  So since you did not do that, you
25 don't actually know what the supply curve in
Page 81

1  How could that be done?
2  **A.  So I didn't -- in general, you have to**
3  **characterize supply and demand -- and that's**
4  **the discussion I have in my report -- and then**
5  **identify the competitors and their response**
6  **sets and compute the new equilibrium.**
7  **How that would have to be implemented,**
8  **I'm not quite sure because I haven't done the**
9  **work yet.**
10 Q.  You say in Paragraph 35 of your
11 report, which is on Page 12, that average
12 willingness to pay does not have a direct
13 relationship to market price.
14 Is willingness to pay a component of
15 determining market price?  Isn't that the
16 demand half of it?
17 **A.  So willingness to pay is a -- if you**
18 **had it -- if you had the full set of**
19 **willingness -- excuse me -- willingness to pay**
20 **for individuals, that is a -- that is a**
21 **characterization of the demand curve.**
22 **The average willingness to pay is not.**
23 **That's a parameter of -- you take a large**
24 **number of things, which would characterize**
25 **demand curve, and compact it down to a number,**
Page 83

1  the actual world looked like in this case;
2  correct?
3  **A.  You observe a point on it, but you do**
4  **not know what the rest of the curve looks like;**
5  **that's correct.**
6  Q.  And similarly, for the but-for world,
7  based on plaintiffs' allegations, you don't
8  know what that supply curve would look like in
9  the but-for world?
10 **A.  Since I haven't built the model, I**
11 **don't know what that would be.  But that is --**
12 **it is something you'd need to figure out in**
13 **order to figure out what the new equilibrium**
14 **prices are.**
15 Q.  Did you do any work to replicate
16 Dr. Krosnick's calculations using the
17 supply-side factors that you think are
18 appropriate?
19 **A.  It's a much larger exercise than that.**
20 **There's more things to do.  There's -- and**
21 **there was no either market modeling or**
22 **supply-side analysis done.  And so I didn't**
23 **introduce anything additional.**
24 Q.  In your opinion, how do you determine
25 market price in the but-for world in this case?
Page 82

1  **which may or may not even lie on the demand**
2  **curve.**
3  Q.  When you say "a full set of
4  willingness to pay," how would you get that
5  full set?
6  **A.  There are various methods people have**
7  **proposed to try to do that.  It's not something**
8  **I evaluated in this context.  But you need to**
9  **get product preferences from different**
10 **customers in the market.  There's -- there are**
11 **some methods that people have attempted to do**
12 **those things.**
13 Q.  Would that be done through survey?
14 I'm trying to picture how that can be done
15 outside of a survey.
16 **A.  There's methods based on archival**
17 **data.  There's methods based on surveys.**
18 **Whether or not, again, that could be**
19 **effectively implemented here, since I haven't**
20 **done it, I don't know.**
21 **I think it is difficult in**
22 **differentiated product markets to do things**
23 **with surveys because there's just a large**
24 **number of different kinds of consumers.  But,**
25 **again, I haven't done that work yet so I don't**
Page 84

Lorin M. Hitt, Ph.D.  -  5/30/2019
Case 2:18-cv-01736-DOC-JPR   Document 194-1   Filed 10/09/19   Page 25 of 53   Page ID
Jennifer Keilman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.
#:7466

know.

Q.  Did you do any analysis in this case
to determine whether the average willingness to
pay has any relationship with actual prices in
the market?

A.  No.  By basic demand theory, average
willingness to pay is a summary of the demand
curve that doesn't necessarily even lie on the
demand curve.  So there's -- that statement
doesn't require any additional analysis.  I
haven't done a full characterization of demand
here.

Q.  So you don't actually know whether the
diminution in value that Dr. Krosnick came up
with reflected what market price would be in
the but-for world?

A.  So -- so my -- I have a pretty strong
opinion that that cannot be right.

What it actually is, I don't know.
But this is not an appropriate way to do that
calculation, and so the -- the likelihood that
that's right is basically zero.

Q.  But, again, you didn't do any
analysis?  You don't know for sure?

A.  It would only be coincidental, and it

Page 85

would have nothing to do with the underlying
method used.  It's -- it's incorrect as a
matter of theory.

Q.  So your second opinion, as I read your
report, is that the use of a willingness-to-pay
measure overstates damages; is that right?

A.  That's correct.

Q.  Would you agree that the market price
of a product is partially based on consumer
demand?

A.  It's the intersection of supply and
demand, so demand is a component of it.

Q.  Do you have any opinions in this case
about whether Champion set the MSRP of the
products at issue at a price that reflects the
value -- the market value of those products?

A.  So I would -- I don't know how to
answer that with market value because, again, I
don't know how they would view such a term.
What my understanding is, is that they set the
price based on some consideration of what they
thought supply and demand was.  I would not
characterize it as market value.

Q.  If I called that market price, would
you agree?

Page 86

A.  So two components.  One is they set
MSRPs based on some -- some sense of what the
market price would be.  What the actual market
price would be varies, because, again,
retailers have the ability and do offer
different prices other than the MSRP.  So it
provides some information, but it's not the
actual market price.

Q.  Did you do any research to determine
whether willingness to pay differs from the
market price or market value of the Champion
products at issue for consumers?

A.  Only the analysis set -- the analysis
set out in my report describes why I believe
that there's different willingness to pay for
different consumers.

And so I did do that analysis.  And,
also, in general, the willingness to pay
exceeds market price.  That's a normal property
of most demand systems.

Q.  You didn't do that analysis here,
though, to determine whether willingness to pay
exceeds market price; correct?

A.  I did an analysis of the underlying
theory of price formation and some additional

Page 87

analysis looking at some information that's
available in the market that led me to that
conclusion.  I didn't compute a demand curve.

Q.  Did you do any work to determine
whether Dr. Krosnick's diminution in value
percentage would be different had he done the
work that you think was appropriate to
determine market value?

A.  Again, I wouldn't characterize it as
market value.  I'd prefer to use a precise
term.  I have not -- since Dr. Krosnick and
Professor -- does he prefer Dr. or Professor?

Q.  Mr. Weir -- or Krosnick?

A.  Yeah.

Q.  I call him Dr. Krosnick.

A.  Okay.  I'll call him Dr. Krosnick.

So since he hasn't done that, I
haven't evaluated it.  And so I don't know if
he had done something different, whether that
would have been -- would have properly or
improperly characterized demand.

Q.  Should I use the term "market price"
going forward?  So I just want to make sure
we're talking about the same thing.

A.  "Market prices" mean something --

Page 88

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 26 of 53 Page ID #:7467
Jennifer Keithman and Carol Shoaff vs. Champion Petfoods USA, Inc.; et al.

1  Q.  Okay.  And --
2  A.  -- although there's not a single
3  market price, but the idea of market price is
4  at least more precise.
5  Q.  So you prefer that over value?
6  A.  Yes.
7       MR. KESSLER:  But just to be
8  clear, you're not using those two terms
9  synonymously; is that right?
10      THE WITNESS:  That's correct.
11 BY MS. BORRELLI:
12  Q.  All right.  My reading of your report
13 says that your third opinion is that
14 Dr. Krosnick's analysis does not follow an
15 established methodology for estimating the
16 effect of a change in a product attribute on
17 demand.
18      Starts on Page 13, Paragraph 39.  Is
19 that right?
20  A.  Let me just get to the same point.
21      That's correct.
22  Q.  You don't have any opinions regarding
23 Dr. Krosnick's survey design, in general;
24 correct?  That's more Dr. Hanssens' purview?
25  A.  So the details of the survey

Page 89

1  Q.  Is a treatment and control survey a
2  method that can be used to estimate the effect
3  of a change in a product attribute on demand?
4  A.  So step back.  A couple of components
5  to that question.  Treatment and control survey
6  I don't think is a standard term of art.  I
7  believe that's something Mr. Weir stated.
8       This isn't, as far as I can tell, a
9  treatment-and-control style analysis, not using
10 it in the same way Mr. Weir does, but the idea
11 that there's -- in fact, Dr. Krosnick says
12 there's no control group so it can't be
13 treatment and control.
14      Methods that rely on the comparison
15 between a treatment group and a control group
16 are widely used.  Whether they could be applied
17 here, I don't know.  But that's not what was
18 done here.
19  Q.  But you would agree -- and I'm not
20 talking about what was done here.  But, in
21 general, a treatment and control survey is a
22 method that can be used to estimate the effect
23 of a change in a product attribute on demand?
24  A.  So, first of all, I don't think that's
25 well defined.  Second is, treatment and control

Page 91

1  implementation, I think, are in
2  Professor Hanssens' world.  I do have some
3  comments as to whether or not the figures
4  produced by that can be used the way they're
5  being used, and that might involve things about
6  the survey design.
7  Q.  Can you identify what your opinions
8  are related to Dr. Krosnick's survey design?
9  A.  So in terms of survey -- so the
10 comment is at best that's a -- and this may not
11 be the universe.  But the primary issue is, is
12 that at best, it's a measure of willingness to
13 pay, which is not an appropriate input to the
14 types of calculations Mr. Weir is doing.
15      Professor Hanssens has some other
16 questions as to whether or not it's able to do
17 that.
18      In addition, in a differentiated
19 product market, the willingness to pay is
20 likely to vary by product and consumer and
21 potentially market environment.  And so the
22 idea that there's -- that one is meaningful, I
23 don't agree with -- if those are the primary
24 things.  There are some other -- we might get
25 to other individual comments in the report.

Page 90

1  methods broadly can be used for all sorts of
2  economic research.
3       It's unclear to me that you -- I don't
4  believe this is true, but -- that a survey by
5  itself would give you all the information that
6  you would need.  But, again, having not seen
7  it, I don't know.  But certainly what was done
8  here can't get you there.
9  Q.  Is a contingent valuation survey a
10 method that can be used to determine the effect
11 of a change in the product attribute on demand?
12  A.  It's my personal opinion, based on my
13 understanding of the literature, that
14 contingent valuation methods are not reliable
15 for estimating demand curves for market
16 products.
17      There's some debate about it as to
18 whether it's appropriate for public goods.  And
19 some people use it, and some people don't.  But
20 given what I've -- my understanding of
21 "contingent valuation," I don't think it can
22 give you reliable estimates of demand curves
23 for sort of ordinary market goods.
24  Q.  Is a choice-based conjoint survey a
25 method that can be used to estimate the effect

Page 92

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 27 of 53 Page ID #:7468
Jennifer Keilman and Carol Shoaff vs. Champion Petfoods USA, Inc.; et al.

**Page 93**

1  of a change in a product attribute on demand?
2     **A. So I've seen that method been proposed**
3  **and used. I think it can provide some**
4  **information about demand.**
5       **Whether or not it can reliably do so**
6  **depends tremendously on the context and, in**
7  **particular, I think it's got some limitations**
8  **regarding products that are highly**
9  **differentiated. But that can be -- that's the**
10 **intention of a choice-based conjoint, is to**
11 **provide information on demand.**
12    Q. In other litigations that you've been
13 a part of where you've evaluated either
14 proposed or implemented choice-based conjoint
15 surveys, have you ever found that that survey
16 was an appropriate methodology to determine --
17 to estimate demand in that case?
18    **A. So no. In most of the cases I've been**
19 **working on, I'm dealing with products that have**
20 **a much larger space of features than are**
21 **typically able to be accommodated by**
22 **choice-based conjoint. So that's one of the**
23 **critiques.**
24      **And then there's other implementation**
25 **things, but it's limited in settings where the**

**Page 94**

1  products have a large number of features.
2     Q. In Paragraph 39 of your report, you
3  say that there are numerous methods and
4  economics for estimating the relationship
5  between product attributes -- sorry -- Page 13,
6  Paragraph 39.
7     **A. I'm mixing pages and paragraphs.**
8  **Sorry.**
9       **Okay. Yes. All good.**
10    Q. Okay. So you're talking about methods
11 in economics for estimating the relationship
12 between product attributes and prices for
13 differentiated products. "These methods
14 include hedonic price analysis, the random
15 utility-discrete choice modeling framework, and
16 conjoint analysis."
17      What is the random utility-discrete
18 choice modeling framework?
19    **A. So that is a family of techniques**
20 **including -- includes some of the techniques**
21 **that people have employed to analyze conjoint**
22 **data, but it's not conjoint.**
23      **The idea is you can look at consumer**
24 **choice in actual markets and combine that with**
25 **characterization of supply, characterization of**

**Page 95**

1  competitive interaction, and build structural
2  models of markets to try and make inferences
3  about the product prices.
4       And it relies on, typically, a certain
5  set of statistical assumptions and observed
6  choice data, what consumers bought when faced
7  with many different alternatives.
8     Q. So that methodology relies on
9  marketplace data?
10    **A. The econometrics of it can rely on any**
11 **kind of choice data, but its implementation is**
12 **typically with market data.**
13    Q. And we've mentioned hedonic price
14 analysis, but can you just remind me what that
15 is.
16    **A. So the random utility approach focuses**
17 **on choices, given a set of product attributes.**
18 **Hedonic price analysis tries to estimate the**
19 **relationship between product attributes and**
20 **observed prices.**
21      **And so it, under some assumptions, can**
22 **give some information about demand, but by**
23 **itself is not -- there's a lot of issues about**
24 **what -- how to actually interpret it. But**
25 **that's the idea, is where you try to estimate**

**Page 96**

1  the relationship between features and price.
2     Q. And did you employ any of these
3  methodologies in your work in this case?
4     **A. No. I just noted that those are the**
5  **most common methods, and this differs from**
6  **those.**
7     Q. Could you have employed those
8  methodologies in this case?
9     **A. I wasn't asked to, so I don't know.**
10    Q. Are you -- do you have the proper
11 education and background to employ these
12 methods?
13    **A. I've used both random utility models**
14 **and hedonics in my own academic work, so I'm**
15 **familiar with these techniques. It is reliant**
16 **on having certain kinds of data available,**
17 **including prices and products, which seem to be**
18 **limited in this context.**
19    Q. I think you say in here that the
20 hedonic price analysis can be done from
21 multi-attribute products; is that right?
22    **A. So all of these methods are intended**
23 **to be done with products that have multiple**
24 **attributes.**
25    Q. So could that method be used on the

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 28 of 53 Page ID #:7469
Jennifer Keilman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Champion products at issue in this case?

A. In the abstract perhaps. But I don't know that either the data is there or that it's possible to characterize the products sufficiently that you could get a reliable estimate, given the very, very large number of products in this space.

Q. What data would you need to determine whether you could do that analysis?

A. So this -- and this is just -- so setting aside, this just deals with -- these are just methods for doing demand; it doesn't deal with the supply side at all.

But hedonic typically needs a full set of product attributes and a full -- and prices and a well-defined set of markets so that you could look at those for products that are similar enough that they're considered in the same market.

Random utility uses the same information as well as with product choice data. Typically, it can be done at either the market-share level or individual choice.

Q. Did you do any work to determine whether this data was available for the

Page 97

Champion products at issue?

A. I did some initial looking when I first started to see what data was available, and it appears that neither price nor quantity data is available even for Champion products. I didn't look to see -- you also need it for all of the additional products in the marketplace. I didn't do that investigation.

Q. So you don't know for sure whether this analysis -- hedonic or random utility-discrete choice -- could be done here?

A. I don't know.

Q. So I think you said that all of these three methods that you identify in this section are difficult to implement for products with a large number of attributes; is that right?

A. They get increasingly difficult as the number of attributes increases, yes.

Q. Can they be used on any consumer products that you can think of?

A. They've -- they have been used for some consumer products. Again, it depends on how much precision you want and what the question you're trying to answer is. But these models have been implemented for consumer

Page 98

products with relatively small number of describable attributes as well as some that have some more.

Q. What would be a product that has a small number of describable attributes?

A. Well, certainly commodities fall into that category, where you have a handful at most of descriptive features. I'd have to think carefully about where you cross the line. But the smaller number of describable attributes that consumers pay attention to, the more likely it is that these will work.

Q. Would you agree with me that Dr. Krosnick's survey seeks to determine how a change in a product attribute affects consumers' purchase decisions?

A. I'm not necessarily -- I don't think I would necessarily agree with that fully in the sense that corrective -- the way the corrective statements are done doesn't resemble what I would consider a normal product attribute. But I understand that's the way he describes it.

Q. So you agree that's what he's seeking to do, whether you agree that's what he actually did?

Page 99

A. That's my understanding, that that was -- he set out to try to figure out how the willingness to pay -- he calls it value, but it ultimately is willingness to pay -- would change under different conditions.

Q. Would you agree that that's the same information that a choice-based conjoint survey would seek to discover?

A. At a very abstract level. There's some similarities. But conjoints provide much more information than these surveys do.

And certain methods provide -- especially the modern techniques for analyzing conjoints provide a lot more information than average willingness to pay.

Q. But, in general, they're seeking the same thing? If this product attribute is disclosed to consumers, how does that change the demand, willingness to pay?

MR. KESSLER: Objection to the form.

THE WITNESS: Yeah, I would -- so you can use these methods to create multiple scenarios and see how behavior is different. And whether -- what you get out of them,

Page 100

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 29 of 53 Page ID
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc.; et al.
#:7470

**Page 101**

1  though, depends critically on the method.
2      And so, for example, conjoint
3  gives you more information than average
4  willingness to pay.  So that gives you
5  potentially more of the characterization of
6  demand.  Whether that's sufficient, I haven't
7  fully evaluated that.
8  BY MS. BORRELLI:
9      Q.  What more information does conjoint
10  give you?
11      A.  So using the standard -- the modern
12  methods, you can get some estimate -- again,
13  how reliable it is and how precise it is
14  varies -- of individual consumer preferences.
15  Typically, has a very, very, very wide band on
16  it, in all the surveys I've seen.  But you get
17  more individual-level information out of there
18  that you can sometimes make inferences on.
19      Q.  But you did not conduct a conjoint
20  analysis here; correct?
21      A.  That's correct.
22      Q.  So since you didn't -- you don't
23  actually know whether it would have turned out
24  any differently than Dr. Krosnick's survey?
25      A.  Again, there's no reason to believe

**Page 102**

1  that two completely different methods would
2  give exactly the same information.  And
3  conjoint provides a super set of the
4  information available in Dr. Krosnick's method,
5  in general.
6      Q.  In Paragraph 41 on Page 15, the second
7  sentence you say, "I was unable to find a
8  precedent in the economics literature for the
9  use of Dr. Krosnick's statistical method in the
10  context of retail consumer products."
11      What do you mean by "Dr. Krosnick's
12  statistical method"?
13      A.  What he considers to be the
14  Lewbel-Watanabe method.  And this was based on
15  back-searching the Watanabe paper to see if
16  there's any use of that in the academic
17  literature for a consumer product.
18      Q.  In that search, did you find any
19  academic literature stating that the
20  Lewbel-Watanabe approach is inappropriate for
21  consumer products?
22      A.  I didn't look for that, so I don't
23  know.  But it's not been -- at least the
24  Watanabe paper, in particular, has not been
25  cited for anything that appears to be a

**Page 103**

1  consumer product.
2      Q.  You go on in that paragraph to talk
3  about a search related to the Watanabe 2010
4  article.
5      In that search, did you find any
6  publications saying that the findings of the
7  2010-Watanabe article could not be used in
8  studies related to demand for a retail consumer
9  good?
10      A.  I didn't look for that specifically,
11  so I can't answer it.  But there were no retail
12  studies done that I know of that cited that
13  paper.
14      Q.  I think you testified earlier that you
15  read that 2010 Watanabe article; right?
16      A.  Yes.
17      Q.  Did anything in that article indicate
18  to you that it was inappropriate for
19  Dr. Krosnick to use that methodology in this
20  case?
21      A.  In that article alone?
22      Q.  Yes.
23      A.  I don't think there's anything
24  specific to that article that would suggest
25  this is appropriate.  Both Professor Hanssens

**Page 104**

1  and I have broader concerns about using these
2  methods in these contexts, but I don't think
3  the Watanabe paper had any comment on that.
4      Q.  Did you do any study or statistical
5  analysis to show that the Lewbel-Watanabe
6  approach was inappropriately used by
7  Dr. Krosnick in this case?
8      A.  So my analysis and my report
9  articulates why I believe it's -- it's not --
10  it doesn't measure the appropriate things even
11  if perfectly implemented.  And then I have some
12  separate issues that suggest that it doesn't
13  provide reliable estimates of the constructs he
14  has presented, but that's separate from that.
15      So as a theoretical matter, it doesn't
16  generate the information you need.
17      Q.  Did you do any analysis of
18  Dr. Krosnick's data using statistical measures
19  that you think are more appropriate?
20      A.  I did not -- well, I did do some
21  modifications of Dr. Krosnick's analysis.  I
22  did reanalyze his data using his techniques,
23  and some of that is articulated in my report.
24      Q.  So you reanalyzed his data using his
25  techniques?  Is that what you said?

Lorin M. Hitt, Ph.D. - 5/30/19
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 30 of 53 Page ID #:7471
Jennifer Keltman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Page 105

1    A.   **Using variations of his techniques,**
2 **yes.**
3    Q.   But you did not reanalyze his data
4 using a statistical methodology that you think
5 would be more appropriate?
6    A.   **I didn't -- that wasn't within the**
7 **scope of my assignment.**
8    Q.   So you don't know whether the results
9 of the statistical analysis would be different
10 under any different methodology?
11    A.   **So my critique is not simply on the**
12 **statistics.  It's on the whole -- it's on the**
13 **data collection and the use of this overall.**
14    **So I did do some reanalysis within the**
15 **world of his methods.  I didn't evaluate**
16 **whether or not other methods to apply to his**
17 **data would yield same or different results**
18 **because I don't think the entire -- I don't**
19 **think the analysis is appropriate as an input**
20 **to what Mr. Weir is doing.**
21    Q.   Your next opinion is on Page 15,
22 starting on Paragraph 43.  You say, "The
23 decision setting in Dr. Krosnick's survey does
24 not resemble the actual purchasing
25 environment."

Page 106

1    Do you see that?
2    A.   **Yes.**
3    Q.   Is it your opinion that surveys can
4 never be used to assess consumer demand because
5 they can never perfectly replicate the
6 real-world purchasing setting?
7    A.   **I don't think I'd ever make a blanket**
8 **statement that was that broad, but certainly**
9 **what is here does not resemble the actual**
10 **decision environment.**
11    Q.   Have you ever evaluated a survey
12 related to assessing consumer demand and found
13 that it did properly reflect the real-world
14 purchasing conditions?
15    A.   **I can only limit it to the ones I**
16 **recall.  I can't recall any that I have, but**
17 **there are academic papers that have done work**
18 **in retail environments.  Nothing comes to mind,**
19 **though.  But that's a fundamental limitation of**
20 **that methodology.  That may be more or less**
21 **important in certain contexts.**
22    Q.   So in Paragraph 43 from Page 15,
23 carrying on over to Page 16, there's a sentence
24 that says, "To the extent that the information,
25 conditions and environment markedly differ

Page 107

1 between the survey environment and the actual
2 retail purchasing environment, there is no
3 reason to believe that choices made under
4 different conditions replicate choices made in
5 the real world."
6    And you have a citation there,
7 Footnote 57, where you talk about severe demand
8 effects.
9    Do you have an opinion about whether
10 demand effects were present in Dr. Krosnick's
11 survey?
12    A.   **My opinion is that, is it plausible**
13 **that there were in this context, which is the**
14 **point I'm making here?  I didn't do the**
15 **evaluation.  That was within the scope of**
16 **Dr. Hanssens'.  I do believe that the deviation**
17 **from the real world to this environment is**
18 **sufficiently different that you could believe**
19 **that there were a variety of biases that were**
20 **introduced.**
21    Q.   But you haven't done the work to
22 identify what those biases were in
23 Dr. Krosnick's survey?
24    A.   **I point out the ex ante conditions**
25 **that suggest those biases are likely to be**

Page 108

1 **present.  That's the -- that was the scope of**
2 **my analysis.**
3    Q.   And then in Footnote 58, prior to
4 that, you say, "Moreover, to the extent that
5 different consumers differ in characteristics
6 of their decision environment," and then you
7 have Footnote 58, citing to the Hanssens
8 report.
9    Do you agree with Dr. Hanssens'
10 conclusions that you cite there?
11    A.   **To the best of my recollection, yes.**
12    Q.   Are you relying on his conclusions?
13    A.   **In this case, yes.**
14    Q.   So wherever you cite Dr. Hanssens in
15 this report, Exhibit 1, are you relying on his
16 conclusions?
17    A.   **There may be circumstances where it's**
18 **consistent with my understanding but, yes, in**
19 **terms of the reliance, I'm relying on his**
20 **analysis there.**
21    Q.   Paragraph 44 discusses that consumers
22 typically have multiple choices in the
23 marketplace.  You don't cite anything here.
24 What is the basis for your opinion in this
25 paragraph?

Lorin M. Hitt, Ph.D.  -  5/30/2019
Case 2:18-cv-01736-RBC-JPR   Document 194-1   Filed 10/09/19   Page 31 of 53   Page ID
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.
#:7472

1    A.  You can walk into any store and any
2  pet store and observe this directly, so that's
3  a normal characteristic of the retail consumer
4  environment.  And there's also some other
5  analysis I did that indicates there's something
6  like at least several hundred different dog
7  foods that are available in the market.
8    Q.  Did you go to any pet stores as part
9  of your work in this case?
10    A.  I did incidentally as part of my
11  normal life as a pet owner and observed what
12  was on the shelves, including a couple of times
13  where I looked specifically at Champion
14  products.
15    Q.  What pet store do you go to?
16    A.  So sometimes I buy online.  There's a
17  couple different ones.  Pet Valu is around my
18  house, and there's another one whose name I
19  don't recall that's also in Norristown that I
20  sometimes go into.
21    Q.  What online retailers do you purchase
22  from?
23    A.  So I think the last dog food I bought
24  was Amazon.  I also rely on our veterinarian
25  for some of it, too.

Page 109

1    THE VIDEOGRAPHER:  We are going
2  off the record.  The time is 11:08 a.m.
3    (Recess.)
4    THE VIDEOGRAPHER:  We're going
5  back on the record.  The time is 11:13 a.m.
6  BY MS. BORRELLI:
7    Q.  Okay.  We were talking about your
8  opinion that the decision setting in
9  Dr. Krosnick's survey does not resemble the
10  actual purchasing environment.  I wanted to
11  looking at -- we're looking at Paragraph 44.
12    So I think you said the basis of this
13  opinion is just your observations that there
14  are a number of products in the pet food
15  market?
16    A.  I think that's part of it.  It's my
17  own personal observation as well as sort of
18  general characteristics of retail environments.
19    Q.  Is there any academic article or
20  source that supports this opinion that the
21  presence of multiple products provides
22  well-defined alternatives that are
23  simultaneously considered at the time of
24  purchase?
25    A.  Nothing that comes directly to mind.

Page 111

1    Q.  What brand of dog food do you buy?
2    A.  Currently, Purina ONE.
3    Q.  Have you bought others in the past?
4    A.  Yes.
5    Q.  Such as?
6    A.  VeRUS is the other one.
7    Q.  Have you ever purchased Champion dog
8  food, Acana or Orijen?
9    A.  I have not.
10    Q.  So which store did you observe
11  Champion's foods?
12    A.  I think in both the one in Norristown
13  and both -- and in Pet Valu.  I've seen -- it's
14  on the shelf.
15    Q.  Have you had any conversations with
16  your vet about Champion dog food?
17    A.  No.  The -- the only time we would do
18  that would be for prescription food.
19    MR. KESSLER:  If you get to a
20  point that makes sense, can we take a quick
21  break before lunch?
22    MS. BORRELLI:  Right now is fine.
23    MR. KESSLER:  Okay.
24    MS. BORRELLI:  Sure.
25    Off the record.

Page 110

1  But, in general, demand estimation methods, you
2  do look at -- you do want to have alternatives
3  defined.  That's part of what defines consumer
4  choice.  It's one of the main two or three
5  things that define what consumer choices are.
6    Q.  Did you do any study or analysis to
7  determine how various other product
8  availability or tradeoffs among product
9  attributes would affect consumer purchases in
10  the market that Champion dog food is in?
11    A.  So my comments here are based on a
12  general understanding of differentiated
13  products.  I didn't do anything additionally
14  other than observe there's large number of
15  products in the market, and they are presented
16  alongside other products; and that, in general,
17  it's preferences, choices and information are
18  the things that drive the demand for product.
19    Q.  In Paragraph 45, talking about
20  Dr. Krosnick's survey, you say, "This focus on
21  a single product is unlike how consumers
22  typically search for products."
23    What's the basis for that statement?
24    A.  A big -- a significant portion of my
25  work for a while was on consumer search

Page 112

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 32 of 53 Page ID #:7473
Jennifer Reitman and Carol Shoaff, vs. Champion Petfoods USA, Inc.; et al.

**Page 113**

1  behavior. And, in general, there are --
2  there's a fair amount of research that suggests
3  that consumers engage in a different and --
4  but -- engage in searches, different across
5  consumers, that involve comparing products or
6  comparing prices. It's pretty well established
7  in both academic and general practice.
8  Q. Did you conduct a survey or other data
9  collection to determine how dog food purchasers
10  typically search for products?
11  A. There's some information available
12  here that -- that you have multiple -- you have
13  comparison sites out there. There's documents
14  cited that suggest there's a variety of
15  different sources of information.
16  Having read the named plaintiffs'
17  depositions, they used different sources for
18  searching as well. And so that's -- I didn't
19  do anything specific -- you know, extensive
20  data analysis to do so. But it is a general
21  characteristic of consumer behavior, and it
22  appears to be true in this environment as well.
23  Q. In Paragraph 46, you say that "Product
24  warning labels or other information on products
25  are typically integrated into the product

**Page 114**

1  packaging or displayed alongside other
2  information."
3  What's your basis for that?
4  A. Well, observations of general consumer
5  products.
6  Q. Did you do any observations of dog
7  food products to come to that opinion?
8  A. I've looked at dog food packaging, but
9  this is a general statement about consumer
10  products broadly.
11  Q. Also in that paragraph, you say that
12  "Product purchase decisions that are made as a
13  result of this type of product information
14  presentation," which I believe you are
15  referring to the corrective statements that
16  Dr. Krosnick proposes? Is that what you're
17  referring to there?
18  A. It's not just the corrective
19  statements but the entire environment in which
20  that information is presented.
21  Yeah, to the extent that the
22  information consumers have at the time of
23  decision is different than that that they would
24  have had in the real world, there's no reason
25  to believe that the choices will be the same.

**Page 115**

1  Q. Did you conduct any analysis or study
2  to determine whether that -- that's the case
3  for the products at issue here?
4  A. Nothing independently, other than
5  noting that that's a normal characteristic of
6  retail environments; and a big portion of my
7  research relates to the effect of information
8  on choices. So it's something I'm very
9  familiar with.
10  Q. Is there any literature or academic
11  research showing whether that opinion applies
12  to every single consumer product?
13  A. So it's inherent in any framework that
14  takes into account consumer choice because,
15  ultimately, the demand depends on consumer
16  preferences, information available at the time
17  of purchase, and the choices available. That's
18  the -- that's kind of like the fundamental
19  characteristic of demand. So it's kind of
20  embedded in almost everything that's done in
21  demand.
22  And certainly there's a lot of
23  literature that changes in information will
24  lead to changes in choices, including papers
25  I've written.

**Page 116**

1  Q. And in Paragraph 47, you opine that
2  class members that purchased the products at
3  issue in this case are likely to have different
4  preferences than those with no experience with
5  Champion products.
6  Did you do any study or analysis to
7  support that opinion?
8  A. So this, again, is a general statement
9  about this market. The one analysis I did do
10  is that there's information that suggests that
11  repeat purchase is common in here, and I've
12  written a lot of papers about drivers of repeat
13  purchase behavior and the information effects
14  thereof.
15  So this is an environment where
16  there's likely to be repeat purchase behavior,
17  and so most of the people buying the product
18  are people who are already familiar with the
19  product. And that's going to be different than
20  people who don't know anything about the
21  product.
22  Q. The source that you cite for that is
23  in Footnote 61. You cite the Bates number, but
24  I can represent that it's a Brand Finance US
25  dog/pet food survey.

Lorin M. Hitt, Ph.D. - 5/30/2019

Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 33 of 53 Page ID #:7474

Jennifer Reitman and Carol Shoaf vs. Champion Petfoods USA, Inc., et al.

1    Does that sound right?
2    **A.  Yes, that sounds correct.**
3    Q.  Do you know how that survey was
4  conducted?
5    **A.  I'd have to look back at the survey**
6  **itself.  I believe -- I'd have to look back and**
7  **see the details.**
8    Q.  Do you know whether best survey
9  practices were put into place in conducting
10  that survey?
11    **A.  I didn't do a separate evaluation of**
12  **the study, but it was something that was**
13  **commercially commissioned and used for**
14  **decision-making, is my understanding.**
15    **And that -- and that the -- in terms**
16  **of the use I'm making of it, it seems**
17  **consistent with my understanding of the market.**
18    Q.  Do you know whether the results of
19  that survey were statistically significant?
20    **A.  I don't think that's a meaningful**
21  **question in context.  I'm using it for the**
22  **observation that the -- for a factual**
23  **observation of the number of people who do**
24  **prior purchase.  Statistical significance must**
25  **be relevant -- relative to a specific**

Page 117

1  hypothesis.  So you can't say that in the
2  abstract at all.
3    Q.  You also say in Paragraph 47 that the
4  preferences of Champion purchasers likely also
5  differ from preferences of Dr. Krosnick's
6  survey population.
7    Did you do any work to determine
8  whether that's actually the case?
9    **A.  So I didn't do any reanalysis of his**
10  **data.  But the work I did do is observe -- is**
11  **observe the two things described in this**
12  **paragraph, is that the repeat purchase rate of**
13  **products is high and that only a very, very**
14  **small fraction of consumers ever purchased a**
15  **Champion product.  So for those reasons, you**
16  **would expect the populations to differ**
17  **substantially in their available information.**
18    Q.  You say in 48 paragraph,
19  "Collectively, these observations suggest
20  problems with the purchase decision environment
21  in Dr. Krosnick's survey."
22    Did you do any work to determine any
23  actual concrete problems that existed in
24  Dr. Krosnick's survey?
25    **A.  So I didn't quantify any of these**

Page 118

1  things.  I understand that Professor Hanssens
2  was addressing the actual content of the survey
3  in most cases.
4    But the things I list in the previous
5  paragraphs, I consider analysis that suggests
6  that the respondents to his survey are not
7  consumers with the same information.  That
8  would be the case of actual purchasers; and,
9  therefore, there's no reason to believe that
10  they would make the same choices.
11    Q.  But you don't have any actual data
12  suggesting that the results of the survey would
13  have been different had the concerns you raised
14  in these paragraphs been addressed by
15  Dr. Krosnick's survey?
16    **A.  I didn't do any quantitative analysis**
17  **on it.  But, again, the things I described**
18  **earlier suggest that the populations are likely**
19  **to be very different.**
20    Q.  Do you have any evidence that the
21  factors identified in Paragraphs 43 through 48
22  affected the outcome of Dr. Krosnick's survey?
23    **A.  So my comment there is specifically**
24  **about the preconditions.  One would expect if**
25  **the preconditions that -- the different**

Page 119

1  populations, you're going to get a different
2  result.  But without doing another survey, you
3  can't tell.
4    Q.  And your next opinion starts on
5  Page 18 at Paragraph 49, and you say that
6  "Dr. Krosnick assumes that his percent decrease
7  in value is statistically significant and
8  applicable across all the accused products, but
9  his data shows assumption is incorrect."
10    Do you see that?
11    **A.  Yes.**
12    Q.  In this case, you're not offering any
13  opinions about the ingredients used in the
14  Champion products at issue; correct?
15    **A.  Correct, other than -- I don't know**
16  **how else that would apply, but I don't have any**
17  **specific comments about the ingredients.**
18    Q.  You're not offering any opinions about
19  the nutritional value of the Champion dog food
20  at issue; correct?
21    **A.  No.**
22    Q.  You're not offering any opinions about
23  the recipe formulation of the products at
24  issue; correct?
25    **A.  No.**

Page 120

Lorin M. Hitt, Ph.D.  -  5/30/2019

Case 2:18-cv-01736-DOC-JPR  Document 194-1  Filed 10/09/19  Page 34 of 53  Page ID
#:7475

Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

Q. And you're not offering any opinions about the similarities or differences between the packaging of various Orijen foods; correct?

A. That's not something I did any evaluation of. But that would be relevant to -- any detailed evaluation about the fact that the packages differ is another reason why these products might be different.

Q. But you didn't do any analysis of the packaging?

A. Nothing extensive, other than make that observation that it's consistent with my prior statement that these products differ.

Q. And you're not making any -- offering any opinions in this case about the similarities or differences between the packaging of various Acana foods; correct?

A. Same answer: I'm not -- I didn't value the packaging except to note that there are different products.

Q. And you're not offering any opinions about any similarities or differences between the packaging of Orijen and Acana foods, correct, those two different brands?

A. Not making any conclusions about the

Page 121

packaging or products other than the fact that there are different products.

Q. Did you do any research or collect any data to determine whether Dr. Krosnick's survey results would have been different had he used a different type of Orijen food in his survey?

A. No.

Q. Did you do any research or analysis to determine whether Dr. Krosnick's results would have been different had he used a different type of Acana food in his survey?

A. No.

Q. Could you have done this research or analysis?

A. In theory, it's possible. But it's not in a framework that I think is correct, in any event. So it's not something I -- would have been within the scope of my analysis.

Q. Since you didn't do that work, you don't actually know whether the outcome would have been any different had a different type of a food been used in the survey?

A. I do know that the point estimates of the various effects of the corrective statements differ between the two products he

Page 122

does have in his survey. That's likely to generalize.

But, again, that's -- with the available information, that's the only inference you can make.

Q. So in Tables 2 and 3 of your report, Exhibit 1, which are on Pages 19 and 20, did you analyze the percent decrease in value for the Orijen Six Fish product?

A. So what I did do is I segmented the sample into two pieces and ran Dr. Krosnick's analysis on each sample individually, and that's what generated Table 2. I think that's the analysis you described, but that's what I did.

Q. And I think -- is it fair to say you concluded that the percent decrease in value is different for the two products under Dr. Krosnick's data?

A. You would get different -- if you ran it on each product individually, you do get different numbers. That's correct.

Q. And did you do that using the same methodology as Dr. Krosnick?

A. With the exception of segmenting the

Page 123

sample into two pieces, it is exactly the same.

Q. As part of that work, did you conduct any statistical test to check if the effect of the corrective statements on the percent decrease in value is actually statistically -- significantly different for the two products?

A. I didn't run that test. However, I'll note that the reason it's unlikely that test would fail, not because they're not different, but because these estimates are so imprecise that you can't reject, for example, zero and numbers over, you know, multiples of these.

So it wouldn't violate -- I don't think it would violate the test, but it does so because these estimates are too imprecise to distinguish really anything.

Q. Okay. But you did not run that rest?

A. I didn't run the test. But eyeballing it, it would probably pass because of the very, very large degree of standard -- the very large standard errors here.

Q. And is it your opinion that the use of a linear model is inappropriate here?

A. I don't have any strong opinion that the -- well, first of all, what he does isn't

Page 124

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 35 of 53 Page ID #:7476
Jennifer Keilman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

1 quite linear.
2    What he does is he estimates sort of
3 an unusual choice of using a Poisson
4 distribution for his model. That is not an
5 obvious first choice, and I do point out that
6 some of the alternatives that would be
7 plausible will give you different results.
8    Q.  What other models or analyses did you
9 do to make that determination?
10    A.  So the one thing I did -- and I
11 discussed this in my report -- is he, in his
12 analysis, chooses a Poisson link function for
13 the model estimate he does.
14    That's kind of an unusual choice.
15 It's not necessarily wrong, but it's not
16 something you would choose to do first.
17    You use Gaussian link function; it
18 becomes more insignificant. And it might -- my
19 inference is, is that his results are just
20 borderline not significant and he's doing
21 things to, you know, find ways to try to make
22 them look more significant.
23    Q.  You said that's your inference. Do
24 you have any evidence to support that?
25    A.  The reasonable alternatives give

Page 125

1 results -- for example, segmenting the sample
2 into two products or using a different
3 assumption for that link function give you --
4 show that his results become less precise if
5 you do that. That's the evidence.
6    Q.  You say "less precise." Do they
7 become statistically insignificant?
8    A.  Well, two thoughts on that. One is
9 the Orijen estimated by itself is
10 statistically -- the number of corrective
11 statements is statistically insignificant
12 throughout his sample.
13    Acana estimated by itself, I believe,
14 is statistically insignificant for most --
15 depending on what level of significance you
16 use, for many of the results. If you use the
17 Gaussian link function, his primary result
18 becomes more insignificant.
19    But as I recall -- I'd have to look at
20 his paper, his original work paper -- the
21 actual direct effect of the number of
22 corrective statements is not significant at the
23 normal conventional level in his base level.
24    Q.  What is the normal conventional level?
25    A.  Most people use P less than .05. The

Page 126

1 one he used would be -- if it would be reported
2 as significant would be referred to as
3 borderline significant, in most places that I
4 publish.
5    Q.  So your next opinion, starting on
6 Page 21, is that "Mr. Weir has misunderstood
7 and misapplied Dr. Krosnick's results, and he
8 has failed to propose a reliable method for
9 estimating damages."
10    Where in Mr. Weir's report does he
11 interpret any of Dr. Krosnick's findings as
12 opposed to citing them?
13    A.  So he has to -- so he, by his use of
14 it, as he's applying Mr. Weir's -- sorry.
15 Mr. Weir is applying Dr. Krosnick's result to a
16 market price, and so that must -- he must
17 understand what that is. I believe that his
18 use is inappropriate.
19    In his deposition, he was asked
20 specifically, What is Dr. Krosnick's result?
21    And he claimed it wasn't willingness
22 to pay.
23    So his deposition, he described it in
24 a different way than his usage is, and then
25 he's -- he has to understand what it is to

Page 127

1 apply it.
2    Q.  Would you agree that what the -- in
3 essence, what Mr. Weir did was take the
4 diminution in value found by Dr. Krosnick and
5 apply it to the sales numbers as he calculated
6 them using the data available?
7    A.  Setting aside all the errors in his
8 calculations, which I identify, I think that's
9 broadly consistent.
10    Q.  Assuming that Dr. Krosnick's analysis
11 and survey results are done and used in a
12 proper methodology -- which I understand you
13 disagree with, but let's assume that they are
14 correct -- is the methodology that Mr. Weir
15 used to calculate damages a proper methodology?
16 The diminution of value multiplied by the sales
17 as calculated?
18    A.  I don't think I can characterize it as
19 a proper method generally, because every method
20 requires the appropriate inputs and the
21 appropriate framework, and there's a lot of
22 things wrong with this.
23    Is there a percentage he could have
24 conjured up? I don't know, but this isn't it.
25 And the framework is inappropriate, so I don't

Page 128

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 36 of 53 Page ID
#:7477
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

1  really know how to answer that.
2      I don't think this is correct, and I
3  don't think it makes sense to talk about
4  portions of it as being correct or incorrect,
5  given that it relies -- the different pieces
6  rely on each other.
7      Q.  Okay.  But I'm asking you to assume
8  that what Dr. Krosnick did, he came up with the
9  right decrease in value for the product based
10 on the various misrepresentations and omissions
11 alleged by the plaintiffs.
12     If, in fact, that decrease in market
13 value is proper, is the right way to calculate
14 damages to take the sales numbers, multiply it
15 by that decrease in value to come up with class
16 damages?
17     A.  So it's -- there's many things in
18 there that aren't true, so I don't know how to
19 respond exactly.  He hasn't -- this approach,
20 whatever it is, can't get at consumer value.
21 And, also, there isn't a single one.  So for
22 those two reasons, I don't think it's possible
23 to use anything resembling this approach to do
24 that calculation.
25     If you could, on an individual basis,

1  he has an appropriate foundation for his
2  calculation without understanding what the
3  calculation actually is.
4      The mechanics of it, he did what he
5  did.
6      Q.  Did you do any work to calculate the
7  damages using what you would consider to be a
8  proper determination of the decrease in market
9  value of the products at issue?
10     A.  Again, I disagree with market value.
11 I did not do a calculation of the change in
12 market price that different consumers in the
13 class might have experienced.
14     So I didn't do -- I didn't do an
15 alternative calculation.  But I wouldn't
16 characterize it as market value the way they
17 have either.
18     Q.  Is it your view that the members of
19 the proposed class in this case did not have
20 the same percentage decrease in market price
21 for the products at issue, assuming plaintiffs'
22 allegations are true?
23     A.  I think it is plausible that there
24 are -- and, in fact, likely that that
25 diminution of value varies considerably across

1  find the change in what is actual value
2  received in the real and but-for worlds for
3  each individual consumer or possibly grouped
4  together in some way, that would be fine,
5  except this method isn't even close to getting
6  there.
7      Q.  So basically, you just don't think
8  there's any way to calculate class damages in
9  this case at all?
10     MR. KESSLER:  Objection to form.
11     THE WITNESS:  No.  I think that
12 the foundations that this is being based on are
13 not sufficiently well-developed to suggest that
14 you can calculate that value.  I don't have an
15 opinion as to whether or not it can be done
16 classwide.  It's certainly challenging.
17     But the -- but what has been
18 proposed here is not the right calculation.
19 BY MS. BORRELLI:
20     Q.  You've opined here that Mr. Weir
21 characterized Dr. Krosnick's survey
22 incorrectly.  Does the fact that he did that
23 affect how he calculated the damages, in your
24 opinion?
25     A.  I don't understand why he can believe

1  the class.  What those figures are I did not
2  calculate.  And there's a number of things in
3  my report that describe why I believe that.
4      Q.  So your next opinion starting on
5  Page 23, Paragraph 61, talks about supply-side
6  factors.
7      We talked about that a little bit
8  earlier.  But would you agree that the
9  historical quantity of the product sold is a
10 supply-side factor?
11     A.  No.  It's quantity -- both quantity
12 and price are equilibrium product outcomes as a
13 result of the intersection of supply and
14 demand.  So they're both -- they're both supply
15 and demand.  They're an outcome.  They're not
16 supply or demand.
17     Q.  Does that hold true even when looking
18 at the but-for world?
19     A.  Yes.  That the -- if you were trying
20 to understand what behavior would be in the
21 but-for world, you would need to use an
22 equilibrium value of what the -- given optimal
23 supplier and consumer behavior, what the
24 equilibrium outcome would be.  And that would
25 give you -- could give you a quantity at

Lorin M. Hitt, Ph.D.   -   5/30/2019
Case 2:18-cv-01736-DOC-JPR   Document 194-1   Filed 10/09/19   Page 37 of 53   Page ID
#:7478
Jennifer Keilman and Carol Sloan, vs. Champion Petfoods USA, Inc.; et al.

1 different prices or it could give you a price
2 and quantity unconstrained.
3    Q.  Would you agree that the number of
4 units of Champion pet food sold in California,
5 which is what we're looking at in this case, is
6 fixed as a matter of history for the class
7 period proposed?
8    A.  The number -- the number that was sold
9 is a figure.  I don't know that we know what
10 that number is, but that number is a constant.
11    Q.  And have you calculated the supply
12 curve for the products at issue in the but-for
13 world in this case?
14    A.  No, I have not attempted to propose a
15 full structural supply-and-demand model.  My
16 analysis is just noting that that hasn't been
17 performed here.  And so as a rebuttal expert,
18 I'm focusing on evaluating what was done.
19    Q.  Could that be done for the but-for
20 world, calculating the supply curve?
21    A.  I don't know.  It could be.  I don't
22 know.
23    Q.  It could be or you don't know?
24    A.  I don't know.
25    Q.  Okay.

Page 133

1    A.  Until you do it, you don't know
2 whether you have the information and whether
3 it's robust.  So without doing it, I can't say
4 for certain.  But that's a component that needs
5 to be done in order to make it, for instance,
6 about market prices.
7    Q.  Have you tried to find the information
8 that you would need to calculate the supply
9 curve in the but-for world in this case?
10    A.  Not systematically, because I wasn't
11 asked to do -- I wasn't asked to do that
12 analysis.
13    Q.  If the market demands a lower market
14 price for a product but the supplier does not
15 decrease the price of their product of the
16 market price, what happens?  What's the outcome
17 of that?
18    A.  So if supply -- so in an actual
19 market, if a -- if demand shifts, demand for a
20 product shifts down and supply doesn't change,
21 you can get outcomes where the quantity would
22 fall.  How much that is, is -- turns out to be
23 complicated, because what will happen in an
24 actual setting is that competitors will also
25 respond.

Page 134

1    And what happens as a result of that
2 means you don't necessarily know how much the
3 change will be.  But it could be the same; it
4 could be smaller in terms of quantity.
5    Q.  And if consumers in that market would
6 not have paid the market price for that
7 product -- strike that.
8    So you go on to say that "Holding the
9 quantity sold fixed does not account for
10 supply."  That's on Page 24, starting at
11 Paragraph 64.  What -- what is an equilibrium
12 market outcome?
13    A.  So what I'm referring to is, is it's
14 a -- the intersection of supply and demand in a
15 well-defined market, allowing for the
16 appropriate adjustment of both consumers and
17 producers, to whatever the existing conditions
18 are.
19    Q.  You probably did this earlier, but can
20 you just do it again.  What is a well-defined
21 market again?
22    A.  So there's technical definitions of
23 that.  But -- and that hasn't been done here,
24 and we haven't formally laid out what the
25 market boundaries are.  But a market is a set

Page 135

1 of products that are broadly substitutable.
2 Some of your earlier questions hinted at the
3 standard definitions there.
4    But it's a boundary you'd want to draw
5 around -- to identify a set of consumers and a
6 set of competitors that you would believe would
7 be acting roughly in a similar manner.
8    Q.  You haven't done the work to identify
9 that market or markets in this case; is that
10 right?
11    A.  I think it's likely markets, but I
12 haven't done the full analysis of where the
13 boundaries lie.
14    Q.  So supply is a component of the
15 quantity sold; correct?  You said it's supply
16 and demand leads to that?
17    A.  So supply is an outcome of the
18 interaction of supply and demand in an actual
19 market.  So it's neither supply nor demand;
20 it's a result of the two things meeting
21 together.
22    Q.  So quantity sold is composed of supply
23 as well as demand; is that what you're saying?
24    A.  Yes, as is with price.
25    Q.  So you say in Paragraph 65, the last

Page 136

Lorin M. Hitt, Ph.D.  -  5/30/2019
Case 2:18-cv-01736-ROC-JPR   Document 194-1   Filed 10/09/19   Page 38 of 53   Page ID
Jennifer Keithman and Carol Sloan vs. Champion Petfoods USA, Inc.; et al.
#:7479

Page 137

¹ sentence, "The appropriate comparison for
² analysis of consumer injury is between the
³ price each consumer actually paid and the price
⁴ the consumer would have paid in the but-for
⁵ world where additional disclosures were
⁶ provided."
⁷      Would you agree that's what
⁸ Dr. Krosnick's survey was seeking to show?
⁹      A.  I can't speak to his intentions.  But
¹⁰ what he computed was willingness to pay, which
¹¹ is not market price.  So it doesn't do that.
¹² It could be that what he did might be an input
¹³ to a broader analysis, but it's not that
¹⁴ analysis.
¹⁵      Q.  But, again, you don't know whether
¹⁶ market price and the price at the diminution of
¹⁷ value percent calculated by Krosnick would be
¹⁸ the same or different because you didn't do
¹⁹ that work?
²⁰      A.  There's no theoretical reason to
²¹ believe those should correspond except by
²² accident.  So the likelihood that will occur is
²³ pretty much zero.
²⁴      Q.  Right; but you didn't do the work?
²⁵      A.  I have not built an alternative model

Page 138

¹ that would enable those calculations; that's
² correct.
³      Q.  So you go on to talk about, in
⁴ Paragraph 69, that Champion does not set retail
⁵ prices for its products.
⁶      You agree Champion sets MSRP for its
⁷ products; right?
⁸      A.  That's my understanding, yes.
⁹      Q.  Did you do any analysis to determine
¹⁰ what the range of market prices are compared to
¹¹ the MSRP throughout the class period for the
¹² products at issue?
¹³      A.  So I did do some -- some review of
¹⁴ some prices that were available to demonstrate
¹⁵ that they're not all MSRP and that there was
¹⁶ price variation.
¹⁷      I didn't do a comprehensive survey of
¹⁸ all prices in this market.
¹⁹      Q.  And you didn't look at historical
²⁰ retail prices; correct?  Do you understand the
²¹ class period for this case started in 2013?
²²      A.  Yes.  There was no available data on
²³ historical prices that I was able to identify.
²⁴      Q.  So you don't know whether prices for
²⁵ times before the date that you looked at them

Page 139

¹ online or elsewhere, whether those varied from
² the MSRP and to what extent they varied?
³      A.  I don't know -- I don't know what the
⁴ actual data would show.  I'd be surprised if it
⁵ were any -- any different in the sense of
⁶ deviating from MSRP some of the time.
⁷      Q.  But, again, you don't have that data,
⁸ so you don't know?
⁹      A.  I don't know for certain.  But to the
¹⁰ extent they've ever offered any promotion, that
¹¹ would be the case.
¹²      The other thing is, is I understand
¹³ that pet food stores often offer like loyalty
¹⁴ programs.  Those have been in existence for a
¹⁵ very long period of time, and so it's very
¹⁶ likely that Champion products were sold under
¹⁷ those things.  I don't know for certain, but
¹⁸ I'd be absolutely shocked if it weren't true.
¹⁹      MS. BORRELLI:  Let's go off the
²⁰ record.
²¹      THE VIDEOGRAPHER:  This marks the
²² end of Tape No. 2 of the deposition of
²³ Dr. Lorin Hitt.  We are going off the record at
²⁴ 11:47 a.m.
²⁵      (Luncheon recess taken from

Page 140

¹      11:47 a.m. to 12:25 p.m.)
²      THE VIDEOGRAPHER:  This marks the
³ beginning of Tape No. 3 in the deposition of
⁴ Dr. Lorin Hitt.  We are going back on the
⁵ record at 12:25 p.m.
⁶ BY MS. BORRELLI:
⁷      Q.  Okay.  Doctor, we are back from our
⁸ lunch break.  I want to move on to your next
⁹ opinion, which is on Page 26, starting in
¹⁰ Paragraph 70.
¹¹      You say, "The use of manufacturers
¹² suggested retail prices does not account for
¹³ supply-side factors."
¹⁴      Do you see that?
¹⁵      A.  Yes.  Excuse me.
¹⁶      Q.  What evidence do you have that prices
¹⁷ paid by consumers differ in any significant
¹⁸ sense from the MSRP?
¹⁹      A.  So --
²⁰      Q.  I guess we talked about that a little
²¹ bit.
²²      A.  Yeah.  As part of this, I did do some
²³ looking at retail prices, and you do see some
²⁴ price variance.  That's one.
²⁵      A general principle is typically, you

Lorin M. Hitt, Ph.D. - 5/30/2019

Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 39 of 53 Page ID #:7480

Jennifer Keltman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

know, setting aside things like shipping, retailers are less likely to offer prices above MSRP and more likely to offer them at or below. That seems to be the case here, but I didn't do a systematic analysis of that. But that's normal behavior.

And then MSRPs aren't prices, sort of in general. So --

Q. Given that we do not have retail sales data in this case, would you agree that MSRP is the best available data of the market price for the products during the class period?

A. I think they're indicative of prices, but I think there's at least two issues. One is that it doesn't account for the fact that different consumers paid different prices, either actually or through some other rebate or loyalty program. And to the extent you're calculating damages off that, I think that's going to tend to overstate it.

So I think there's that. And it also doesn't account for the variation generally across consumers broadly. But it is informative about prices. I just don't think it's the -- it is not necessarily the

Page 141

appropriate value of the price that's actually paid.

Q. That wasn't quite my question.

My question was: Would you agree that the MSRP set by Champion for the products during the class period is the best data available, to your knowledge, of the retail prices paid by consumers during the class period?

A. I don't know, and for a couple of reasons. So, one, I do think it's informative of prices. But, in fact, MSRPs are only available, I think, back until 2016 anyway. So it's not even a complete characterization of the class period. And, also, that by using that, you will most likely overstate damages in a method.

So I think -- I can't characterize it as "best" because I know it creates bias. I don't know of any systematic data that provides retail prices in this setting, however.

Q. So you don't know of any other data that could have been used here to determine retail prices?

A. Other than current prices, which you

Page 142

can kind of collect and analyze, I don't know of any other price data in this setting.

Q. If you could look at Paragraph 72 on Page 27. Could you just take a second to read that. And then I just don't understand this paragraph. I'm hoping you can explain it to me in different terms.

A. Okay. It's -- do you have a specific question or should I just explain?

Q. If you can just try to restate this, and we'll see if I understand. If not, maybe I'll have a specific question.

A. Oh, okay. So this is a point about -- this is even more helpful -- out-of-sample extrapolation.

So he has this -- he in a survey asks questions about MSRP and prices in the vicinity of MSRP. If the -- on the surface, plaintiffs' expert's theory of price change is true, they're trying to make inferences about a 60-ish percent price change when the survey only covered range within 5 percent of MSRP.

And so -- and as you -- as you -- general statistical principle, as you get away from the data you're actually using, you get more

Page 143

imprecision as to what those inferences are.

So he has data on plus or minus 10 percent but is trying to make inferences about minus 60 percent. And that just adds a lot more uncertainty to it.

Q. Sure. But the minus 60 percent wasn't known until the survey was actually conducted; right? There's no way to know that the diminution of value is approximately 60 percent until the survey was conducted and the prices used in the survey had to be determined before the survey was conducted?

MR. KESSLER: Objection to the form.

THE WITNESS: So I wouldn't -- I wouldn't agree that the diminution of value is minus 60 percent. The figure they calculated based on their survey analysis was minus 60. And no, until you did the calculation, you wouldn't know what that was.

BY MS. BORRELLI:

Q. So you would agree Dr. Krosnick could not have taken that percentage into account when setting the prices used in his survey because he didn't know that percentage?

Page 144

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 40 of 53 Page ID
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.
#:7481

1    A.  You can always use a wider range of
2  prices.
3    So I don't think -- he couldn't have
4  known that it was -- that the ultimate answer
5  was going to be minus 60, but certainly having
6  a broader span of prices would not necessarily
7  have been a bad strategy.  But that's not
8  something I really evaluated.
9    Q.  So your next opinion starts on
10  Page 28.  But you say that "Dog food is a
11  differentiated product, therefore changes in
12  product characteristics will not affect the
13  prices of all products in the same way."
14    Please tell me again what a
15  differentiated product market is.
16    A.  So the standard casual definition is a
17  differentiated product market is a product
18  market that has a wide variety of different
19  products with different feature combinations
20  that is intended to appeal to consumers with
21  different preferences.
22    Q.  Are most consumer products in a
23  differentiated product market?
24    A.  Most of the ones I personally deal
25  with are, but there are products that are less

Page 145

1  rely on, and I wasn't asked to produce one.
2    I did identify in a couple different
3  sources hundreds of alternative products, some
4  of which are likely to be substitutes and
5  others may not.
6    Q.  Would you need to know the definition
7  of the market for Champion -- the Champion pet
8  food products at issue here to make concrete
9  conclusions about how the differentiated
10  product market affects the sales and
11  supply-demand of the Champion pet foods at
12  issue here?
13    A.  Well, I think the observation that
14  this is a differentiated market; and,
15  therefore, methods that are appropriate for
16  differentiated markets have to be used here, I
17  think, is evident just from the characteristics
18  of the product itself and has a number of
19  attributes which are communicated to consumers.
20  There's a large variety of different products,
21  and there's -- Professor Hanssens talks about
22  difference in preferences.
23    So that foundation, I think, is
24  clearly present.
25    To do -- to determine how much of an

Page 147

1  differentiated and more differentiated.  Some
2  products have fewer attributes -- brand and
3  size might be the only attributes -- others
4  have a lot more.
5    Q.  What studies or analysis did you do on
6  the economics of the dog food market?
7    A.  So the -- that focuses on the --
8  looking at the available products in the
9  marketplace, as well as the information
10  available in all the reports, as well as the --
11  there's a number of Champion documents that I
12  cite regarding surveys and so forth.
13    But these statements here are
14  generally about differentiated product markets;
15  and just with that information, I'm able to
16  make an inference there are multiple products
17  and multiple preferences.  And Professor
18  Hanssens also has more stuff there as well.
19    Q.  What work did you do to determine the
20  available products in the Champion pet food
21  market?
22    A.  So I didn't define a specific market
23  for Champion pet foods.  I considered the
24  market broadly because there is no existing
25  sort of market boundary definition that I could

Page 146

1  impact anything would have, you need more
2  information on that.  But that's outside the
3  scope of what I was asked to do.
4    Q.  If Champion pet foods were in a market
5  by itself with no other brands, would these
6  conclusions -- would your conclusions be
7  different?
8    A.  It's not something I've evaluated, so
9  I don't know.  Monopoly markets are simpler;
10  but, again, not having done the analysis, I
11  don't know.
12    And given the characteristics market,
13  I wouldn't -- I wouldn't expect that you could
14  make an argument that they're a monopoly.
15    Q.  How do you determine which products
16  are in a product -- particular product market?
17    A.  There are some standard methods that
18  can be used.  There are sort of more
19  practice-oriented methods by companies trying
20  to define who competitors are.  Those vary in
21  quality.
22    The precise economic definition is the
23  degree of substitutability.
24    Q.  If analysis showed that there is no
25  substitute for Champion pet foods in the

Page 148

Lorin M. Hitt, Ph.D.  -  5/30/2019
Case 2:18-cv-01736-RGC-JPR   Document 194-1   Filed 10/09/19   Page 41 of 53   Page ID #:7482
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

market, would that change any of your opinions here?

A.  That's -- that's something I have to consider.  I don't know.  But given the large number of products, I'd have to evaluate that, what that would actually mean.  Even in context, when you're talking about, you know, 20-plus products, that there's no substitutes for 20-plus products, I don't know what that would look like.

Q.  In Paragraph 75, you say in the last sentence, "This diversity of underlying conditions makes it exceedingly unlikely that any change in product's characteristics will affect the prices of all products in the same way, contrary to plaintiffs' assumptions."

What's the basis for that opinion?

A.  The basis is the discussion I had before.  You're in a differentiated product market.  You know there's different products.  You know there's different consumer preferences, based on my observations and the work of Professor Hanssens.

And so once you're in that condition, you have to account for other product

Page 149

attributes in order to figure out what the marginal impact is.  And to the extent those differ in almost every analysis I've ever seen -- I think in every analysis I've ever seen, the marginal effect depends on other product attributes.

So it's based on my experience, my understanding of differentiated product markets, and the information that would lead me to conclude this is clearly a differentiated product market.

Q.  You noted that you're relying on some of the conclusions of Dr. Hanssens with relation to consumer preferences.

Did he do any survey or other study of consumers to reach those conclusions that you're relying upon?

A.  I don't believe he did his own independent survey, but he did do a review of existing information in order to reach those conclusions.

Q.  I think you testified that you would agree that most or many consumer products are in a differentiated product market.  Is that right?

Page 150

A.  I think many are, yes.  I think that's fair.

Q.  If that --

A.  And then -- oh, go ahead.

Q.  If that's the case, can it ever be determined how changes in product characteristics affect value of consumer products that are in a differentiated market?

A.  Oh, sure.  That's -- I mean, that's what these methods I was describing are intended to do.  Whether the question is that the -- of whether the market is too differentiated for those things to be reliable is a different matter.  But hedonic price analysis was developed for dealing with specifically differentiated products, as is the random utility framework.

Q.  In Paragraph 76, you talk about the variety of dog food formulations available for purchase at any given time.

And in Footnote 111, you note that on dogfoodadvisor.com, you saw 520 reviews of dry dog food.  And a search on Amazon using the keyword "dog food" showed -- and filtered for weight showed 574 products.  And a

Page 151

Google Express search for dog food with a size filter showed more than 500 results.

Would you agree the dog food market can be broken down further than just by dog food or dry dog food?

A.  I would think so generally, yes, that there are likely segments of this market.  That's not an analysis I did, but there is likely to be some segmentation.

Q.  And if you were looking at Champion's pet foods that are at issue in this case, would you agree that to look at the appropriate market, you would need to segment down further than dog food or dry dog food?

A.  I would say that the -- what I -- some segmentation is probably appropriate.  How much is an empirical question.

Q.  And you didn't do any work to determine what segmentation would be appropriate?

A.  No.  I didn't try to define market boundaries, and it's complicated by the fact that there are so many different products of Champion that are likely to have different markets.

Page 152

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 42 of 53 Page ID #:7483
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc.; et al.

Q. To look at substitution or what product attributes matter to consumers, would you agree that you need to be looking at the proper market segment?

A. Again, I don't think there's one market segment. But I think to reach a conclusion that the product is differentiated, you can look in the market as a whole. Part of the implications of differentiated products is that there are multiple segments.

What that segmentation is would affect later calculations. But in terms of the observations I'm making, I don't think they hinge on that -- knowing what that segmentation is.

Q. So you think comparing Champion's pet foods at issue here to Kibbles 'n Bits is an appropriate comparison?

A. That's not the conclusion I'm drawing. The observation that there exists multiple products in this market is consistent with differentiation. To do the actual analysis where you come up with quantitative figures, you would want to do some kind of segmentation.

But for the purpose of establishing

Page 153

it's differentiated, the fact that there's multiple different kinds of products is indicative of that.

Q. So you haven't made any quantitative conclusions based on your opinion that the market is differentiated?

A. The quantitative conclusions I reach -- I do mention the number of products, Champion -- the number of products in the overall market as a whole. I think those are the figures. I didn't do a full supply-and-demand analysis, which would need things like market definitions.

Q. In Paragraph 77 on Page 29, you state that "there is no reason to believe that a particular attribute (or change to an attribute) would have exactly the same effect across a large group of consumers purchasing different products over many years."

What's the basis for that opinion?

A. It's my review of the markets. In differentiated product markets, you have multiple products purchased by consumers with multiple different preferences. In that case, it's an empirical question, ultimately, of how

Page 154

much a product -- change in a product attribute would affect the outcome in the market.

But when you have multiple different kinds of consumers, there's no ex ante reason to believe that all consumers have exactly the preference over any particular chosen attribute when they demonstrate to have different preferences over many others.

Q. Did you do any research or analysis to support that opinion with respect to the Champion pet foods at issue here?

A. So the analysis I did is documented in my report, which is the number of products in the market, the number of different Champion products in the market, the discussion in Professor Hanssens' report about differences in preferences as well.

And, also, just the empirical analysis of -- we talked about earlier that does suggest that even using Dr. -- Dr. Krosnick's methods give you somewhat different results for the two products he considered, I think, is all consistent with that observation.

Q. But neither you nor Dr. Hanssens, to your knowledge, did any data collection or

Page 155

research of consumer preferences to determine preferences for particular attributes?

A. I would consider existing surveys and documentation in the industry as data. We -- I don't think we did any original data collection as part of this.

Q. In your opinion, can the attributes of a consumer product sold at retail ever have any influence on the market price paid by a consumer of that product?

A. I think all attributes have the potential to affect the price of a product because it affects the equilibrium prices in a regular market. So, sure, that's the premise of these methods.

Q. Right. So would you agree that the presence of heavy metals and the failure to disclose that in Champion's products could affect the market price paid by a consumer?

A. There's always a potential for anything to potentially affect market prices that are considered attributes. Whether that particular example, that's an empirical question.

Q. And is it possible that the presence

Page 156

Lorin M. Hitt, Ph.D.   -   5/30/2019
Case 2:18-cv-01736-ROC-JPR   Document 194-1   Filed 10/09/19   Page 43 of 53   Page ID
#:7484
Jennifer Reitman and Carol Sloan, et al. vs. Champion Petfoods USA, Inc., et al.

1  of BPA and plasticizers and the failure of
2  Champion to disclose that on the pet foods at
3  issue here could affect the market price paid
4  by the consumer for that product?
5      A.  Changes in attributes -- changes in
6  any attribute of a product have the potential
7  to affect the market price.  But, ultimately,
8  whether that happens and how much it happens is
9  an empirical question.
10     Q.  In Paragraph 78, you opine that
11 "Another key difference across dog food
12 purchasers involves the potential differences
13 in the information they have access to
14 regarding the characteristics of the products
15 they buy."  And you cite some paragraphs from
16 the Hanssens report.
17     Do you know whether Dr. Hanssens
18 conducted any data collection to support those
19 opinions that you rely on here?
20     A.  My understanding is that this
21 information was sourced from market studies.  I
22 don't recall that he did any original data
23 collection, but this is based on existing
24 information that was available.
25     Q.  And do you have any opinion about

*Page 157*

1  whether this different -- potential differences
2  in the access of information consumers have
3  regarding the characteristics of the products
4  they buy affected the results of Dr. Krosnick's
5  survey?
6      A.  My opinion is it almost certainly
7  does.  It's the premise of my research area
8  that information affects consumer demand.  And
9  there's strong reasons to believe that the
10 information that was possessed by the consumers
11 in Dr. Krosnick's survey differ from the
12 purchasers of Champion products if only because
13 of the fact that only 6 percent or so of his
14 survey respondents report purchasing these
15 products.
16     Q.  Did you do any work to quantify to
17 what extent that affected Dr. Krosnick's survey
18 results?
19     A.  So the -- what outcome that would
20 cause, no.  That would require probably a
21 different survey, which is outside of the scope
22 of what I was asked to do.
23     Q.  Paragraph 79, you discuss how
24 differences in information may also give rise
25 to different potential for harm.

*Page 158*

1      Are you providing any legal opinion
2  about the harm alleged by plaintiffs in the
3  class in this case?
4      A.  No.  I'm focusing on economic injury
5  here in that phrase.
6      Q.  Are you aware of any disclosures made
7  to consumers by Champion, either identical to
8  or similar to the corrective statements used in
9  Dr. Krosnick's survey?
10     A.  I don't know.  I don't think --
11 there's nothing that comes immediately to mind.
12 I understand there's reports that were produced
13 on certain characteristics of the food, but I
14 don't know how those correspond.
15     Q.  In Paragraph 80 at the bottom of
16 Page 30, you say, "For example, it is widely
17 known by consumers that fish generally and
18 wild-caught fish specifically have a risk of
19 presence of mercury, and consumption should be
20 limited to a specific level."
21     What's the basis for saying that that
22 is widely known by consumers?
23     A.  It's something that's been heavily
24 publicized.  You see this around.  I also have
25 references to the US FDA that puts that

*Page 159*

1  information on their website as well.
2      Q.  But you didn't do any data collection
3  to determine whether consumers actually widely
4  know that?  You didn't survey consumers to find
5  out?
6      A.  I didn't conduct any consumer surveys,
7  but it's publicly known.  That information is
8  in the public domain.  And I've encountered it
9  enough to believe that it is available -- the
10 extent to which it's available.  If that was
11 necessarily to quantify, would require further
12 work.  But certainly that information is
13 present.
14     Q.  Sure.  So it's your opinion that if
15 something is publicized on the internet, that
16 it's widely known by consumers?
17     A.  That makes it plausible that it is,
18 yes, especially in this particular -- for that
19 particular statement, I think, is -- is likely
20 to be true.  Quantifying that is -- if you
21 needed to quantify that, that would require
22 further work.
23     Q.  Did you do any work to determine
24 whether price dispersion exists for the
25 Champion products at issue in this case?

*Page 160*

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 44 of 53 Page ID #:7485
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc.; et al.

1    A.  Yes.
2    Q.  Does price dispersion exist?
3    A.  Yes.
4    Q.  What's the basis for that opinion?
5    A.  Looking at actual prices that we
6  did -- I set my research team on collecting
7  prices, online prices.  And you get different
8  prices, which is the presence of price
9  dispersion.
10    Q.  The prices that your research team
11  found, they're only reflective of the prices
12  that exist in the market as of the day they
13  looked at those prices; correct?
14    A.  Yes, that's correct.
15    Q.  Did they do any work to determine
16  prices that Champion Petfood has been offered
17  for sale at in the past?
18    A.  I don't believe that information is
19  available.  It would be surprising if there was
20  not price dispersion in the past and it was
21  today; but without information, you can't
22  confirm the extent to which that's true.
23    Q.  How different do prices have to be for
24  there to be price dispersion?  Is it 1 cent
25  different?  $10 different?

Page 161

1    A.  So price dispersion is the observation
2  that there are multiple prices for the same
3  product; and so in general, there's no cutoff
4  that says it isn't or isn't there.  If there's
5  variation, it's there.  And it's certainly
6  present in this market.
7    Q.  How does your opinion that price
8  dispersion is present affect Dr. Krosnick's
9  survey results?
10    A.  So I think it -- it doesn't -- for
11  example, it won't change the number he gets,
12  but it changes whether that number is
13  appropriate to plug into one of these model --
14  the way that Mr. Weir uses that figure.  It
15  would affect that because, of course, different
16  consumers pay different prices.
17    Q.  Does your opinion that price
18  dispersion exists affect Mr. Weir's opinions
19  beyond what you just stated?
20    A.  I think if you're going to -- just to
21  sharpen that, I think the -- if you were going
22  to make inferences about changes in market
23  price, you have to actually account for the
24  prices paid by actual consumers.  So it affects
25  it to that extent.

Page 162

1        It also -- the existence of price
2  dispersion is also indicative of the number of
3  what I've called primitives for demand that
4  would suggest that different consumers have
5  different information and preferences.
6    Q.  But you don't have any evidence
7  whether price dispersion actually affected
8  Mr. Weir or Dr. Krosnick's results; right?
9    A.  In the presence of price dispersion
10  Mr. Weir's calculation is strictly incorrect.
11  It doesn't change Dr. Krosnick's survey because
12  he doesn't actually use market data at all.
13        So it doesn't change that figure, but
14  it does change whether or not it's relevant to
15  the calculations being done.  And Mr. Weir's
16  calculation is strictly wrong because he
17  doesn't actually have prices paid by consumers.
18    Q.  I think we've agreed, though, that no
19  one has prices paid by consumers; right?  The
20  data doesn't exist?
21    A.  Sitting here --
22        MR. KESSLER:  Objection to the
23  form.
24        THE WITNESS:  Sitting here right
25  now, I do not know of a source of retail price

Page 163

1  data.  But, again, I also believe that
2  Mr. Weir's calculation is biased upwards
3  because of the use of MSRP.  So not only is the
4  data not present, but it's also overstated.
5  BY MS. BORRELLI:
6    Q.  Did you do any independent work to
7  determine whether there's a common price impact
8  based on plaintiffs' allegations in this case
9  in the but-for world?
10    A.  So I didn't do anything -- any
11  separate empirical analysis, other than
12  indicating that -- I think very similar to the
13  answer I gave earlier, which is that in a
14  differentiated product market with different
15  information and different preferences, there's
16  no reason to believe the marginal impact of a
17  change in information would be exactly the same
18  for all consumers for one chosen attribute when
19  it's different for other attributes.
20    Q.  Next opinion starts on Page 32 at
21  Paragraph 85.  You say, "Mr. Weir's claim that
22  individual inquiry is not required is
23  inconsistent with the economics of the markets
24  for dog foods."
25        Do you see that?

Page 164

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 45 of 53 Page ID
Jennifer Reitman and Carol Sloan vs. Champion Petfoods USA, Inc., et al.
#:7486

1    A.   Yes.

2    Q.   So I assume this opinion relates quite

3 a bit to what we've just been discussing about

4 the differentiated market.

5    A.   Yes.

6    Q.   So we've already discussed the use of

7 MSRP.  And in Paragraph 87, you note that a

8 simple internet search shows there's variation

9 in posted prices for the same products at the

10 same point in time.  And then --

11    I'm sorry.  Let's back up to Paragraph

12 86.  I wanted to look at Footnote 131.

13    You say, "To the extent that consumers

14 of most products typically pay no more and

15 often less than MSRP -- either because of

16 retailer discounting or due to promotional

17 activities, such as coupons or free trials

18 (both of which occur in this market) -- his

19 aggregate classwide damages will be

20 overstated."

21    What did you do to determine that

22 coupons and free trials exist in this market?

23    A.   So those cited documents are all

24 Champion marketing material that indicate the

25 various kinds of promotions that were active at

Page 165

1 the time.

2    Q.   My understanding is that Champion does

3 not provide product directly to retailers.  Is

4 that your understanding as well?

5    MR. KESSLER:  Objection to form.

6    THE WITNESS:  I understand that

7 Champion distributes the products -- well, I

8 think that's not strictly true.  But in most of

9 the cases, they use a distributor intermediary,

10 and then to a retailer.  I believe there are

11 some retailers that actually receive direct,

12 but the majority is through some kind of

13 distribution and distributor.

14 BY MS. BORRELLI:

15    Q.   So in general, Champion is not -- and

16 Champion doesn't sell directly to consumers, to

17 your knowledge?

18    A.   In general, that's correct.

19    Q.   And, in general, Champion does not

20 sell directly to retailers either; correct?

21    A.   In most cases, I believe that's true.

22    Q.   So you said you looked at Champion

23 materials about prices that they -- and

24 promotions that they offer.  Are those

25 promotions being offered directly to consumers?

Page 166

1    A.   My understanding is those promotions

2 are offered to retailers, who then have a

3 choice of what to pass on to consumers.

4    Q.   So you do have any information about

5 whether retailers actually participated in

6 those programs?

7    A.   I've observed that the -- I've

8 directly observed that Champion products, some

9 of those promotions have actually passed

10 through.

11    Q.   When you say "directly observed," what

12 do you mean?

13    A.   That you can -- that these trial --

14 sticker on shelf; free product; or buy one/get

15 one; or those kinds of things that look very

16 similar to the types of promotions that are

17 being done here.

18    Q.   Where have you seen that?

19    A.   I was just over in Pet Valu five days

20 ago, four days ago.

21    Q.   Looking at Champion food?

22    A.   Getting something else, went by and

23 looked to see.

24    Q.   Did you take any photos of that?

25    A.   No.

Page 167

1    Q.   Any notes from any of those visits

2 where you observed Champion Petfood?

3    A.   No.

4    Q.   Do you have any documents from

5 Champion showing that that was a promotion

6 offered by them and accepted by the retailer?

7    A.   No, not specific documentation, but it

8 does look in a similar manner to the promotions

9 being offered by Champion.  And it's a normal

10 economic behavior for retail promotions to be

11 passed through in whole or in part to

12 consumers.

13    Q.   But do you have any data that you've

14 seen from Champion or from retailers directly

15 showing those promotions being put into action

16 and the resulting prices paid by consumers?

17    A.   No, I haven't done a detailed analysis

18 on the pass-through of these promotions.  But I

19 do -- as I noted here, as I cite here, these

20 promotions do exist.

21    There's some evidence that retailers

22 respond.  Whether it was to these specific ones

23 I cite, I'm not sure.  But there's some

24 evidence that that -- and the normal economic

25 behavior would be that some of these promotions

Page 168

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 46 of 53 Page ID #:7487
Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

1  would be passed through to consumers, perhaps
2  all.
3      Q.  From what you've said, my
4  understanding is the only evidence that you've
5  seen is your general observations while
6  purchasing pet food for personal use, recently?
7      MR. KESSLER:  Objection to form.
8      THE WITNESS:  That's -- well,
9  first of all, I wouldn't characterize it that
10 way.
11     So these promotions exist.
12 BY MS. BORRELLI:
13     Q.  Sure.
14     A.  It's my understanding that promotions
15 generally are passed through to consumers.
16 I've seen promotions on shelves that resemble
17 the types of terms that would be -- that are
18 described in these promotions.
19     But in terms of relying on it for my
20 report, I'm relying on the fact that these
21 promotions are offered in the normal economic
22 behavior that promotions are passed through in
23 whole or in part and my general familiarity
24 with retail purchasing.
25     Q.  The promotions that you cite in

Page 169

1  Footnote 131, do you agree you don't have any
2  evidence about how those promotions are tied to
3  actual retail prices paid by consumers?  You
4  don't -- none of those documents show the
5  result?
6      A.  I think it's fair to say that these
7  are promotions to the retailers, and retailers
8  do have the choice to pass those along or not.
9  And that creates another source of
10 heterogeneity.
11     Q.  But you don't have any data showing
12 that those promotions were passed on?
13     A.  I haven't done a specific analysis of
14 these particular promotions and how they affect
15 retail prices; that's correct.
16     Q.  So it's your opinion that MSRP will
17 overstate sales if retailers sell at a lower
18 price, if there's a promotion, for example?
19     A.  I think -- barring something I missed
20 in your question, I think that's a mathematical
21 tautology.  But I think in general, prices tend
22 to be at or below MSRP as a general
23 proposition.
24     Q.  And conversely, MSRPs would understate
25 price if retailers sold the product at a price

Page 170

1  higher than MSRP?
2      A.  If that's -- that it could if it was
3  systematic, yes.  And that's -- most of the
4  research I've seen on pricing suggests that
5  lower prices are more common than higher prices
6  in these things.
7      And, in particular, if you start
8  talking about transaction prices, consumers are
9  much more likely to purchase at lower prices.
10 So generally, the bias is downward.  But as a
11 mathematical proposition, if it's above MSRP
12 and everybody charges that, it's higher.
13     Q.  Did you do any analysis of what the
14 actual average retail price of the products was
15 during the class period?
16     A.  I don't believe that information is
17 available, and it requires a lot of data
18 collection to do that.  So I didn't -- I didn't
19 undertake that exercise other than to
20 demonstrate -- with the limited number of
21 prices, you can demonstrate there is price
22 dispersion.
23     Q.  In your research to come to your
24 conclusion that there's price dispersion, did
25 you do a calculation of the average retail

Page 171

1  price that you were seeing and whether it was
2  higher or lower than MSRP?
3      A.  I didn't do a calculation of the
4  average price.  I believe -- and it also --
5  what price exactly means when you have bundled
6  transactions and involve shipping and other
7  things associated with actually doing that is
8  difficult.  The analysis I did was focused on
9  the dispersion.
10     Q.  Can you take a look at Paragraph 88 on
11 Page 34.  I have a question about that
12 paragraph, so maybe you want to take a read
13 through it first.
14     A.  Okay.
15     Q.  Do you have any basis for believing
16 that any of these situations that you talk
17 about in Paragraph 88 actually occurred in the
18 Champion Petfood market?
19     A.  At the time of writing, I think there
20 was -- that this was just general consumer
21 behavior.  So there's nothing specific to this
22 environment, but this is general retail
23 strategy.  And there's a number of -- or retail
24 behavior.
25     And there's a citation to, for

Page 172

Lorin M. Hitt, Ph.D.   -   5/30/2019
Case 2:18-cv-01736-ROC-JPR   Document 194-1   Filed 10/09/19   Page 47 of 53   Page ID
#:7488
Jennifer Keithman and Carol Shoatt vs. Champion Petfoods USA, Inc.; et al.

¹ example, the stockpiling point that has been
² made there.  But, also, it's my general
³ understanding of retail consumer behavior,
⁴ which I've studied.
⁵   Q.  But not specific to the Champion
⁶ products market?
⁷   A.  Some of these statements are -- are
⁸ generally applied to all markets, but there's
⁹ nothing specific I cited here that's talking
¹⁰ specifically about Champion products.
¹¹   Q.  In Paragraph 89, you say that
¹² "Mr. Weir does not perform any analysis of the
¹³ market, simply adopting Dr. Krosnick's survey
¹⁴ results on willingness to pay."
¹⁵   Did you conduct any analysis of the
¹⁶ market, as you suggest that Mr. Weir should
¹⁷ have done?
¹⁸   A.  No.  I was asked to evaluate what
¹⁹ Mr. Weir did, and that was one of the issues of
²⁰ his analysis.  I wasn't asked to do a separate
²¹ analysis.
²²   Q.  In your opinion, can a deceptive or
²³ misleading statement or omission on a consumer
²⁴ product ever result in the market price of that
²⁵ consumer product being higher than it otherwise

Page 173

¹ would have been absent that deceptive
² misrepresentation or omission?
³   MR. KESSLER:  Objection to form.
⁴   THE WITNESS:  I think that would
⁵ be unusual.  I can't think of all possible
⁶ conditions, but I think that would be unusual
⁷ for that to be the case.
⁸ BY MS. BORRELLI:
⁹   Q.  Can a misrepresentation or an omission
¹⁰ on a consumer product ever result in increased
¹¹ demand for that consumer product, higher than
¹² it would have been absent that
¹³ misrepresentation or omission?
¹⁴   MR. KESSLER:  Same objection.
¹⁵   THE WITNESS:  I'm sorry.  Make
¹⁶ sure I got the question right.
¹⁷ BY MS. BORRELLI:
¹⁸   Q.  Yeah.  Can a misrepresentation or an
¹⁹ omission on a consumer product ever result in a
²⁰ higher demand for that product than the demand
²¹ would have been --
²²   A.  Actually, I should probably go back on
²³ the previous question, too, because I think I
²⁴ misheard the question.  Let's actually do that
²⁵ one again, and then we'll do this one.

Page 174

¹   MS. BORRELLI:  I am not confident
² in my ability to say it right again.
³   THE WITNESS:  You can read it
⁴ back.  I think that would be fine.  I think I
⁵ misinterpreted what you said.
⁶   MS. BORRELLI:  We're going to
⁷ back up two first.
⁸   (Record read.)
⁹   THE WITNESS:  Oh, okay.  Yeah.
¹⁰ And the answer is --
¹¹   MR. KESSLER:  Same objection.
¹²   THE WITNESS:  Change my answer.
¹³ So, yes, I misheard it as correcting a
¹⁴ statement.
¹⁵   It's possible -- information can
¹⁶ affect demand.  And so it is certainly possible
¹⁷ that incorrect information that makes a product
¹⁸ more attractive could affect demand.
¹⁹ BY MS. BORRELLI:
²⁰   Q.  Okay.  That answers the second
²¹ question, too, I think.
²²   A.  Yeah.  Yeah.
²³   Q.  In this case, are you offering any
²⁴ opinion about what the market price of the
²⁵ products at issue would have been if the

Page 175

¹ appropriate disclosures had been made according
² to plaintiffs' allegations?
³   A.  No, I'm not offering an affirmative
⁴ estimate of that figure.
⁵   Q.  Do you believe that there would have
⁶ been a different market price for the products
⁷ if the disclosures that plaintiffs allege are
⁸ necessary had been made?
⁹   A.  I don't know, because I haven't done
¹⁰ the analysis.
¹¹   Q.  What would you need to know to do that
¹² analysis?
¹³   A.  You'd need to do the full
¹⁴ supply-demand characterization.  You'd have to
¹⁵ get a good characterization of the information
¹⁶ the consumers had at the time.
¹⁷   There's a number of things I outline
¹⁸ in the report that would limit that impact;
¹⁹ but, again, without doing it, it's hard to say.
²⁰   Q.  Do you believe there's ever a
²¹ situation where survey analysis can be used to
²² determine economic damages on a classwide
²³ basis?
²⁴   MR. KESSLER:  Objection to form.
²⁵   THE WITNESS:  Yeah.  I don't know

Page 176

Lorin M. Hitt, Ph.D.  -  5/30/2019

Case 2:18-cv-01736-RGC-JPR   Document 194-1   Filed 10/09/19   Page 48 of 53   Page ID
#:7489

Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

1  if I can say it absolutely in abstract, so I
2  don't know.  It would be unusual for that by
3  itself to be the appropriate input, but I don't
4  know all the possible scenarios under which
5  that -- you could do surveys.
6  BY MS. BORRELLI:
7      Q.  Do you agree that the historic market
8  price of the Champion pet foods products at
9  issue in this case would reflect the
10  then-existing supply-and-demand conditions?
11      **A.  So there were prices actually paid.  I**
12  **don't think there is a market price but many**
13  **different prices paid by many different**
14  **consumers.  Those prices are facts.  They**
15  **result -- and they result by the interaction of**
16  **supply and demand.**
17          **But it doesn't characterize the full**
18  **supply curve or the full demand curve.  It's**
19  **just a point where they happen to intersect for**
20  **those particular consumers who paid those**
21  **prices.**
22      Q.  Do you have an opinion about whether
23  the potential presence or risk of heavy metals
24  in the Champion products at issue in this case
25  would have had any impact on the market price

Page 177

1      Q.  So beyond what you identified in your
2  report, Exhibit 1, you didn't find any
3  calculation or math errors in Mr. Weir's work;
4  is that right?
5      **A.  So in terms of the mechanics of the**
6  **calculation, I identified the ones that I did.**
7  **I didn't attempt to do a comprehensive,**
8  **complete replication of it.  But these are the**
9  **things I identified, and I don't know of any**
10  **others at the moment.**
11      Q.  So beyond the errors that you
12  identified in your report, would you agree that
13  Mr. Weir's other calculations, to the best of
14  your knowledge sitting here today, are accurate
15  based on the Champion data that he used?
16          MR. KESSLER:  Objection to form.
17          THE WITNESS:  So the mathematical
18  operations, aside from the flaws identified
19  here, I believe, are correct.
20          Conceptually, I don't think they
21  measure what he claims to measure, so I
22  disagree with the method generally.  But in
23  terms of the mechanics of the math, this
24  outlines my only objections to those.
25  BY MS. BORRELLI:

Page 179

1  paid by consumers?
2      **A.  I think, ultimately, that's an**
3  **empirical question.  It potentially could, but**
4  **the magnitude of that is unknown; and without**
5  **doing the analysis, you don't know what that**
6  **figure is.**
7      Q.  And the same question with respect to
8  BPA or plasticizers.
9      **A.  Oh, I think it's the same answer.**
10      Q.  And with respect to pentobarbital?
11      **A.  Same answer.**
12      Q.  In your report on Page 35, start the
13  section, the opinion:  "Mr. Weir incorrectly
14  calculates product sales, leading to a vast
15  overstatement of actual sales and potential
16  damages."
17          Did you re-run all of Mr. Weir's
18  calculations?
19      **A.  So we -- in the process of doing this,**
20  **I corrected the files that he used and reran**
21  **them from scratch.  So I don't know exactly**
22  **what you're asking there, but certainly we used**
23  **all of his other methods and his actual program**
24  **code to do this with corrections for these**
25  **errors.**

Page 178

1      Q.  Okay.  How did you gain your
2  understanding of how Champion sells its
3  products -- you know, its distribution method?
4      **A.  Some of it was reading case materials.**
5  **Some of it was communicated to me through my**
6  **research team.**
7      Q.  Do you know how they got that
8  information?  Your research team.
9      **A.  I think it's a mixture of existing**
10  **case documents, perhaps a conversation with**
11  **counsel.**
12      Q.  Would you agree that Champion is
13  likely not producing or manufacturing food that
14  it doesn't intend to sell?
15          MR. KESSLER:  Objection to form.
16          THE WITNESS:  My understanding --
17  it depends on what you mean "intend to sell."
18  They manufacture product I would presume that
19  they hope to bring to market but may not for a
20  number of reasons.
21  BY MS. BORRELLI:
22      Q.  Such as what?
23      **A.  Failure of quality standards.**
24      Q.  Okay.  But as far as you know, that's
25  not the norm; right?

Page 180

Lorin M. Hitt, Ph.D.  -  5/30/2019
Case 2:18-cv-01736-ROC-JFR  Document 194-1  Filed 10/09/19  Page 49 of 53  Page ID
#:7490
Jennifer Reitman and Carol Sloan vs. Champion Petfoods USA, Inc., et al.

1    A.  They'd like to make it not the norm,
2  and it hopefully is not a very large fraction.
3    Q.  Do you know how long a bag of Champion
4  food is good for?  Like what the expiration or
5  shelf life is?
6    A.  I encountered this figure at some
7  point.  I don't recall off the top of my head
8  what it is.
9    Q.  Do you have any basis or evidence for
10  opining that the quantities produced by
11  Champion that Mr. Weir then used in his sales
12  calculations is significantly different than
13  the quantities sold?
14    A.  So, in general, my understanding of
15  production -- I work in an operations
16  department -- production, not all production
17  reaches the market for all sorts of reasons,
18  which I describe in my report.  How big that
19  difference is, I don't know.
20    Q.  Would you need to know that to be able
21  to quantify the overstatement of damages based
22  on the -- using the production amount versus
23  the actual sales amount?
24    A.  Yes, in order to get a precise
25  quantification, you'd need to know what that

1  available.  I didn't -- didn't pursue that
2  further.
3  BY MS. BORRELLI:
4    Q.  Are you offering an opinion in this
5  case about Mr. Weir's overall methodology for
6  calculating class damages, assuming that
7  Dr. Krosnick's diminution of value input is
8  correct?
9    A.  So I don't believe that the figures
10  calculated by Dr. Krosnick's method, even if he
11  implemented it perfectly well and is perfectly
12  reliable estimate of average willingness to
13  pay, can be used in the way Mr. Weir is doing
14  it.  So I don't agree that this is the proper
15  calculation.
16    So I think that's -- that's the most I
17  can say.
18    Q.  And is that because of the supply-side
19  issue?
20    A.  It's -- so at best, Mr. Weir can
21  provide an average willingness-to-pay figure.
22  That is not all you need to characterize
23  demand, especially in a differentiated product
24  market.
25    You don't have the market boundaries,

1  is.  And my observation is that it can't be
2  more.  It probably is less.  How much less it
3  is, I don't know.
4    Q.  So you don't have a number for how
5  much the kitchen data overstates the retail
6  sales data?
7    A.  No, I don't.
8    Q.  Are you aware of any documents that
9  exist in this litigation -- that would probably
10  mean Champion documents -- that would be a
11  better measure or proxy of the retail sales
12  data than the kitchen data?
13    MR. KESSLER:  Objection to the
14  form.
15    THE WITNESS:  It's not something
16  I investigated systematically, so I don't know.
17  BY MS. BORRELLI:
18    Q.  You didn't ask Champion whether they
19  have any better data than that that should have
20  been used?
21    MR. KESSLER:  Form -- same
22  objection.
23    THE WITNESS:  I don't think I've
24  phrased it in that way.  I did ask for retail
25  price and sales data.  I understand that's not

1  and they -- and there's been no work done on
2  characterizing supply.  So it's missing a lot
3  of the standard components of a market
4  analysis, also characterizing the possible
5  responses of the competitors and Champion to
6  the disclosures and other things that would be
7  part of that.
8    So it's missing a lot of the
9  components you would need to do equilibrium
10  product market calculations.
11    Q.  Did you review the two main Champion
12  data sources that Mr. Weir used to do his sales
13  numbers calculations, those two big
14  spreadsheets?
15    A.  I did to the extent I replicated his
16  analysis, and so I used the same data that he
17  did when I did the corrections.
18    Q.  And after looking at that data, would
19  you agree that the data available required
20  Mr. Weir to make certain assumptions in order
21  to do his sales calculations?
22    A.  Because he didn't have sales data, I
23  think there's some work to be done to translate
24  production to sales.  So I think there are
25  assumptions you need to make.

**Lorin M. Hitt, Ph.D. - 5/30/2019**

Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 50 of 53 Page ID
#:7491

Jennifer Reitman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

1  Q.  Do you disagree with any of Mr. Weir's
2  assumptions beyond what's identified in your
3  report?
4  **A.  So I -- I disagree with them to the**
5  **extent that some are not conservative in the**
6  **sense that, for example, substituting MSRP for**
7  **actual price will tend to overstate things.**
8  **Using production data, not accounting for**
9  **various reasons why production may not equal**
10 **retail sales, is also a problem.  And it tends**
11 **to overstate it.  I didn't do any attempt to**
12 **come up with an alternative.**
13 Q.  So can you look at Page 38 of your
14 report, Table 4.  Does this table incorporate
15 all of the calculation corrections that you
16 made?
17 **A.  Yes.  This -- this is the before and**
18 **after for all the four major corrections that I**
19 **identified.**
20 Q.  So in your view, had Mr. Weir done the
21 math correctly under his methodology,
22 understanding that you disagree with the
23 methodology for a number of reasons, the proper
24 calculation of damages should have been
25 approximately 60 million as opposed to

Page 185

1  204 million?
2  Am I reading that right?
3  **A.  The way I characterize this is, had he**
4  **not made any mathematical errors, his analysis**
5  **would have gotten the 60.99 number.**
6  Q.  So the first error you identified was
7  using the wrong conversion factor for 25-pound
8  bag products.  Let's start -- that discussion
9  starts on Page 39.
10 Do you see that?
11 **A.  Yes.**
12 Q.  And actually, before we get to that, I
13 want to briefly just look at Table 5 to make
14 sure I'm interpreting this correctly.
15 So it's your opinion that had Mr. Weir
16 done the math right under his methodology, the
17 illegal sales damages would be approximately
18 17 million as opposed to 71 million?
19 **A.  Yeah.  17.54 is the number I got.**
20 **Yes, that's correct.**
21 Q.  Rounding heavily here.  Okay.
22 So then the conversion-factor issue,
23 how did you determine that that
24 kilogram-to-pound conversion was incorrect in
25 Mr. Weir's calculations?

Page 186

1  **A.  So I think both my research team and I**
2  **reviewed Mr. Weir's program code, and it**
3  **contains a design error, essentially.  And**
4  **once -- yeah, once I identify that, then**
5  **it's -- then it was just a question of**
6  **correcting it.**
7  Q.  Okay.  Mark this.
8  (Incidental comments off the
9  stenographic record.)
10 (Exhibit 2, Backup data to
11 Footnote 161, was marked for
12 identification.)
13 BY MS. BORRELLI:
14 Q.  You've been handed what's been marked
15 as Exhibit No. 2.
16 Do you recognize this document?
17 **A.  Yeah.  This is a portion -- this is a**
18 **printout of a portion of the backup for the**
19 **report.**
20 Q.  And so this includes 14 different
21 products, I believe; is that right?
22 **A.  Yes, this one includes 14.**
23 Q.  Okay.  And so is it right that these
24 14 products are the only ones that were sold in
25 25-pound bags, so those are the only ones that

Page 187

1  this error applied to?
2  **A.  I'd have to go back and look.  I think**
3  **that's correct.**
4  Q.  If there were others that --
5  **A.  If there were others that needed a**
6  **correction, it would have been on here.  And it**
7  **certainly would have been reflected in Table--**
8  **let me just count -- two, four, six, eight,**
9  **ten, twelve -- yeah, there are 16.**
10 **I'd have to go back and look to see**
11 **why those were -- it's possible that it was**
12 **because they don't appear in 25-pound bags, but**
13 **I'd have to go back and look at the original**
14 **program code to be certain.**
15 Q.  Okay.  Well, for example, if you look
16 at Table 4, there's one product, Tundra, which
17 is fourth up in the bottom where it says
18 there's a 0 percent decline in damages
19 estimate.  So I would imagine there were no
20 calculation errors associated with that; right?
21 **A.  Yeah, that's one of them.  I'm not --**
22 **and I have to look at the other one -- is the**
23 **other one -- let's see if I can identify it.**
24 **Yeah, I think that's right.  I think**
25 **you're -- you're just looking at this.  Not**

Page 188

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 51 of 53 Page ID
Jennifer Reitman and Carol Sliozar vs. Champion Petfoods USA, Inc., et al.
#:7492

1 absolutely certain, but pretty close to certain
2 that the reason it didn't make it on here is
3 because the 25.
4    Q.  Okay.  And in Exhibit 2, just titled
5 "Footnote 161," the dates on there, it says
6 2016 to 2018.
7      Is that because these products were
8 only sold in 25-pound bags between those years?
9    A.  Again, I believe that's correct.  I
10 would want to go back and check the original
11 source data, but I believe that's correct.
12    Q.  So the third column over in the table
13 in Exhibit 2 says, "Sales volume in kilograms."
14      So you would agree that the kitchen
15 data that Mr. Weir pulled this data from listed
16 product production in kilograms?
17    A.  Yes, consistently.
18    Q.  How did you --
19    A.  Including 2013.
20    Q.  How did you know that?
21    A.  That was communicated to us.  So
22 Mr. Weir, I think, used it for every year
23 except 2013.  And that was one thing my
24 research team interacted with counsel and
25 possibly Champion folks to figure out what was

1 the 2013 data, and their conclusion was it was
2 also kilograms.
3    Q.  Do you know who your research team
4 talked to at Champion about that issue?
5    A.  No, I don't know.
6    Q.  Could you find out?
7    A.  Presumably, yes.
8      MS. BORRELLI:  Counsel, we'd like
9 to know how -- how it was known that that was
10 in kilograms, because it's not apparent from
11 the data itself.  So we'd appreciate an answer
12 on that.
13 BY MS. BORRELLI:
14    Q.  Okay.  So then you take that and
15 correct the conversion factor; is that right?
16    A.  Yes.
17    Q.  Okay.
18    A.  So dividing by 2, dividing by 11.36.
19    Q.  And then you end up with 29.33 million
20 when you correct the conversion factor; is that
21 right?
22    A.  Which figure are you pointing to?
23    Q.  Under diminution of value damages,
24 there's a column --
25      (Simultaneous cross-talk.)

1    A.  There we go -- yes, that's correct.
2    Q.  Okay.  And then the next item you
3 identify as a math mistake is using the wrong
4 conversion factor and wrong price per unit for
5 2.5-kilogram bag products.
6      How did you identify that issue?
7    A.  It was the same kind of issue except
8 there were -- I think I suspect -- this is one
9 where my research team identified this one.
10 It's the same kind of issue where just
11 incorrect program code.  It's out of order.
12      And there was an adjustment made later
13 down in the program to like fix an error that
14 was created by this, and we undid that as well.
15    Q.  What error was that?  Do you recall?
16    A.  So a product code was converted to
17 another product code incorrectly.  And then
18 when the price was assigned, it was converted
19 to something else.  And that second conversion
20 was to fix the earlier error so it would match.
21 So we undid both of those.
22    Q.  So that's the price per unit that you
23 mentioned that was fixed?
24    A.  Yeah, that was that.
25      (Exhibit 3, Backup data to

1      Footnote 166, was marked for
2      identification.)
3 BY MS. BORRELLI:
4    Q.  Okay.  I've handed you what's been
5 marked as Exhibit 3.  Does this table show this
6 math correction that we were just discussing?
7    A.  Let me just line this up.  So it was
8 done in two stages.
9      Just check to see how this was done.
10      (Witness reviews document.)
11      Yes.  So this is -- these
12 footnotes are done in a way that's independent
13 of all of them.  So this would be the figure if
14 you just fixed this.  That's what I was trying
15 to sort out there.
16    Q.  Okay.  So looking at Exhibit 3, it
17 appears that this error only applied to five
18 products; is that a fair reading of this?
19    A.  Yes, I think that's correct.
20    Q.  Okay.  So for the other products on
21 this list where the decline in damages estimate
22 column indicates 0 percent, this particular
23 math error was not an issue?
24    A.  I believe that's correct.  I'd have to
25 check to see if it interacts with any of these

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-ROC-JPR Document 194-1 Filed 10/09/19 Page 52 of 53 Page ID
#:7493
Jennifer Keltman and Carol Shoaff vs. Champion Petfoods USA, Inc., et al.

others. But I think in terms of if you did this in isolation, these are the products that it directly affected.

Q. Okay. The next one you identify is including cat food products.

How did you identify that error?

A. I think that was another one where my research team found it while they were processing the data. And it was just a simple, you know, tabulated -- are there things that are flagged as cat in there? It's not much, but it's there.

(Exhibit 4, Backup data to Footnote 167, was marked for identification.)

BY MS. BORRELLI:

Q. I've handed you what's been marked as Exhibit 4. Does Exhibit 4 reflect this specific error that you identified in isolation?

A. Yes, that's correct.

Q. So it appears that it only affected one of the products; is that right? All the other ones say 0.0 percent.

A. Yes, that's correct.

Page 193

Q. And was this error identified based on the review of Mr. Weir's code or through a review of a list of product SKUs?

A. So it was -- it was found as part of doing the reanalysis. It's just there is a flag on there that identifies dog and cat. So it's just a simple calculation, like, wait a second; there's a cat product on here.

And that's how it's removed. It's just excluded cat product. Something that's flagged as cat.

Q. And the last one is the assuming that 2013 volume data represent units.

We briefly talked about this, but I just want to circle back. How did you become aware of that calculation error?

A. So this is one where we saw it. It's like -- yeah, it's one of those, as soon as you see data coming from roughly the same sources that seems to be different, we investigate it.

And the result of our investigation is it's our belief that it also represents in kilograms. And I think there's some ambiguity in the data because there's some fractional values in there that might have caused Mr. Weir

Page 194

to believe it could be something else.

But ultimately, based on our investigation, we believe that the data is in kilograms.

Q. You'd agree that looking at the face of the data, it's not particularly clear whether it was in kilograms or units?

A. Absent a data dictionary, you can't necessarily know. So that's an error that could have been made. But, again, further investigation is that's an error.

(Exhibit 5, Backup data to Footnote 170, was marked for identification.)

BY MS. BORRELLI:

Q. You've been handed Exhibit 5.

Does this reflect the correction in the math error for the units-versus-kilograms issue that we were discussing for the 2013 data?

A. Yes. This is when it's done in isolation.

Q. Yep.

A. And, yeah, together -- they're all done together to get the final number because

Page 195

some of these interact. But this is if you do this in isolation.

Q. So, again, for the products that have 0.0 percent for the decline-in-damages estimate, this calculation error did not apply; is that fair?

A. That's correct.

Q. So, again, once these four math errors are corrected, you would agree that at least Mr. Weir's math, based on the data he had and used, is correct --

MR. KESSLER: Object.

BY MS. BORRELLI:

Q. -- to your knowledge, sitting here today?

A. Sitting here today, this is what I think he would have gotten had he not made these errors, 60.99.

MS. BORRELLI: Can we go off the record?

THE VIDEOGRAPHER: We are going off the record. The time is 1:32 p.m.

(Recess.)

THE VIDEOGRAPHER: We're going back on. The time is 1:40 p.m.

Page 196

Lorin M. Hitt, Ph.D. - 5/30/2019
Case 2:18-cv-01736-DOC-JPR Document 194-1 Filed 10/09/19 Page 53 of 53 Page ID #:7494
Jennifer Keilman and Carol Shoatt vs. Champion Petfoods USA, Inc., et al.

BY MS. BORRELLI:

Q.  Dr. Hitt, we went through a number of the tables showing the corrections to the calculations based on the errors you identified for the diminution-in-sales damages.

Did you make those same corrections to the applicable products for the illegal sales damages, as Mr. Weir calls them?

A.  Yes, yes.  The code that generates -- they draw from the same data resource, just different numbers.  So, yeah, the same adjustments were made.  That's, I believe, Table 5 in my report.

Q.  And do you have any opinion in this case about whether a full refund is the appropriate damages model for the products that plaintiffs allege may contain pentobarbital?

A.  That's not something I evaluated.  I think it's mostly a legal conclusion.  There are some economics behind that, but that's not something I considered.

Q.  I just want to look briefly, again, at Appendix 3 to your report, which is your list of materials relied on.

A.  Okay.

Q.  So on Page 3 there's a list of publicly available materials.  Appendix 3 is at the very end.

A.  Okay.  So at the very, very, very --

MR. KESSLER:  I think it's two pages from the back.

THE WITNESS:  There it is.

Okay.  Good.  Yes.  Okay.

BY MS. BORRELLI:

Q.  So a number of the items listed here are things like Amazon.com, eBay.com, Jet.com, Petco.com.  How would I find out exactly what you were looking at there as a source?

A.  I believe we have screenshots of all that stuff.  I think it was produced.

Q.  I did get screenshots.  I just wanted to make sure that's what those are referring to.

A.  Yeah.  That's what -- that's what they should be.  Anything that -- those were all -- those retailers were all related.  When you see a retailer, most likely it's related to one of the price observations and the screenshots were taken.  I think they were produced.

Q.  Any items you can look at that -- or

that you looked at that you can think of today that are not on this list in Appendix 3?

A.  The only thing that I would add is I did read both in plaintiff depositions after I filed my report, but that wasn't relied upon in the report.

MS. BORRELLI:  Okay.  I think that is all I have for you, Dr. Hitt.  Thank you so much for your time.

THE WITNESS:  Okay.  Thank you.

MR. KESSLER:  I have no questions, Professor Hitt.  So with that, this deposition is concluded.

MS. BORRELLI:  Nice.

THE VIDEOGRAPHER:  This marks the end of today's deposition of Dr. Lorin Hitt.  This is Tape No. 3 of 3.  We are going off the record at 1:43 p.m.

MR. KESSLER:  We will read and sign the transcript.

THE COURT REPORTER:  Do you need a rough draft? expedite?

MR. KESSLER:  I need all of those things, a rough draft and an expedite, if possible.

MS. BORRELLI:  Aren't we done with these depositions now?

MR. KESSLER:  Is there any way you can give me the rough tomorrow?

THE COURT REPORTER:  Yes.  And what about the final?

MR. KESSLER:  I would like everything expedite.  The rough as soon as you can, and then Monday for the final.  Does that work?  Is that possible?

THE COURT REPORTER:  Sure.

MS. BORRELLI:  If you're doing a rough for him, can I just get it too?

(Videotaped deposition concluded at 1:43 p.m.)

C E R T I F I C A T I O N

I hereby certify that I have read the foregoing transcript of my deposition testimony, and that my answers to the questions propounded, with the attached corrections or changes, if any, are true and correct.

----------------------------------
LORIN M. HITT, PH.D.